UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

SHIELDMARK, INC.,                            )
                                             )        CASE NO.:    1:12-CV-223
        Plaintiff,                           )
                                             )
        v.                                   )        JUDGE DONALD C. NUGENT
                                             )
INSITE SOLUTIONS, LLC,                       )
                                             )
        Defendant.                           )        MEMORANDUM OPINION
                                             )        AND ORDER
                                             )


        This matter is before the court for claim construction.   The parties have filed written

submissions in support of their respective interpretations of disputed terms (ECF # 41, 42, 49, 50,

51), The Court has also heard oral arguments on the issue.


                    **FACTUAL AND PROCEDURAL HISTORY**

        ShieldMark, Inc. ("ShieldMark") filed this action against InSite Solutions, LLC ("InSite") on

January 30, 2012 to enforce it rights under United States Patent No. 8,088,480 B2 ("the '480

Patent"), which relates to adhesive tape that can be used as floor marking in industrial and factory

environments.  (ECF #1).  ShieldMark claims that Insite has willfully and deliberately made, sold,

offered for sale, and/or imported into the United States, adhesive tape that infringes the '480 Patent.

(ECF #1).  On March 5, 2012, ShieldMark filed an Amended Complaint indicating that the names of

the allegedly infringing products are "Superior Mark Tape" and "Last Mark Aisle Marking Tape."

(ECF #4).   The Infringement Contentions charge InSite with infringement of Claims 2-8, 10, 12 and

13 of the '480 Patent.  (ECF #19).  Shortly after filing its Amended Complaint, ShieldMark also filed a motion for Preliminary Injunction. (ECF #12).

In response, InSite filed a Motion to Dismiss, (ECF #14), and a Motion to Stay the Preliminary Injunction Proceedings,  (ECF #15), both of which were denied.  (ECF #23).  InSite then filed a Motion for Summary Judgment arguing that the '480 Patent is invalid under the "public use" and "on-sale" bars under 35 U.S.C. § 102, and that it is invalid for obviousness under 35 U.S.C. §103.  The Court denied this motion, finding that these questions require a determination of disputed material facts, and are, therefore, inappropriate for resolution at the summary judgment stage.  (ECF # 52).  The issue is now before the Court on claim construction issues relating to various terms in Claims 2, 4, 5, 6, and 7.


## **LEGAL STANDARD**

In order to determine the proper construction of disputed claims, the Court must look to several sources identified by the Patent Act, and by those Federal Courts that have interpreted and clarified the requirements of the Act.   However, non-technical terms may not require elaborate interpretation.  *See Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001).  "The criterion [for claim construction] is whether the explanation aids the court and the jury in understanding the term as it is used in the claimed invention."  *Funai Elec. Co. V. Daewoo Elecs. Corp*., 616 F.3d 1357, 1366-67 (Fed. Cir. 2010).

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  *Philips v. AWH Corp*., 415 F.3d 1303, 1312 (Fed. Cir. 2005)(*quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d

1111 (Fed. Cir. 2004); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)("we look to the words of the claims themselves . . . to define the scope of the patented invention").   Further, although Congress has required that a patent specification should include a segment wherein the inventor "shall particularly specify and point out the part, improvement, or combination, which he claims as his own invention or discovery," (Act of July 4, 1836, ch. 357, § 6, 5 Stat. 117, 119), the Supreme Court has long since made clear that the claims themselves are "of primary importance, in the effort to ascertain precisely what it is that is patented." *Merrill v. Yeomans*, 94 U.S. 568, 570 (1876); *see also, e.g.*, *White v. Dunbar*, 119 U.S. 47, 52 (1886); *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 339 (1961).

In determining what the claims mean, the Federal Circuit has repeatedly held that the words of the claim are generally to be given their ordinary and customary meaning, and has defined "ordinary and customary meaning" as "the meaning that the term would have to a person of ordinary skill in the art in question" at the time of the effective filing date of the patent application. *Philips*, 415 F.3d at 1312-13 (citations omitted).  A person of ordinary skill in the art is presumed to have read the claim not only in the context of the particular claim containing the disputed term, but in the context of the entire patent, including the specification, and with knowledge of the prosecution history. *Multiform Desiccants, Inc. v. Medzan, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).

The specification is "the single best guide to the meaning of a disputed term," and the specification "acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Philips* at 1320 (*quoting Vitronics*, 90 F.3d at 1582; *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004)).   Section 112 of the Patent Act, 35 U.S.C. § 112, states that the specification

> shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains ... to make and use the same... [and] ... shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Although reference to the specification is potentially highly useful in construing or defining specific terms, or in providing context to terms within the individual claims, the Federal Circuit has warned courts against reading limitations from the specification, most especially from the description of specific or preferred embodiments, into an individual claim. *Philips* at 1322; *Texas Digital Systems, Inc. v. Telegenix, Inc.,* 308 F.3d 1193 (Fed. Cir. 2002); *Nazomi Communications, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005); *Gemstar-TV Guide Int'l, Inc. v. ITC*, 383 F.3d 1352, 1366 (Fed. Cir. 2004). "The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of the claims." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995)(en banc)(reaffirmed by *Philips* at 1312).

The Federal Circuit has also long held that the prosecution history may be relevant when attempting to interpret disputed terms in the claim language of a patent. The prosecution history is relevant in so far as it may provide some evidence as to how the inventor, and the United States Patent and Trademark Office ("PTO") understood the patent, and as to whether the inventor, by disclaiming a particular interpretation of the patent, "limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Philips* at 1317 (citing *Vitronics*, 90 F.3d at 1582-83); *see also Chimie v. PPG Indus., Inc*., 402 F.3d 1371, 1384 (Fed. Cir. 2005); *ZMI Corp. V. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1580 (Fed. Cir. 1988).

The language of the claim, the information contained in the specification, and the prosecution history available through the public notice requirements in the patent process are all

- 4 -

considered intrinsic sources for determining the meaning of disputed terms in a patent claim.  In

addition, outside or extrinsic sources such as dictionaries, treatises, and expert testimony may all be

considered to discern the meaning of disputed terms so long as they do not "contradict claim

meaning that is unambiguous in light of the intrinsic evidence."  *Philips* at 1324 (*citing Vitronics*, 90

F.3d at 1583-84; *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003).


## <u>ANALYSIS</u>

InSite has identified thirteen terms that it believes require construction.  ShieldMark,

although contending that most of these claims require no additional construction or definition, has

agreed to InSite's proposed construction for seven of these claims.   Therefore, the Court will adopt

the agreed upon construction for the following terms:


| <u>Claim Terms</u> | <u>Agreed Meaning</u> |
|---|---|
| 1. "a thickness" (Claim 2) | "a distance between the upper surface and the lower surface" |
| 2. "peel adhesion greater than 2.0 Lb/in width" (Claims 2, 5) | "a measure of strength of an adhesive bond between the adhesive tape and a test surface greater than 2 lbs for each inch of width" |
| 3. "peeling the tape at a 90 degree angle" (Claim 2) | "The angle between the test surface and the direction of the force which is pulling the tape from the test surface is 90 degrees" |
| 4. "allowing a dwell time of one hour" (Claim 3) | "waiting one hour from sample preparation to conduct the test method" |
| 5. "pressure sensitive" (Claim 13) | "capable of adhering with application of pressure" |

6.  "peeled at a 90 degree angle"          "the angle between the test surface and the direction of
    (Claim 5)                             the force which is pulling the tape from the test surface
                                          is 90 degrees"

7.  "dwell time of 1 hour"                "waiting one hour from sample preparation to conduct
    (Claim 5)                             the test method"

       The remaining six terms at issue are found in Claims 2, 4, 5, 6, and 7.    In Claim Two there

are two disputed terms: "double sided adhesive layer" and "substantially continuous contact."  InSite

contends that "double sided adhesive layer" should be defined as "a substrate having adhesive on

opposing or both surfaces."  ShieldMark proposes that the construction should be "a layer with

adhesive on both sides."  On the surface, these definitions actually appear to have the same meaning.

However, during oral arguments, ShieldMark  argued that "a layer with adhesive on both sides" is a

layer of adhesive that is sticky on both sides.  This appears to be at odds with the literal meaning of

the language proposed.   The plain meaning of ShieldMark's proposed language would more

logically be explained as a layer (of unidentified material) *with* adhesive on both sides, which would

be entirely consistent with InSite's proposal that there is a layer (InSite calls it a "substrate") that has

adhesive on both sides, similar to double-sided carpet tape.  Nonetheless, the Court will address

ShieldMark's proposed construction as it was explained and presented at oral argument.

       The '480 Patent distinguishes between a "layer of adhesive" and a "double-sided adhesive

layer."  The inventor clearly used different terms to describe different concepts related to the

adhesive.  Claim One and Claim Five, as well as the Patent specification speak of "a layer of

adhesive material" and "a layer of pressure-sensitive adhesive material" without any restriction or

requirement that the layer is "double-sided."  In Claim Two, however, the claim requires a "double

- 6 -

sided adhesive layer." Claim differentiation requires that the Court recognize differences in claims when the inventor uses different words in different claims. *CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000); *Tandon Corp. V. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987). To do otherwise would render certain claim terms superfluous. *Id.*

If the Court were to adopt ShieldMark's argued interpretation, the choice of distinguishing Claim Two's "double sided adhesive layer" from the "adhesive material" in Claims One and Five would be rendered superfluous. ShieldMark attempted to preserve the separate meaning of the two terms by proving to the Court that some adhesives are sticky on only one side, and others are sticky on both sides. Their attempt failed, however, as the examples they provided of adhesives that are supposedly sticky on only one side (i.e. paint, shellac, sealing wax) actually reinforce the concept that any adhesive, prior to curing or attachment to another surface, is an all around amorphous and sticky substance that has no differentiation between a sticky and a non-sticky side. Exhibits 5 and 6, offered as examples of double sided adhesive not attached to a substrate also failed to support ShieldMark's contentions. These exhibits intended to show that adhesive can, without attachment to any other material or substrate, constitute an identifiable layer that is sticky on both sides. However, they also ended up only reinforcing the idea that adhesive is an overall sticky material with no clear form or shape that could be identified or differentiated as having a single sticky side or being sticky on two sides.

There has been no showing that there is any differentiation between a single sided and double sided adhesive. Therefore, it appears from the evidence and arguments presented that "adhesive" is generally a term for a material that is sticky throughout without regard to shape or

- 7 -

surface configuration. In other words, adhesive is sticky on any and all sides.  ShieldMark's construction would, thus,  render the disputed term superfluous and provide no contrast to the clearly different language chosen to describe the adhesive layers in other claims of the Patent.  The only way to give meaning to the term "double sided adhesive layer," and to differentiate it from the term "layer of adhesive material," is to accept InSite's construction of the term which requires that an adhesive be present on both sides of a center layer of non-adhesive material.  Further, the meaning of "double sided adhesive layer" is illustrated in the Examples section of the '480 Patent.  In that section, double-sided carpet tape is presented as an example of this layer of the patented product. ShieldMark has not contested that double-sided carpet tape is a layer of non-adhesive material covered on both sides by an adhesive, which aligns completely with InSite's proposed construction.

Another issue arises, however, in adopting InSite's proposed construction verbatim.   InSite has proposed using the term "substrate" rather than "layer" to describe the material that has adhesive on both sides.   InSite has sought to define the term "substrate" under Claim 6 as "a thin protective strip of material that is attached to adhesive to prevent the adhesive from undesirable adhering to items during storage or transport; the strip is intended to be removed and thrown away; such is often referred to as a 'release liner.'" The material holding the adhesive in the "double sided adhesive layer" discussed in Claim 2 does not appear to be intended as a release liner, and certainly there is no indication that it would be limited to the same definition of substrate InSite advanced in connection with Claim Six.  Further, the general definition of "substrate" contains limitations that the term "layer" does not, as it implies a specific location relative to other layers of the product. Therefore, it would be more accurate to adopt a construction consistent with InSite's arguments, but more closely resembling ShieldMark's actual proposed language.  The term "double sided adhesive

layer" in Claim 2, therefore, is to be defined as "a layer of non-adhesive material with adhesive on both sides."

The second disputed term in Claim 2 is "substantially continuous contact." InSite proposes that this term be defined as "substantially uninterrupted contact." ShieldMark on the other hand seeks to have it defined as "largely but not wholly uninterrupted contact." InSite's proposal does nothing to clarify the language set forth in Claim 2 and both parties apparently agree that "continuous" is the same as "uninterrupted." If this were the only word in contention, the claim language would require no definition as it is clear to any reasonable person. ShieldMark, however, has also proposed to define "substantially" as "largely but not wholly." This proposed definition is at odds with the generally understood meaning of the word, as well as with the context provided by the '480 Patent and its prosecution history.

The general ordinary definition of "substantially" is "to a great or significant extent" or "essentially." This definition does not exclude something that is wholly continuous, as ShieldMark has proposed. Further, the drawings of the Patent clearly show the adhesive layer to be wholly in contact with the polymer layer. As argued by InSite, the word "substantially" was not included in the specification and is not expressed in the drawings. Rather, it was added to claims late in the patent process to avoid any argument that a slight bubble or break in the adhesive to polymer contact, such as could be caused by manufacturing variations or the possible presence of dust or contaminates between the layers, would differentiate a product from the patented invention.

The word "substantially" is also used in several other places in the patent. It can be found in the specification, at column 2, line 65 ("substantially improved"), and column 3, lines 7 ("substantially increased") and 23 ("substantially increased"). In those instances substantially

- 9 -

clearly does not mean "largely but not wholly."  Rather "substantially" is used as a modifier to indicate a great deal of improvement or a significant increase, or to indicated improvement and increase without setting forth any precise amount that is required.  Therefore, it appears clear within the four corners of the patent, as well as in the history of its prosecution, that "substantially" is used throughout to indicate a general compliance or manifestation with the modified description, without any requirement of exactness.  In the context of "substantially continuous contact," the word has been used to mean generally in contact but not necessarily exactly or precisely so.  In other words the term should be construed as  "largely, but not necessarily wholly."   For the same reasons, "substantially" will be construed in the same manner in Claims Four and Five.  The term "substantially continuous contact" from Claim Two is, therefore, defined as "largely but not necessarily wholly, uninterrupted contact."

In Claim Four, the parties disagree on the meaning of the term "substantially planar floor." As set forth above, "substantially" shall be construed as "largely, but not necessarily wholly."  Both ShieldMark and InSite agree that "planar" is defined as "flat."  InSite contends further that "floor" should be defined as a "surface on which items or people may be supported."  ShieldMark supports leaving "floor" undefined.  The Court finds that "floor" is a term that should be construed according to its ordinary and customary meaning without imposing any limitations or restrictions not specifically included in the claim language itself.   Further explanation is not necessary to aid the court or the jury in understanding this terms as it is used in the claimed invention.   Therefore, the claim term "substantially planar floor" from Claim Four shall be defined as "a floor that is largely, but not necessarily wholly, flat."

- 10 -

In Claim Five, the parties dispute the meaning of "substantially uniform thickness."  The Court has, for the reasons set forth above, determined that "substantially" should be defined as "largely, but not necessarily wholly."  The parties also previously agreed on the meaning of "thickness" which they have jointly defined as "a distance between the upper surface and the lower surface."  The word "uniform" is a term that clear to the general public and should be construed according to its ordinary and customary meaning without imposing any limitations or restrictions not specifically included in the claim language itself.   Further explanation is not necessary to aid the court or the jury in understanding this terms as it is used in the claimed invention.  InSite's proposed definition substantially changes the meaning of the term adding limitations and motives that are in no way identified by the language or the context of the '480 patent.

InSite and ShieldMark also both include an additional description not present in the claim language that requires there be no steps and no deviations or protrusions.  While not inclined to add limitations or explanations not specifically articulated in the patent, ShieldMark has argued that these additional explanations were part of the definition of "substantially uniform thickness" as the term was understood by the Patent Office, and that they were necessary to overcome prior art and obviousness issues raised by the Patent Office.  Further, InSite has not objected to the inclusion of these limitations or explanations and has proposed the same basic definition itself.   Thus, the Court will accept that these exclusions were intended as part of the term's definition.  The  term "substantially uniform thickness" as used in Claim Five is, therefore, defined as "a largely, but not necessarily wholly, uniform distance between the upper surface and the lower surface without significant deviations, protrusions, or steps."

Claim Six uses the term "substrate."  InSite argues that "substrate should be defined as "a thin protective strip of material that is attached to adhesive to prevent the adhesive from undesirable adhering to items during storage transport; the strip is intended to be removed and thrown away; such is often referred to as a 'release liner.'"  ShieldMark proposes to define "substrate" simply as "layer," although the definition it cites is actually "a layer lying under another."  The Patent itself does not limit the "substrate" in Claim Six to being a release liner.   While both parties agree that a release liner satisfies the "substrate" requirement of Claim Six, ShieldMark contends that other types of layers could also satisfy the requirement.

Indeed, this interpretation is supported by the language and context of the '480 Patent. The Specification provides that a release liner is an example of the "substrate," but even the language used therein does not limit it to that.  The language cited by InSite makes clear that the additional layer is not limited by the description that follows.  "It may *optionally* have an additional layer, *such as* a laminating substrate... The laminating substrate *is usually* peeled off . . . *however, there are no particular limitations* on the materials used on the laminating substrate... Fig. 1 *is an example*... *wherein* a layer of polymeric material ...."  The Federal Circuit has clearly instructed that it is improper to read a limitation from the written description into the claims, and that only the claims define the invention to which the patentee has the right to exclude.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312, 1319-20 (Fed. Cir. 2005).

Claim Six does not include any language that would limit the "substrate" to always being a release liner.  While InSite's proposed definition is under-inclusive,  ShieldMark's proposed definition of "layer" is over-inclusive.  A "substrate,"  as the definition provided by ShieldMark indicates, is a layer that is specifically situated below another layer.   Defining it simply as a "layer"

- 12 -

would eliminate the locational directive included in the term "substrate," robbing the inventor's word choice of its full meaning. "Layer" is used repeatedly throughout this patent and "substrate" was presumably chosen in Claim Six to indicate something more limited or precise. The Patent language clearly indicates that "substrate" is meant to be differentiated from the term "layer" in some manner. Therefore, "substrate" is defined as "a layer under or below another layer."

Claim Seven includes the term "textured surface." ShieldMark proposes the following definition: "a surface characteristic perceptible to one's touch." InSite begins with the same phrase and adds: . . . "a tactile property of the surface that is rough or raised; not smooth to the touch." ShieldMark's definition would include all surfaces within its definition, be they smooth, dimpled, raised, rough, or otherwise. InSite's proposed definition excludes smooth surfaces, and possibly unintentionally certain other tactile configurations such as a dimpled surface. To accept ShieldMark's definition would render the use of the term "textured" completely superfluous, as by their definition, every surface is textured by virtue of being capable of touch. This is clearly not the meaning intended or expressed in the patent language. While under normal circumstances the Court would assume that "textured surface" would be clear to the general public and should be construed according to its ordinary and customary meaning without imposing any limitations or restrictions not specifically included in the claim language itself, because the definition proposed by ShieldMark is so far afield, the Court will impose a construction consistent with that ordinary and customary meaning in order to preclude arguments that do not comport with a reasonable interpretation of the stated language. "Textured surface" in Claim Seven shall be defined as "a surface with a tactile property that is not smooth."

## CONCLUSION

For the reasons set forth above, the Court adopts the undisputed claim constructions offered by the parties.  The proposed definitions of disputed terms have been considered and the construction supported by the Patent and by the ordinary and customary meaning of the language chosen by the patentee have been decided.  The adopted definitions are set forth below.

1.  "double sided adhesive layer" (Claim 2)    "a layer of non-adhesive material with adhesive on both sides"

2.  "substantially continuous contact" (Claim 2)    "largely, but not necessarily wholly, uninterrupted contact"

3.  "substantially planar floor" (Claim 4)    "a floor that is largely, but not necessarily wholly, flat"

4.  "substantially uniform thickness" (Claim 5)    "a largely, but not necessarily wholly, uniform distance between the upper surface and the lower surface without significant deviations, protrusions, or steps"

5.  "substrate" (Claim 6)    "a layer under or below another layer"

IT IS SO ORDERED.

 /s/ Donald C. Nugent
DONALD C. NUGENT
UNITED STATES DISTRICT JUDGE

Date:   February 13, 2013

- 14 -