IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

- - -

SHIELDMARK, INC.,     )

     Plaintiff,     )

     vs.            )    1:12-CV-00223-DCN

INSITE SOLUTIONS,     ) Judge Donald C. Nugent

     Defendant.     )

- - -

     Deposition of THOMAS R. GOECKE, a
Witness herein, called by the Defendant for
cross-examination pursuant to the Federal
Rules of Civil Procedure, taken before me,
the undersigned, Michael G. Cotterman, a
Notary Public in and for the State of Ohio,
at 106 South Main Street, 4th Floor, Akron,
Ohio, on Thursday, the 25th day of April,
2013, at 9:40 o'clock a.m.

---------------------------------------------

BISH & ASSOCIATES, LLC

150 Smokerise Drive

Wadsworth, Ohio  44281

330-336-1280

FAX 330-336-7956

E-Mail: bishinfo@bish-associates.com

EXHIBIT A

APPEARANCES:


        On Behalf of the Plaintiff:

                Dubyak, Connick, Sammon,
                Thompson & Bloom

        By:  Mark B. Cohn, Att. at Law
             3401 Enterprise Parkway
             Suite 205
             Cleveland, Ohio  44122
             216-364-0500
             mark@markcohnlaw.com


                Brennan, Manna & Diamond

        By:  W. Scott Harders, Att. at Law
             75 East Market Street
             Akron, Ohio  44308
             330-253-3715
             wsharders@bmdllc.com



        On Behalf of the Defendant:

                Renner, Kenner, Greive, Bobak,
                Taylor & Weber

        By:  Ray L. Weber, Att. at Law
             Laura J. Gentilcore, Att. at Law
             400 First National Tower
             106 South Main Street
             Akron, Ohio  44308
             330-376-1242
             rlweber@rennerkenner.com
             ljgentilcore@rennerkenner.com


ALSO PRESENT:


        Cliff Lowe


                    -  -  -

EXHIBIT A

I N D E X

Exhibit No.                                    Page/Line

Defendant's Exhibit No. 1          6 / 19
      "              "    No. 2          6 / 19
      "              "    No. 3         91 /  8
      "              "    No. 4        106 / 24
      "              "    No. 5        110 /  1
      "              "    No. 6        122 /  1
      "              "    No. 7        138 /  9
      "              "    No. 8        140 /  5
      "              "    No. 9        142 / 22
      "              "    No. 10       152 / 21

Defendant's Exhibit No. 11         155 / 12
      "              "    No. 12       157 / 18
      "              "    No. 13       159 / 17
      "              "    No. 14       162 / 19
      "              "    No. 15       163 /  6
      "              "    No. 16       163 /  6
      "              "    No. 17       167 / 23
      "              "    No. 18       173 /  1
      "              "    No. 19       180 /  6
      "              "    No. 20       180 /  6

Defendant's Exhibit No. 21         181 /  8
      "              "    No. 22       184 /  2
      "              "    No. 23       188 /  8
      "              "    No. 24       189 /  6
      "              "    No. 25       192 / 18
      "              "    No. 26       193 / 20
      "              "    No. 27       197 /  3
      "              "    No. 28       199 / 20
      "              "    No. 29       201 /  8
      "              "    No. 30       203 /  9

Defendant's Exhibit No. 31         203 /  9
      "              "    No. 32       203 /  9
      "              "    No. 33       205 / 21
      "              "    No. 34       206 / 22
      "              "    No. 35       209 /  6
      "              "    No. 36       212 / 10
      "              "    No. 37       213 / 14
      "              "    No. 38       217 /  4
      "              "    No. 39       220 / 13

      "              "    No. 40       222 / 17

EXHIBIT A

I N D E X (Cont'd)


Defendant's Exhibit No. 41      223 /  4

    "           "    No. 42      224 /  6

    "           "    No. 43      225 / 16

    "           "    No. 44      233 /  4


                    - - -


Examination By:                 Page/Line



MR. WEBER                        5 /  9



MR. COHN                        -- / --


                    - - -

EXHIBIT A

1            THOMAS R. GOECKE

2    of lawful age, a Witness herein, called for

3    examination, as provided by the Rules of

4    Civil Procedure, being by me first duly

5    sworn, as hereinafter certified, deposed and

6    said as follows:

7                  - - -

8            CROSS-EXAMINATION

9    BY MR. WEBER:

10       Q.  Would you state your name for the

11   record please?

12       A.  My name is Thomas R. Goecke.

13       Q.  Okay.  Mr. Goecke, have you ever had

14   your deposition taken before?

15       A.  No.

16       Q.  Okay.  You've attended at least one

17   deposition that I'm aware of, have you

18   attended any others?

19       A.  That was my first one.

20       Q.  That was your first, okay.  So you

21   understand that you're under oath?

22       A.  Yes, I do.

23       Q.  And you understand that a record is

24   being made of everything that's going here,

25   including my questions and your answers?

EXHIBIT A

1      A.  Yes, I do.

2      Q.  Okay.  If you don't understand a

3  question that I propound, it's probably my

4  fault, not yours, so I don't want you to

5  hesitate to ask me to restate it, rephrase it

6  or whatever so that you understand the

7  question before you answer it, is that fair

8  enough?

9      A.  That's fair.

10      Q.  Okay.  And we can take a break any

11  time anyone wants to, and there are a number

12  of people with gray here in the room so that

13  may be with some frequency, but I would just

14  ask that we don't have a question pending

15  when we take a break, okay?

16      A.  Okay.

17          MR. WEBER:  All right.  We'll get

18  right to these two first.

19                  (Defendant's Exhibit

20                  Nos. 1 and 2 marked

21                  for identification.)

22  BY MR. WEBER:

23      Q.  Have you seen Exhibit 1 before?

24      A.  Maybe via e-mail.

25      Q.  Okay.  That's just a notice of your

EXHIBIT A

1   personal deposition, so you understand that

2   you're here to testify personally; is that

3   correct?

4       A.  Yes, I do.

5       Q.  Okay.  And then Exhibit 2, have you

6   ever seen that before?

7       A.  This is my first time seeing this.

8       Q.  Okay.  I'd like for you to look back

9   on the last page of Exhibit 2, which is a

10  notice of deposition of your company, and it

11  lists eleven matters for examination, it's

12  back on page three.  Have you seen that list

13  before?

14      A.  This is the first time.

15      Q.  Okay.  Well, would you look over the

16  list and tell me if, despite the fact that

17  you've not seen it before, have you prepared

18  yourself to testify on those topics?

19      A.  Yes, I have.

20      Q.  Okay.  And what did you do to prepare

21  yourself to testify?

22      A.  I met with counsel.

23      Q.  Okay.  Anything else?

24      A.  Just went over what happens in a

25  deposition and how --

EXHIBIT A

1           MR. COHN:  The subject of our

2    meeting, unless you're talking about

3    separately from our meeting, the subject of

4    our meeting is privileged.

5    BY MR. WEBER:

6       Q.  Yeah, I don't want you to tell me

7    what you discussed with counsel, but did you

8    do anything else besides a meeting with

9    counsel, did you look at documents, did you

10   go through your corporate files, did you

11   look at your calendar, anything of that

12   nature?

13      A.  I prepared a summary of events.

14      Q.  Sort of a time chart?

15      A.  Yes.

16      Q.  Okay.  And did you prepare that for

17   your use?

18      A.  No, for the attorneys.

19      Q.  For the attorneys' use.  When did you

20   prepare that?

21      A.  Probably shortly after I received the

22   '480 patent.

23      Q.  Before you received the '480 patent?

24      A.  Once I received the '480.

25      Q.  Once you received it, okay.  And was

EXHIBIT A

1   that a chronology of events that bear upon

2   this lawsuit?

3            MR. COHN:  Objection, don't

4   answer, that's both attorney/client privilege

5   and it is work product.

6   BY MR. WEBER:

7       Q.  Why did you make up that list?

8       A.  On the advice of counsel, it's a good

9   thing to do.

10      Q.  On the advice of counsel or request

11  of counsel?

12           MR. COHN:  Objection, once you

13  characterize what counsel said, that's

14  privileged.  He's answered the question but

15  it's inappropriate, I'm not sure of the

16  difference.

17  BY MR. WEBER:

18      Q.  Okay.  Do you understand the

19  difference between advice and request?

20      A.  I guess you're splitting hairs, I'm

21  not sure what the difference is.

22      Q.  Okay, all right.  Could you share

23  with me your educational background?

24      A.  After high school I was drafted into

25  the service.  After the service I attended

EXHIBIT A

1   the University of North Dakota for two years,

2   transferred to Ohio State, graduated with a

3   bachelor's in accounting.  And after, after

4   that I received an MBA at Case Western

5   Reserve in 1985.

6       Q.  When did you receive your bachelor's

7   in accounting?

8       A.  1980, early 1980.

9       Q.  Did you, in your accounting

10  curriculum did you take any engineering

11  courses?

12      A.  Not in my accounting curriculum.

13      Q.  Have you ever taken any engineering

14  courses?

15      A.  Yes, industrial engineering courses

16  at part of my MBA program at Case Western

17  Reserve.

18      Q.  And what did those courses involve?

19      A.  They were more emphasized on how to

20  organize processes, to make the most

21  efficient and effective in an organization.

22      Q.  Would that be what's often referred

23  to as process engineering?

24      A.  Yes.

25      Q.  Let's talk about your employment

EXHIBIT A

1    history.  Share with me in the narrative, if

2    you will, your employment history from high

3    school to present?

4       A.  You'll have to give me some time

5    here, the years go by.

6       Q.  Okay.

7       A.  After high school, let's see, I

8    worked at a small stamping plant in

9    Coldwater, Ohio, Packs Manufacturing I

10   believe it was.  I was drafted into the

11   service, spent two years in the Army.

12      Q.  And when was that?

13      A.  '72 through '74.

14      Q.  Do you remember what your lottery

15   number was?

16      A.  I think it was 38.

17      Q.  Not a good number, okay.  So two

18   years in the service and then what, what did

19   you do in the service?

20      A.  I was a track vehicle mechanic.

21      Q.  A track vehicle mechanic?

22      A.  Yes.

23      Q.  Okay.  After the service what was

24   your next employment?

25      A.  I worked on a dairy farm with one of

EXHIBIT A

1   my friends.

2       Q.  Where was that?

3       A.  He held property in western Indiana.

4       Q.  And how long did you work on the

5   dairy farm?

6       A.  Until the fall of I guess it was '75

7   or might have been '76, it was probably '76,

8   then I went to the University of North

9   Dakota.

10      Q.  Now, when you were working on the

11  dairy farm, you were doing typical farming

12  chores?

13      A.  Milking cows, yes.

14      Q.  Feeding and milking and herding.  Did

15  you do any work while you were in college,

16  did you have any jobs?

17      A.  Yes, at the University of North

18  Dakota I worked in a service station at night

19  and I had some campus job that was measuring

20  light emissions at the different classrooms

21  or whatever, I think it was mostly a

22  make-work project.

23      Q.  Your next employment venture?

24      A.  After I graduated from Ohio State I

25  obtained a job at Parker Hannifin in

EXHIBIT A

Page 13

1    Cleveland, Ohio.

2        Q.  And what did you do at Parker

3    Hannifin?

4        A.  I started out as a cost accountant

5    and ended up as a cost accounting supervisor.

6        Q.  How long were you with Parker

7    Hannifin?

8        A.  Until I think 1987.

9        Q.  And what did you do next?

10       A.  I was in a job at All Type Software

11   in Pearl Heights, Ohio.

12       Q.  How do you spell --

13       A.  Or not Pearl Heights, on Pearl Road

14   in Middleburgh Heights, Ohio.

15       Q.  And how do you spell All Type?

16       A.  A-L-L, and then T-Y-P-E.

17       Q.  Two words?

18       A.  Right.

19       Q.  Okay.  And what was the nature of the

20   business at All Type Software?

21       A.  They sold or were attempting to sell

22   an MRP system, material resource planning

23   system, that had Data General computers, it

24   was an educational job.

25       Q.  What did you do there?

EXHIBIT A

1       A.  Provided support as far as if the

2   sales team obtained an interested customer, I

3   could give them demos, going through the

4   software itself, and also assisted the sales

5   team making cold calls to try to attract

6   customers.

7       Q.  So was it basically a sales job that

8   you were engaged in?

9       A.  Yes, it was more related to sales.

10      Q.  It wasn't accounting?

11      A.  No.

12      Q.  Okay.  And how long were you with All

13  Type?

14      A.  For the two years.

15      Q.  So that took you to 1989?

16      A.  Correct.

17      Q.  And why did you leave All Type?

18      A.  I changed jobs to work for

19  Lear-Siegler in Maple Heights, Ohio.

20      Q.  I know you changed jobs but was there

21  a reason you changed jobs, did All Type go

22  out of business?

23      A.  No, All Type didn't go out of

24  business but it was what I considered a dead

25  end job so...

EXHIBIT A

1     Q.  Did you leave on good terms?

2     A.  Yes.

3     Q.  Same question for Parker Hannifin,

4  why did you leave Parker Hannifin?

5     A.  At the time I was working in Andover,

6  Ohio, at a plant they had there and I wanted

7  something closer to home.

8     Q.  And what was home?

9     A.  At that time I was living in

10  Lakewood, Ohio.

11     Q.  Then Lear-Siegler, where are they

12  located?

13     A.  They were located in Maple Heights,

14  Ohio.  I'm not sure they're still there, I

15  don't think they are.

16     Q.  And what did you do at Lear-Siegler?

17     A.  I was responsible for MRP

18  implementation.

19     Q.  What do you mean by implementation?

20     A.  They had procured a new

21  enterprise-wide software system that was

22  converted from one type of system to the

23  I.B.M. mainframe, whatever it was, and they

24  were struggling with trying to put it in.

25     Q.  What did you do -- well, let me ask

EXHIBIT A

1    you this, were you successful in implementing

2    their system for them?

3        A.  No.

4        Q.  How long were you with Lear-Siegler?

5        A.  Two years.

6        Q.  So that takes us to 1991?

7        A.  Correct.

8        Q.  Is that what you did your entire time

9    with Lear-Siegler, attempt to implement the

10   MRP?

11       A.  And give them evaluations of the

12   software, let them know that it was really

13   not implementable, it was a, not a good

14   software system.

15       Q.  Okay.  So after Lear-Siegler what did

16   you do?

17       A.  I worked for Price Waterhouse as a

18   consultant.

19       Q.  Are you a CPA?

20       A.  No.

21       Q.  How long did you work with Price

22   Waterhouse?

23       A.  Two years.

24       Q.  I'm seeing a trend here.  So that

25   takes us to 1993, correct?

EXHIBIT A

1    A.  Correct.

2    Q.  Now, when you say you worked for them

3  as a consultant, what, what type of

4  consulting did you do?

5    A.  They were implementing an activity

6  based cost system at -- not General Mills

7  but, shoot, I can't think of the name, a huge

8  breakfast cereal company -- Kellogg's,

9  Kellogg's.

10    Q.  In Battle Creek?

11    A.  In Battle Creek, Michigan, yes.

12    Q.  And you were a consultant on that

13  project?

14    A.  Yes.

15    Q.  Is that what you worked on totally

16  during your employment with Price

17  Waterhouse?

18    A.  Yes.

19    Q.  So in 1993 you left them and was that

20  on good terms?

21    A.  Yes.

22    Q.  And where did you go then?

23    A.  I went to Myers Industries or

24  Akro-Mils, a division of Myers Industries.

25    Q.  So you worked for the Akro-Mils

EXHIBIT A

1    division, right?

2         A.  Yes.

3         Q.  Is that a division or a subsidiary?

4         A.  A division.

5         Q.  And that was here in Akron, right?

6         A.  That's correct.

7         Q.  Out off of Waterloo Road?

8         A.  Off Waterloo Road, which is no longer

9    there.

10        Q.  Okay.  And what did you do for

11   Akro-Mils?

12        A.  I was responsible for systems

13   implementations, I oversaw purchasing, the

14   purchasing department, and responsible for

15   inventory control.

16        Q.  And what were the products of

17   Akro-Mils?

18        A.  They were keep boxes.

19        Q.  I'm sorry?

20        A.  Keep boxes.

21        Q.  Keep?

22        A.  Keep boxes, twelve gallons containers

23   with flip lids over the top, AkroBins and

24   multi-drawer plastic cabinets.

25        Q.  For nuts, bolts and --

EXHIBIT A

Page 19

1       A.  Correct.

2       Q.  -- sundry items.  Those were the

3  three major --

4       A.  Flower pots also.

5       Q.  Okay.  Were those all manufactured

6  here in the Akron area?

7       A.  Not the flower pots.

8       Q.  But the other three items were?

9       A.  Yes.

10       Q.  And how long were you with Akro-Mils?

11       A.  About ten years.

12       Q.  Okay.

13       A.  I broke your cycle.

14       Q.  I know, okay.  What was your starting

15  position at Akro-Mils, did you have a title,

16  like junior systems implementer?

17       A.  I believe it was MRP manager.

18       Q.  Okay.  And did that title change?

19       A.  No, it didn't.

20       Q.  So you were the MRP manager for

21  Akro-Mils for ten years?

22       A.  That's correct.

23       Q.  Is Myers Industries a publicly traded

24  company?

25       A.  Yes, it is.

EXHIBIT A

1       Q.  Was it publicly traded when you

2   worked there?

3       A.  Yes, it was.

4       Q.  Did you own any stock in Myers

5   Industries?

6       A.  Yes.

7       Q.  And was that stock that you obtained

8   as a part of your employment or stock that

9   you purchased independently or both?

10      A.  Both.

11      Q.  So you received Myers Industries

12  annual reports, didn't you, as a shareholder?

13      A.  Yes.

14      Q.  And what were the other divisions of

15  Myers Industries?

16      A.  There was the tire division, Myers

17  Tire, there was Patch Rubber of course.

18  There were others but I can't remember them

19  right now at this time.

20      Q.  Okay.  Myers Tire and Patch Rubber

21  were also right here in the Akron area; is

22  that correct?

23      A.  Not Patch Rubber, they were at one

24  time but not when I was there, they had

25  already moved.

EXHIBIT A

1      Q.  Okay.  And where, do you know where

2   they had moved to or to where did they move?

3      A.  Roanoke, North Carolina.

4      Q.  In your ten year period of employment

5   with Akro-Mils did you ever have any dealings

6   with Patch Rubber or any of the employees of

7   Patch Rubber?

8      A.  One time.

9      Q.  And when was that?

10     A.  They were looking at, at Christmas

11  time they always striped the floor at Myers,

12  similar to the way they do at other

13  locations, and I had called someone there, I

14  knew that they did it for highway marking and

15  inquired about doing it inside.

16     Q.  Do you recall who you talked to?

17     A.  No, I don't.

18     Q.  You wanted some marking done inside

19  the Akro-Mils plant?

20     A.  Correct.

21     Q.  And did, did Patch Rubber provide you

22  any materials to do the marking?

23     A.  No, they advised against it.

24     Q.  And why was that?

25     A.  They said they didn't want to use

EXHIBIT A

1   it, you really don't want to use it for

2   interior applications, the highway tape,

3   because it doesn't clean up well.  And my

4   understanding was that it was tar based on

5   the bottom side and the glass beads on the

6   top surface.

7       Q.  Those were reflective beads?

8       A.  Correct.

9       Q.  Are you saying that, what was it,

10  adhesive tar base?

11      A.  That was my understanding.

12      Q.  And you got that understanding from

13  the gentleman or the individual you talked

14  to?

15      A.  Correct, it was a gentleman but I

16  don't remember his name.

17      Q.  Okay.  And it didn't clean up well,

18  do you know why it didn't clean up well?

19      A.  I surmised that the reason it didn't

20  clean up well was the tar base.

21      Q.  Okay.  Well, was cleaning up well

22  important to you?

23      A.  Yes.

24      Q.  Why is that?

25      A.  Because if you need to lay down new

EXHIBIT A

1   material or whatever, it makes the process

2   difficult if you have to remove stuff that's

3   hard to remove.

4        Q.  Okay.  So by clean up well you meant

5   removability?

6        A.  Correct.

7        Q.  Did you care whether or not the tape

8   actually looked good on the surface and

9   cleaned up well on the surface?

10        A.  Of course.

11        Q.  Why do you say of course?

12        A.  Because when you put floor lines

13   down, you want to have something demarcating,

14   to have contrast with the surroundings.  And

15   with forklift truck tires traveling across

16   the top of the line, whatever the line is

17   made of, if it obscures that then it does not

18   serve its purpose as segregating wheeled

19   vehicles from foot traffic.

20        Q.  Okay.  Do you know if, if Patch made

21   any of this marking tape without glass

22   beads?

23        A.  No.

24        Q.  You don't know?

25        A.  I didn't know at the time.

EXHIBIT A

1    Q.  Okay.  I apologize, I think I

2  probably asked a negative question and I'm

3  not sure of the import of your answer so let

4  me approach it a different way.

5              Did Patch Rubber make marking

6  tape without glass beads at this time, the

7  time we're talking about?

8    A.  Not that I understood.

9    Q.  Okay.  Did you end up getting some

10  marking tape for your --

11    A.  No.

12    Q.  Why not?

13    A.  Because of the advise I received.

14    Q.  Well, did you get marking tape from

15  anybody?

16    A.  We continued to paint.

17    Q.  You continued to paint on the floor?

18    A.  Correct.

19    Q.  Okay.  Did you look for marking tape

20  from any other source?

21    A.  Not to my recollection.

22    Q.  Did you ask the folks at Patch Rubber

23  if they could lead you to a source that made

24  indoor marking tape?

25    A.  No.

EXHIBIT A

Page 25

1       Q.  Can you recall a reason why you

2    didn't do that?

3       A.  No.

4       Q.  Do you personally know anyone who

5    worked at Patch Rubber?

6       A.  No.

7       Q.  Okay.  I'd like for you to describe

8    for me in as much detail as you can the

9    product that Patch Rubber was making that you

10   found to be unsuitable based upon the advice

11   of the gentleman from Patch Rubber?

12              MR. COHN:  Objection.  You can

13   answer.

14              THE WITNESS:  My understanding is

15   that it was a glass beaded product with tar

16   adhesive on the bottom side.

17   BY MR. WEBER:

18       Q.  And what was --

19       A.  Used to adhere to pavement surfaces.

20       Q.  What was the top side of the

21   product?

22       A.  I don't really know, other than to

23   know that it included glass beads, the top

24   surface.

25       Q.  Well, was what the top surface was of

EXHIBIT A

1   any importance to you in looking for a tape

2   to meet the needs of your company?

3          MR. COHN:  Objection.

4          THE WITNESS:  The surface I'm sure

5   would make a difference, yes, what the top

6   surface was.

7   BY MR. WEBER:

8      Q.  Okay.  Explain to me what you mean by

9   it would make a difference?

10     A.  If you have a pebbly glass bead

11  surface, most likely it will be difficult to

12  clean.

13     Q.  Any other issues that you would or

14  did consider with regard to the top surface

15  when you were talking to Patch Rubber?

16     A.  No.

17     Q.  Did you have tow motors at Akro-Mils?

18     A.  Yes.

19     Q.  Did you want to have a tape that the

20  tow motors could go over without damaging

21  it?

22     A.  Yes.

23          MR. COHN:  Let me note an

24  objection, maybe he understood it but without

25  damaging it, what was it?

EXHIBIT A

1   BY MR. WEBER:

2       Q.  Without damaging the tape?

3       A.  Yes.

4       Q.  Okay.  Did those tow motors have

5   skids on them or use skids, forklifts to move

6   pallets along the floor surface?

7       A.  They moved skids.

8       Q.  Okay.  And did you want a tape that

9   would withstand impact with the skids?

10      A.  Yes.

11      Q.  Did you tell that to the person at

12  Patch Rubber?

13      A.  I don't believe.  I don't recall the

14  conversation other than to know that I had a

15  conversation of that nature that I spoke

16  about.

17      Q.  Well, you would have wanted a tape, a

18  marking tape that would have had a top

19  surface that would have withstood impact from

20  skids, correct?

21          MR. COHN:  Objection.

22          THE WITNESS:  Correct.

23  BY MR. WEBER:

24      Q.  Okay.  And the highway tape would

25  withstand impact from cars, trucks, vehicles

EXHIBIT A

Page 28

1    on the highway, right?

2        A.  To an extent.

3        Q.  Okay.  And beyond being reflective,

4    what did you understand the top surface of

5    the Patch Rubber product to be?

6            MR. COHN:  Objection.  You

7    chastised me for going over things twice,

8    I'll point that out to you.

9            MR. WEBER:  I didn't chastise you

10   for twice, it was about the fifth time that I

11   did, but in any event...

12           MR. COHN:  Well, we can disagree

13   about that.

14           MR. WEBER:  Okay, go ahead.

15           THE WITNESS:  What was the

16   question again?

17           MR. WEBER:  Would you read that

18   back, Mr. Cotterman.

19    (Previous testimony read back as requested.)

20           THE WITNESS:  A product used on

21   highways, where pneumatic tires travel across

22   it, that is used to adhere to pavement

23   surfaces.

24   BY MR. WEBER:

25       Q.  Were these glass beads embedded in

EXHIBIT A

Page 29

1   something?

2       A.   That is my understanding of the

3   tape.

4       Q.   Okay.  And was it your understanding

5   it was embedded in a plastic layer?

6            MR. COHN:  Objection.

7            THE WITNESS:  I do not know what

8   type of layer the glass beads at Patch Rubber

9   were inserted in.

10  BY MR. WEBER:

11      Q.   Inserted in?

12      A.   Applied to or...

13      Q.   Okay.  Can you put a general time

14  frame on when you contacted Patch Rubber, the

15  event that we've been talking about here for

16  the last ten minutes or so?

17      A.   Probably around 1999-2000, I'm not

18  sure.

19      Q.   When did you leave Patch Rubber?

20      A.   I didn't.

21      Q.   I'm sorry, I apologize, thank you,

22  when did you leave Akro-Mils?

23      A.   March of 2003.

24      Q.   And why did you leave?

25      A.   They were having financial

EXHIBIT A

Page 30

1    difficulties and I was, I selected myself to

2    leave because they needed to reduce my

3    department.

4        Q.  So it was a staff reduction?

5        A.  Uh-huh.

6        Q.  You volunteered to leave?

7        A.  I was brought in and told somebody in

8    my department had to go, so I volunteered.

9        Q.  Okay.  And what did you do next?

10                And let me just ask you, during

11   the entire period of time that you were at

12   Akro-Mils, did you mark the floors with

13   paint, is that your testimony?

14       A.  I didn't mark the floors with paint

15   but the floors were marked.

16       Q.  Were marked with paint at your

17   direction?

18       A.  No.

19       Q.  Okay.  Why did it -- well, okay,

20   strike that.

21                It wasn't a part of your job to

22   oversee or to have the floors marked at

23   Akro-Mils; is that correct?

24       A.  That is correct.

25       Q.  Okay.  Why was it you that ended up

EXHIBIT A

Page 31

1    contacting Patch Rubber for marking tape for

2    the floors?

3        A.  I was allowed some leeway because of

4    my purchasing role to look for things that

5    could be presented to the plant managers as

6    far as here's alternatives if you're

7    interested.

8        Q.  Did you ever go to the headquarters

9    of Myers Industries while you were working at

10   Akro-Mils?

11       A.  Yes.

12       Q.  Did you ever see a display of the

13   various products that the divisions of Myers

14   Industries make on display there at the

15   headquarters?

16       A.  Yes, I'm sure I did.

17       Q.  Did you see the Patch Rubber tape

18   there?

19       A.  I don't recall.  If I did, my memory

20   doesn't recollect that at any point in time

21   to say, oh, here's the floor tape.

22       Q.  Do you recall any, any of the Myers

23   Industries products that you did see on

24   display?

25       A.  Yes.

EXHIBIT A

1      Q.  Okay, what products do you recall?

2      A.  Tire stems, patch repair thread, the

3  needle you stick in the tire.

4      Q.  The tubeless tire plug?

5      A.  Correct.

6      Q.  Okay.  So after you left Akro-Mils in

7  March of 2003 what did you do?

8      A.  I ran ShieldMark Incorporated.

9      Q.  Now, is ShieldMark Incorporated the

10  Plaintiff in this lawsuit that brings us

11  together?

12     A.  Yes, it is.

13     Q.  Okay.  So you said you ran it, was

14  ShieldMark Incorporated in existence when you

15  left Akro-Mils?

16     A.  I had ShieldMark as an LLC started in

17  November of 2000 that I ran as a part-time

18  business.

19     Q.  And what were the, what was the

20  nature of the business of ShieldMark LLC from

21  November of 2000 until the time you left

22  Akro-Mils?

23     A.  There were different products that I

24  was looking at to develop to make internal

25  for a marking floor tape system, an internal

EXHIBIT A

Page  33

1    tape for inside buildings, inside factories

2    and warehouses.

3        Q.  Was your motivation for doing that

4    the inapplicability of the Patch Rubber

5    product to meet your needs at Akro-Mils?

6        A.  No.

7        Q.  Okay.  What was the, the germ, if you

8    will, for your effort in developing such a

9    tape?

10       A.  Well, across my career at different

11   points in time, starting with Parker

12   Hannifin, I noticed a tremendous amount of

13   manpower expended maintaining floor lines

14   that separated motor vehicles from foot

15   traffic and designated walking areas.

16       Q.  So you saw that at Parker Hannifin,

17   anywhere else?

18       A.  Lucas Aerospace.

19       Q.  Lucas Aerospace?

20       A.  Lucas Aerospace, if I can go back,

21   Lucas Aerospace was a result of the

22   Lear-Siegler, it used to be Lear-Siegler but

23   it became Lucas Aerospace, a British owned

24   company.  So.

25       Q.  So you saw the same issue at

EXHIBIT A

1  Lear-Siegler?

2      A.  Yes, or Lucas.

3      Q.  Or Lucas, okay.  And any other

4  observations that you made that led you to

5  this endeavor?

6      A.  No, no, other than, other than the

7  painting of floor lines was a messy process

8  that you had to, based on my training you

9  had to stop production while the lines, wait

10  for them to dry as opposed to an

11  alternative.

12      Q.  So for a period of about two and a

13  half years, while you were employed by

14  Akro-Mils, you were in this part-time venture

15  of ShieldMark LLC, exploring the development

16  of an indoor marking tape; is that fair to

17  say?

18      A.  That's correct.

19      Q.  Who all was involved in that effort

20  with you?

21      A.  Originally myself.

22      Q.  Let's take it on up to when you left

23  Akro-Mils, was it always you by yourself

24  until you left Akro-Mils?

25      A.  No.

EXHIBIT A

1      Q.  Okay.  Tell me who joined in the

2  effort?

3      A.  I contacted Advanced Plastics in

4  Wadsworth, Ohio, who was an extruder.

5      Q.  Why did you contact an extruder?

6      A.  The first cut of the product that I

7  envisioned I made out of an eighth inch thick

8  polycarbonate sheet, had it slit.  And I

9  thought that that would be something that

10  would work well, polycarbonate, but if you

11  have it in just four foot sections, it makes

12  it very difficult to, it makes it labor

13  intensive to put down.

14      Q.  So you wanted what, a long web of

15  this, or I don't know what you would call

16  it?

17      A.  Yes.

18      Q.  Would web be appropriate?

19      A.  I'm not sure if web is appropriate

20  but a roll.

21      Q.  Okay, all right.  And making a long

22  piece then, you would want to extrude it, is

23  that what you're saying?

24      A.  Yes.

25      Q.  So you contacted Advanced Plastics

EXHIBIT A

1   because they were extruders?

2       A.  That's correct.

3       Q.  What kind of products did they

4   extrude?

5       A.  Jump ropes, edging for cabinets, on

6   bookshelf cabinets, and they were also --

7   that's it, other bookshelf parts they make.

8       Q.  And who did you deal with at Advanced

9   Plastics?

10      A.  Phil Nye.

11      Q.  Phil Nye?

12      A.  Phil Nye.

13      Q.  Did you know of -- well, when did

14  you first learn of Advanced Plastics or Phil

15  Nye?

16      A.  I have to think about this.  I think

17  it was in 2001, sometime in 2001.

18      Q.  Were you just looking for a plastics

19  extruder?

20      A.  Correct.

21      Q.  Who were the other candidates, if

22  there were others?

23      A.  There was an extruder, and I forget

24  the name, in Strongsville, Ohio, that I

25  checked out also.

EXHIBIT A

1      Q.  Had Akro-Mils done any work with

2  Advanced Plastics?

3      A.  No.

4      Q.  Was Advanced Plastics a competitor of

5  Akro-Mils?

6      A.  No.

7      Q.  Did you first meet Phil Nye then as a

8  consequence of this venture in about 2001?

9      A.  Yes, I called him up.

10      Q.  And what did you tell him?

11      A.  That I had an idea and I had samples

12  of it, the slit sheets that I mentioned, and

13  I wanted to know if he would be interested in

14  making some on my behalf.

15      Q.  And what did he say?

16      A.  Well, he came back, gave me a quote

17  and let me know how much the dies would be,

18  went to making it.

19      Q.  Do you have any of the samples or

20  specimens that you first made in 2000,

21  November of 2000 through March 2003 time

22  period?

23      A.  No.

24      Q.  But you said the plastic material was

25  a polybicarbonate?

EXHIBIT A

1      A.  Polycarbonate.

2      Q.  Oh, just a polycarbonate.  And where

3  did you get did polycarbonate?

4      A.  From the sheets, I believe I procured

5  that from ET Plastics here in Akron, Ohio,

6  had them slit it for me.

7      Q.  And you had it slit did you say in

8  four foot lengths, these were four sheets

9  apparently you bought?

10     A.  No, they were forty-eight inch wide

11  by four foot long or six foot long sheets

12  that I had slit into four foot wide

13  sections.

14     Q.  Okay.  And did you put an adhesive on

15  the back of it?

16     A.  Yes.

17     Q.  What kind of adhesive did you put

18  on?

19     A.  I put a double-faced adhesive on the

20  back side of it.

21     Q.  Like a carpet tape?

22     A.  Yes.

23     Q.  Was it in fact carpet tape?

24     A.  Yes.

25     Q.  Why did you choose a double-backed

EXHIBIT A

1  tape?

2      A.  We wanted something that had two

3  sides.

4      Q.  What was the benefit of having --

5  well, okay, I don't want to get into this

6  argument again because the judge has already

7  ruled on it, but why did you want two sides

8  to the tape?

9      A.  One side to adhere to the polymer,

10  the underneath side of the floor striping,

11  the other side to adhere to the floor.

12      Q.  Okay.  Why would you need a cloth

13  layer or some type of an intermediate

14  material between those two faces, if you

15  will?

16      A.  I don't know if that's, if it is

17  totally necessary.

18      Q.  I mean did you ever consider just

19  rolling adhesive onto the back of the

20  polycarbonate and putting a silicone release

21  liner or something over it and be done with

22  it, back in 2000 through 2003?

23      A.  Not that I recall.

24      Q.  Where did you get the double-backed

25  tape?

EXHIBIT A

1           MR. COHN:  Are you talking about

2    this same time frame?

3    BY MR. WEBER:

4       Q.  Oh, yeah, yeah, we're still back in

5    the early days while you were doing this

6    part-time and you were still at Akro-Mils.

7       A.  I think we, the early version was

8    Cortape here in Akron, Ohio.

9       Q.  From Cortape?

10      A.  Cortape.

11      Q.  Are they still in business?

12      A.  Yes.

13      Q.  Where are they located, besides in

14   Akron?

15      A.  I don't know.  They're not

16   necessarily Akron, I think it's Tallmadge or

17   someplace.

18      Q.  Did you actually go to their facility

19   to get the tape?

20      A.  Yes.

21      Q.  Did you talk to anyone there about

22   what you were intending to use it for?

23      A.  I'm sure I probably did.

24      Q.  And did they then say, well, here,

25   this ought to fit your bill, or exactly how

EXHIBIT A

1    did you know what double-backed tape to get?

2        A.   Okay, when I first started off with

3    the slit sheets, I'm sure I procured that at

4    the hardware store.  After putting it onto

5    the product as it was coming out of the

6    extruder, I'm sure I worked with Phil Nye

7    because he had other applications where he

8    did apply tape and that's why we selected

9    Cortape, at least initially.

10       Q.   You chose Cortape because that's what

11   Nye was using?

12       A.   Had used in the past.

13       Q.   Okay.  Did you actually make any

14   product while you were still employed at

15   Akro-Mils, while you were doing this

16   part-time?

17       A.   Yes.

18       Q.   Okay.  So you built dies; is that

19   correct?

20       A.   Had dies made.

21       Q.   Okay, you had dies made and was that

22   through Mr. Nye?

23       A.   Yes.

24       Q.   And then Mr. Nye fitted those dies to

25   an extruder, is that fair to say?

EXHIBIT A

1      A.  Yes.

2      Q.  And then he put a bunch of

3  polycarbonate beads up in a hopper and melted

4  them and extruded the plastic, is that fair

5  to say?

6      A.  That's correct.

7      Q.  Okay.  And he extruded it what, onto

8  a conveyor of some sort that's moving this,

9  I call it a web, I'm sure there's a better

10  name, web is what I've always used in dealing

11  with vinyl film, stuff like that, but you

12  were moving this elongated, you were

13  developing this elongated piece, correct?

14      A.  That's correct.

15      Q.  And that's the reason you wanted to

16  extrude it, because you wanted it to be long,

17  right?

18      A.  That's correct.

19      Q.  Okay.  And that's the reason you went

20  no an extruder, that's the reason you went to

21  Mr. Nye, correct?

22      A.  Uh-huh.

23      Q.  Did you ever consider any other way

24  of making this long piece of polycarbonate

25  plastic to put adhesive on?

EXHIBIT A

Page 43

1       A.   Yes.

2       Q.   What other way did you consider?

3       A.   Using the same process but only doing

4    it wider.

5       Q.   Okay, doing it wider, which would

6    mean you would have a different die?

7       A.   And a larger machine.

8       Q.   Okay.  I mean but the natural way for

9    you to do this was to extrude it, right?

10      A.   Correct.

11      Q.   Okay.  I mean you didn't have to go

12   see an engineer to know that you'd want to

13   extrude this to make this long web of

14   polycarbonate, correct?

15      A.   That's correct.

16      Q.   So you were extruding, did you

17   actually go over and observe the production

18   runs, the first ones?

19      A.   Yes.

20      Q.   Okay.  And were these prototypes you

21   were making or did you package this up and

22   sell it to somebody or give it to somebody to

23   see how they liked it?

24              And I apologize, that was a

25   very poor question, I beat you to the punch

EXHIBIT A

Page 44

1   on that one.  Did you -- well, in fact let me

2   just step back.

3                  You had the die, we know the

4   die was fitted to the extruder, the extruder

5   was filled with pellets, it was heated up,

6   melted, and you started extruding this

7   polycarbonate strip, and when was the

8   adhesive applied?

9              MR. COHN:  Objection.

10             THE WITNESS:  After it left the

11  extruder.

12  BY MR. WEBER:

13    Q.  Okay.  Was there a period of time

14  where you let the extrudate cool down before

15  you applied the adhesive?

16    A.  Yes.

17    Q.  Did you actually take the extrudate

18  up in a roll and then in a separate process

19  apply the adhesive?

20             THE WITNESS:  I think maybe we

21  need to invoke the same procedure we did

22  yesterday.

23             MR. WEBER:  All right.  Well, I'll

24  come back to that.

25             MR. COHN:  I'll designate this

EXHIBIT A

1    answer as --

2    BY MR. WEBER:

3        Q.  Well, do you still use the same

4    process?

5        A.  What's that?

6        Q.  Do you still use the same process?

7               MR. COHN:  Objection, same thing.

8               MR. WEBER:  Well, no, he didn't

9    say what the process is.

10              MR. COHN:  I don't want him

11   talking about what his current process is,

12   whether it's changed or the same.

13   BY MR. WEBER:

14       Q.  Okay.  If I went out and bought a

15   piece of your material today, would I find it

16   has the double-backed tape on it?

17       A.  Yes.

18       Q.  All of your products?

19       A.  All of the tapes.

20       Q.  All of the tapes made in accordance

21   with your '480 patent?

22       A.  Correct.

23       Q.  But in any event, somehow you

24   extruded this and you got the tape on it, and

25   we're back here, let's talk about your first

EXHIBIT A

Page 46

1    run, okay, did you take the product and test

2    it?

3        A.  Yes.

4        Q.  How did you test it?

5        A.  Put it down on the floor at Advanced

6    Plastics.

7        Q.  Okay.  Did it stick to the floor?

8        A.  Initially.

9        Q.  Okay.  That suggests, did it

10   eventually come loose?

11       A.  Yes.

12       Q.  And why did it come loose?

13       A.  One of the things with the

14   polycarbonate is it's a stiff enough material

15   that when it was in a roll, it had a memory,

16   it wanted to come back up after, once it's on

17   the floor.

18       Q.  So it's sort of elastic, it wants to

19   recover?

20       A.  I don't know if elastic is the

21   correct term, I always called it memory, that

22   it wanted to go back to the form that it was

23   used to.

24       Q.  It had been in a roll for quite

25   awhile and so when you laid it down it wanted

EXHIBIT A

Page 47

1    to roll back up?

2              MR. COHN:  Objection.

3              MR. WEBER:  Is that correct?

4              MR. COHN:  Objection.

5              THE WITNESS:  I don't know about

6    roll back up but it wanted to go like this.

7    BY MR. WEBER:

8        Q.  It would raise up off the floor?

9        A.  Yes.

10       Q.  Okay.  And the raising up off the

11   floor, that force to your understanding would

12   be sufficient enough to break the engagement

13   of the adhesive, is that correct, or the bond

14   of the adhesive?

15       A.  Yes.

16       Q.  And I assume you eventually remedied

17   that problem, correct?

18       A.  Yes.

19       Q.  Okay.  How did you do that?

20       A.  Well, we looked at a thermoplastic

21   elastomer in its place.

22       Q.  In place of the polycarbonate?

23       A.  Correct.

24       Q.  Phil Nye -- well, strike that.

25              Did Phil Nye explain to you

EXHIBIT A

1    what was happening when it was lifting off of

2    the floor why the polycarbonate was doing

3    that?

4        A.  I'm sure we both came to the same

5    conclusion on that.

6        Q.  What's Phil Nye's background?

7        A.  He's an accountant I believe by

8    trade or finance, he was a banker prior to

9    --

10       Q.  Okay.

11       A.  -- prior to buying Advanced

12   Plastics.

13       Q.  So he's not a chemist?

14       A.  No.

15       Q.  Is anybody out there a chemist?

16       A.  No.

17       Q.  So why did you go to a thermoplastic

18   elastomer?

19       A.  It was something that Phil had

20   experience with.

21       Q.  And what was his experience with it?

22       A.  He had just used it before on other

23   products.

24       Q.  Well, okay, was his experience that

25   it would not have this memory, I think you

EXHIBIT A

1   said?

2       A.   Correct.

3       Q.   Okay.

4           MR. COHN:  Ray.

5                - - -

6           (Short recess had.)

7                - - -

8   BY MR. WEBER:

9       Q.   I want to jump back just for a

10   moment to the Patch Rubber situation.  Did

11   you ever receive a sample of the Patch Rubber

12   product?

13       A.   No.

14       Q.   Okay.  Did you get any literature

15   from Patch Rubber regarding this highway tape

16   that you were talking to them about?

17       A.   No.

18       Q.   Okay.  So we'll come back around now

19   to your run, your first run using the

20   thermoplastic elastomer, how did that product

21   work?

22       A.   It was too soft.

23       Q.   And what do you mean by too soft?

24       A.   It received dirt too easily and it

25   was too hard to clean.

EXHIBIT A

1    Q.  When you say received dirt, are you

2  talking about the elastomeric surface, the

3  top surface received dirt?

4    A.  Well, not only the top surface, the

5  entire profile.

6    Q.  I'm struggling with this, and it's

7  probably my fault, not yours, what do you

8  mean by received dirt, you mean dirt got on

9  it, it got embedded in it?

10    A.  Embedded in it and it was too

11  difficult to remove it.

12    Q.  And how did you determine that that

13  was a problem?

14    A.  By testing it out.

15    Q.  And where did you run these tests?

16    A.  At Advanced Plastics.

17    Q.  And what was the nature of the test,

18  just running/driving over it?

19    A.  Just put it down and let normal

20  traffic transpire.

21    Q.  And when you say normal traffic, did

22  that include skids?

23    A.  Yes.  Well, it included forklifts

24  moving pallets.

25    Q.  Okay.

EXHIBIT A

1      A.  Driving over top of it.

2      Q.  Okay.  Then what did you do next in

3  the development?

4      A.  We went to a PVC material.

5      Q.  And that's polyvinyl chloride?

6      A.  That's correct.

7      Q.  And why did you go to PVC?

8      A.  It was a harder material and made it

9  easier to clean.

10     Q.  And had Phil had any -- I apologize,

11  strike that.

12             Had Phil Nye had any experience

13  with PVC before?

14     A.  I don't think so.  Well, I'm not

15  sure.  With the semi-rigid, this was

16  classified as semi-rigid PVC, I think he

17  produced product with a rigid PVC before, on

18  the bookcases that I mentioned earlier.

19     Q.  Who suggested that you go from this

20  thermoplastic elastomer to PVC, semi-rigid

21  PVC?

22     A.  I did.

23     Q.  Okay.  And what was the, what was the

24  basis of your knowledge for doing that?

25     A.  Just general literature that's out

EXHIBIT A

Page 52

1    there available for the different resins and

2    the uses for them.

3        Q.  Well, what did the literature tell

4    you about PVC?

5        A.  That it's a widely used product

6    that's got characteristics, it had some of

7    the characteristics that I was looking for.

8        Q.  And what were those characteristics?

9        A.  A hardness that would make the

10   product not become a sponge for dirt.

11       Q.  What other characteristics, or was

12   that it?

13       A.  That was my concern.

14       Q.  So your concern at the time was I've

15   got this thermoplastic elastomer, it's too

16   soft and the dirt gets embedded in it and it

17   won't clean up; is that correct?

18       A.  That's correct.

19       Q.  And so you said so I think I need a

20   harder material so that the dirt can't

21   penetrate it; is that correct?

22           MR. COHN:  Objection.

23           THE WITNESS:  Yes.

24   BY MR. WEBER:

25       Q.  Okay.  And then you went to the

EXHIBIT A

1  literature and you looked for harder

2  materials?

3            MR. COHN:  Objection.

4  BY MR. WEBER:

5     Q.  Or did you look for materials that

6  are easy to clean or what, what was the

7  characteristic that you were looking for?

8     A.  A characteristic that would have the

9  hardness and the cleanability that I wanted

10  of the product.

11     Q.  Did the literature tell you that PVC

12  would have the hardness and the

13  cleanability?

14     A.  Well, when you get into literature,

15  there's all different types of formulations

16  for different types of resins, and even in

17  the PVC category there's a wide range of

18  different barometers that you can utilize to

19  fulfill whatever outcome you're looking to

20  get to.

21     Q.  Well, what, what made you choose this

22  semi-rigid PVC, what did you see in the

23  literature?

24     A.  Through, through the development of

25  this project, we had been going through

EXHIBIT A

Page 54

1  different resins to try to obtain the goal of

2  obtaining a very durable, cleanable, long

3  lasting floor tape.

4      Q.  Did either one of you consider

5  getting on the phone and calling a chemist or

6  calling the polymer science department here

7  at the University of Akron and telling them

8  what you were looking for and say what should

9  we use?

10      A.  No.  I can tell you that in addition

11  to the literature, I had a discussion with

12  one of the PVC resin salesmen, or a resin

13  salesman, not a PVC resin salesman, a resin

14  salesman.

15      Q.  And what did he tell you?

16      A.  He recommended I should try PVC.

17      Q.  Did you tell him you were looking for

18  something that was hard and that would clean

19  easily and not be penetrated by dirt?

20      A.  Yes.

21      Q.  Did he tell you any particular PVC to

22  try?

23      A.  Not to my recollection.

24      Q.  Why did you go to semi-rigid instead

25  of rigid PVC?

EXHIBIT A

Page 55

1      A.   Rigid PVC would be too difficult to
2  roll up, probably get us back to the memory
3  thing we talked about earlier with the
4  polycarbonate.
5      Q.   So when you -- by the way -- strike
6  that.
7                When you were working for
8  Akro-Mils or for Myers Industries, did you
9  have an employment agreement with them?
10     A.   Yes.
11     Q.   Did you have an agreement regarding
12 inventions?
13     A.   My recollection is yes.
14     Q.   Okay.  And what was that agreement?
15     A.   It was a boilerplate agreement that
16 I'm sure a lot of employees have as far as
17 what resides, you know, trade secrets and
18 whatever belonging to the company that you're
19 working for.
20     Q.   Did the people at Akro-Mils know that
21 you were, you had this business going on the
22 side?
23     A.   Yes.
24     Q.   Who in particular there knew that?
25     A.   Jim Daw.

EXHIBIT A

Page 56

1      Q.   Jim Doll?

2      A.   Daw, D-A-W.

3      Q.   And what was his position?

4      A.   He was in charge of inventory

5    management and scheduling at the Wadsworth,

6    Ohio, facility.

7      Q.   Was he your supervisor?

8      A.   No.

9      Q.   Okay.  Did any of your supervisors

10   know you were doing this?

11     A.   Yes.

12     Q.   Okay.  Who?

13     A.   Joe Pallota.

14     Q.   Joe Pallota?

15     A.   Yes.

16     Q.   How do you spell that?

17     A.   P-A-L-L-O-T-A.  But he really wasn't,

18   he was quasi a supervisor the way the

19   management structure worked.

20     Q.   Well, who did you report to at

21   Akro-Mils?

22     A.   He's passed on now, Bill -- I can't

23   remember his last name now but he's passed

24   on.  And once he left the company, in the

25   last year and a half, then I reported to Gary

EXHIBIT A

Page 57

1    McDonald.

2        Q.  And what was Gary McDonald's

3    position?

4        A.  General manager.

5        Q.  Did Mr. McDonald know you were doing

6    this?

7        A.  I don't believe so.

8        Q.  We're back now to extruding

9    semi-rigid PVC and how did the product that

10   you made with that material prove out?

11       A.  It worked very well.

12       Q.  And when you did these tests, did you

13   keep records of the evolution of this

14   product?

15       A.  No.

16       Q.  Why not?

17       A.  I was a small company and it wasn't

18   something that was a formalized thing that I

19   said I'll keep track of everything I do.

20       Q.  Well, did you keep track of anything

21   you did?

22       A.  In what regards?

23       Q.  Well, in regards to the conception,

24   reduction to practice, testing of what you

25   claim to be your invention?

EXHIBIT A

1      A.  After the product went to market I

2  went back and notated the steps and when they

3  occurred for that product.

4      Q.  And was that just testing your

5  memory?

6      A.  No.

7      Q.  So did you have papers?

8      A.  Yes.

9      Q.  And what's happened to those papers?

10      A.  I have them.

11      Q.  Okay.  You have the papers from which

12  you made this chronology?

13      A.  That I've shared with my lawyers.

14      Q.  I don't recall getting any documents

15  from you that deal with conception, reduction

16  to practice, testing, anything of that

17  nature.

18          MR. COHN:  Is that a question?

19          MR. WEBER:  Were you asked for

20  those documents?

21          MR. COHN:  By whom?  If by his

22  lawyers, he can't answer.

23  BY MR. WEBER:

24      Q.  Well, did you search for those types

25  of documents in, to respond to document

EXHIBIT A

1   requests that we had propounded?

2      A.  There are certain documents that are

3   considered privileged.

4      Q.  Okay, let me just cut to the chase,

5   when you were working with Mr. Nye, your

6   lawyers weren't standing there with you, were

7   they?

8      A.  No.

9      Q.  Okay.  You weren't even talking to

10  lawyers then, were you?

11     A.  No.

12     Q.  No, you were talking to people who

13  could provide you with raw materials and you

14  were testing different, different mixes and

15  different batches and adhesives and whatever;

16  is that correct?

17     A.  That's correct.

18     Q.  Okay.  And do you, do you have any

19  documentation that shows those efforts,

20  including purchase orders, letters to

21  suppliers, e-mails with Mr. Nye, anything of

22  that nature?

23     A.  Yes.

24     Q.  Okay.  Did you, did you provide those

25  to your attorneys?

EXHIBIT A

Page 60

```
 1      A.  Yes.

 2              MR. WEBER:  I'd like to see those.

 3              MR. HARDERS:  We'll look for them,

 4   I'm not sure what he's talking about.

 5   BY MR. WEBER:

 6      Q.  Okay.  You know, you've gone around

 7   the country suing a lot of people on your

 8   patent, haven't you?

 9              MR. COHN:  Objection.

10              MR. WEBER:  Is that fair to say?

11              THE WITNESS:  No.

12              MR. COHN:  Objection.

13   BY MR. WEBER:

14      Q.  You've filed three lawsuits, haven't

15   you, four now, right?

16      A.  Four.

17      Q.  Have you filed four lawsuits?

18      A.  Yes.

19      Q.  Okay.

20              MR. COHN:  Is there any purpose to

21   this other than trying to --

22              MR. WEBER:  And --

23              MR. COHN:  Excuse me.  Is there a

24   purpose to this line of questioning other

25   than trying to badger the witness?
```

EXHIBIT A

Page 61

1          MR. WEBER:  No, I'm not badgering

2     the witness, I'm wanting to find out why I

3     haven't gotten documents which are the basic

4     underpinnings of a patent lawsuit, and that

5     is conception, reduction to practice,

6     testing, marketing and things of that nature.

7               I haven't gotten any of that

8     and you're trying to claim attorney/client

9     privilege when he never even knew you existed

10    when he was doing all of this stuff.

11         MR. COHN:  I haven't said anything

12    about attorney/client privilege.  And if you

13    don't stop raising that angry tone with me,

14    you will not get to go forward any further

15    in this deposition.  And especially, I could

16    take the angry tone, but you are not to do

17    that to my witness, do you understand that?

18         MR. WEBER:  I'm not going to take

19    instructions from you.

20         MR. COHN:  Well, you ought to.

21         MR. WEBER:  In fact you're

22    probably the last guy in this room that I'll

23    take any instructions from.

24         MR. COHN:  Well, you will take

25    them --

EXHIBIT A

 1              MR. WEBER:  But let's go forward,

 2    let's go forward.

 3    BY MR. WEBER:

 4        Q.  You've filed four lawsuits?

 5        A.  Yes.

 6        Q.  Okay.  Have you assembled documents

 7    regarding the development of your product and

 8    the marketing of your product and things of

 9    that nature for those lawsuits?

10        A.  I'm not sure what you mean by the

11    marketing of my products and how that

12    pertains to the lawsuits themselves.

13        Q.  Have you -- what efforts if any did

14    you take when you filed the lawsuits to be

15    sure that all the documents pertaining to

16    your patent and your competitors and the

17    accused products remained and weren't

18    destroyed, what efforts did you take?

19              MR. COHN:  What time, at the time

20    of filing?

21    BY MR. WEBER:

22        Q.  At the time that you determined to

23    file these lawsuits?

24        A.  At the time I determined to file the

25    lawsuits?

EXHIBIT A

1      Q.  In fact I'm going to go back even

2  further.  When you sent out the letters, when

3  your patent application published years ago,

4  did you take efforts from that date forward

5  to secure and maintain documents?

6      A.  That's a very broad question, what

7  documents?

8      Q.  Any documents dealing with, with

9  your patented product and the activities of

10  any of your competitors that you've sued, I

11  want to know what efforts you took to secure

12  and maintain relevant documents?

13      A.  Relevant documents pertaining to

14  what?

15      Q.  Well, let's talk about the e-mails

16  and that that you had, that you said that

17  you've given to your attorneys, what, you

18  know, things of that nature, your

19  communications with Mr. Nye, your efforts to

20  market the product, to offer it for sale, to

21  advertise it, to promote it, did you keep

22  those records?

23      A.  I have those records.

24      Q.  Okay.  Why haven't I seen those

25  records?

EXHIBIT A

1          MR. COHN:  Objection.

2          THE WITNESS:  I don't know why you

3    need my marketing records.

4          MR. WEBER:  You don't need to know

5    why I need them but in any event, let's go

6    forward.

7    BY MR. WEBER:

8       Q.  So you were satisfied with the test

9    that you ran on the PVC material, correct?

10      A.  That's correct.

11      Q.  And that satisfaction was based on

12   tests that you ran at Advanced Plastics,

13   correct?

14      A.  Yes.

15      Q.  Did you run any tests outside of

16   Advanced Plastics?

17          MR. COHN:  At that time?

18   BY MR. WEBER:

19      Q.  I'm still talking about when you

20   first went to the PVC material that you said

21   worked well.

22      A.  Yes, at Chemsultants.

23      Q.  And when did you run tests at

24   Chemsultants or have them run tests?

25      A.  July of 2003.

EXHIBIT A

1      Q.  Did you make any installations of

2   this product in any warehouses or factories

3   in the 2001 -- or 2000 to March 2003 period?

4      A.  We sold some of the non-working

5   product.

6      Q.  Who did you sell it to?

7      A.  Different customers, I don't recall

8   the names of them.

9      Q.  When did you make your first sale?

10     A.  Of?

11     Q.  Of the non-working product.

12     A.  Probably in 2001 sometime.

13     Q.  Who was the customer?

14          MR. COHN:  Objection.

15          THE WITNESS:  I don't remember.

16   BY MR. WEBER:

17     Q.  You can't remember any of customers

18   that you sold to?

19     A.  I do have records.

20     Q.  You didn't think that would be

21   important?

22          MR. COHN:  Objection, you're

23   arguing with him now.

24          MR. WEBER:  No, I'll tell you

25   what, I'm really upset and I think the Court

EXHIBIT A

1    is going to be upset about what I'm hearing

2    right now.

3              MR. COHN:  Yeah?

4              MR. WEBER:  Yeah.

5    BY MR. WEBER:

6       Q.  You understand that we claim, we

7    meaning Defendants, claims that your patent

8    is invalid, don't you?

9       A.  I understand that.

10      Q.  And that's in our answer and

11   counterclaim, right?

12      A.  Yes.

13      Q.  And you're here today to testify with

14   regard to the answer and counterclaim,

15   correct, that was in schedule A, correct?

16      A.  Yes.

17      Q.  Now, if I remember your testimony

18   earlier, you hadn't seen that before I

19   handed it to you, is that correct, that

20   schedule A?

21      A.  If I had, it was one of many.

22      Q.  So around 2001 you sold, what made

23   this product non-working?

24      A.  The polycarbonate?

25      Q.  Right.

EXHIBIT A

1    A.  It chipped, had memory.

2    Q.  How much of it did you sell?

3    A.  Not much.

4    Q.  Well, how much?

5    A.  Ballpark?

6    Q.  Ballpark.

7    A.  Lucky to be a thousand dollars, if

8  that.

9    Q.  Was it to someone locally?

10   A.  No.

11   Q.  Where, did you have to package it,

12  did you have to package and ship it?

13   A.  Yes.

14   Q.  Are you starting to recall who you

15  shipped it to or who you sold it to?

16   A.  No.

17   Q.  How many sales did you make in 2001

18  of this non-working product?

19   A.  How many?

20   Q.  Right.

21   A.  Maybe four, maybe five.

22   Q.  And was each one of them in about the

23  thousand dollar range of sale?

24   A.  No.

25   Q.  Were there larger ones?

EXHIBIT A

1      A.  No.

2      Q.  Are you saying that the total amount

3  of sales was about a thousand dollars?

4      A.  That would be my recollection, yes.

5      Q.  But you'd have documents that would

6  prove that, right?

7      A.  Yes.

8      Q.  And those are documents that you've

9  given to your attorneys?

10     A.  They were not part of the '480

11  patent.

12     Q.  Oh, they weren't?

13     A.  No.

14     Q.  They were part of the development of

15  the '480 patent product, weren't they?

16     A.  They were part of our development

17  efforts to get to a patent.

18     Q.  Did you tell the Patent Office about

19  those earlier sales?

20         MR. COHN:  Why don't you ask if

21  he ever told the Patent Office anything

22  first.

23         MR. WEBER:  Thanks for your

24  coaching but I'll --

25         MR. COHN:  It's not coaching.

EXHIBIT A

Page 69

1              MR. WEBER:  Coaching me, I'm not

2    talking about him, thanks for coaching me but

3    I'm not ready to go in yet, okay, I've still

4    got my warmup jacket on.

5              Did you ever tell the Patent

6    Office, did you ever tell the Patent Office

7    about these prior sales of the non-working

8    product?

9              MR. HARDERS:  Objection.

10             THE WITNESS:  No, because I did

11   not think they were relevant.

12   BY MR. WEBER:

13      Q.  And the reason you thought they were

14   not relevant was what?

15      A.  Because in combination with the '480

16   patent, they did not have the thickness, they

17   did not have the hardness that we were

18   looking for, they did not have the

19   combination of products to make it a viable

20   working product.

21             And one of the things that I

22   did know that as far as a patent that you

23   have to have is a working product, you can't

24   file a patent on something that doesn't

25   work.

EXHIBIT A

1      Q.   Who ever told you that?

2      A.   That was my reading of it.

3      Q.   Where did you read that?

4      A.   In U.S. patent literature that's

5  widely available on the Web.

6      Q.   Well, I've been doing this for 41

7  years and that's the first time I've ever

8  heard that as a requirement but...

9           MR. COHN:  Now why would you say

10  that?

11          MR. WEBER:  Well, I would say it

12  because it's true.

13          MR. COHN:  Well, who cares what

14  you know and --

15          MR. WEBER:  I do.

16          MR. COHN:  Then keep it to

17  yourself.  You've been doing this long enough

18  that you know better.  I'm not going to let

19  you badger my witness, we're not going to

20  allow it.  I'm telling you right now, Ray,

21  you want to play that game, you will not be

22  allowed to do it.

23  BY MR. WEBER:

24      Q.   Where did you read the literature,

25  where did you find that literature?

EXHIBIT A

1      A.  On a website.

2      Q.  So you made some sales in about 2001,

3  what were the next sales that you made?

4      A.  We made some sales in 2002 also.

5      Q.  Tell me this, who is the first

6  customer that you can recall having sold

7  product to?

8          MR. COHN:  And I just want to be

9  sure that this isn't something that I have to

10  ask your client to leave for, is that

11  proprietary or are you comfortable?

12          THE WITNESS:  That's proprietary.

13  BY MR. WEBER:

14      Q.  Okay, it's proprietary of who you

15  sold -- was it a non-working product?

16      A.  It's proprietary.

17      Q.  No, was the product non-working, the

18  next one?

19      A.  Yes.

20      Q.  The first sale sale that you can

21  recall, it was of a non-working product?

22      A.  Yes.

23      Q.  And when was that sale?

24      A.  In 2001.

25      Q.  Okay.  And you can recall the

EXHIBIT A

1  customer of that product?

2     A.  No.

3     Q.  Okay, I apologize, maybe I've run

4  around the barn here.

5           Okay, I want you to think of

6  the first customer that you sold product to

7  during this development effort, okay, that

8  you can recall the identity of the customer,

9  do you have that in mind?

10    A.  Uh-huh.

11    Q.  Was that product a non-working

12  product?

13    A.  Yes.

14    Q.  And what was non-working about it?

15    A.  It did not clean up well, it was too

16  soft, or depending on which version you're

17  looking at, the thermoplastic elastomer

18  product was too soft, too difficult to clean

19  up and too thick.

20    Q.  And when were -- now the sale that

21  you have in mind, where you can recall who

22  you sold it to, what year was that sale

23  made?

24    A.  In 2002.

25    Q.  Okay.  So you made some out of

EXHIBIT A

1   polycarbonate and you sold that; is that

2   correct?

3              MR. COHN:  Objection, why do you

4   keep going over the same ground over and over

5   and over?

6              MR. WEBER:  Because now I'm

7   bringing out the material, previously I

8   hadn't talked about the material.

9              MR. COHN:  He already testified to

10  that.

11             MR. WEBER:  Well, that's fine, you

12  just hang in there.

13  BY MR. WEBER:

14     Q.  You sold some that was made with

15  polycarbonate, right?

16     A.  That's correct.

17     Q.  And you sold some that was made with

18  the thermoplastic elastomer, right?

19     A.  That's correct.

20     Q.  And then you sold some that was made

21  with the PVC material, correct?

22     A.  That's correct.

23     Q.  And when did you decide that you

24  wanted to file a patent application?

25     A.  After sales of that particular

Page 74

1    product enjoyed considerable success, in the

2    spring of 2003.

3        Q.  What do you mean, enjoyed

4    considerable success?

5        A.  It was displayed at I believe it was

6    the February of 2003 Material Handling Show

7    in Chicago and enjoyed considerable interest

8    from the attendees that were there and as a

9    result the following sales under the name

10   DuraStripe product.

11       Q.  Now, were the products that you were

12   selling made by Advanced Plastics?

13       A.  Yes.

14       Q.  Was the DuraStripe product made by

15   Advanced Plastics?

16       A.  Yes.

17       Q.  Is DuraStripe a trademark?

18       A.  Yes.

19       Q.  Who owns that trademark?

20       A.  Ergomat.

21       Q.  So when did Ergomat enter this

22   picture?

23       A.  December of 2002.

24       Q.  And how did that come about?

25       A.  An agreement between Advanced

EXHIBIT A

1  Plastics and Ergomat.

2      Q.  And what was the nature of the

3  agreement?

4      A.  That Ergomat would only buy product

5  from Advanced Plastics and Advanced Plastics

6  would only sell what became the '480 patent

7  to Ergomat.

8      Q.  So you had an exclusive arrangement?

9          MR. COHN:  Objection.

10  BY MR. WEBER:

11      Q.  I mean is that correct?

12      A.  I didn't.

13      Q.  Well, Ergomat and Advance Plastics

14  had an exclusive arrangement?

15      A.  That's correct.

16      Q.  And where did Advanced Plastics get

17  the right to enter into such an agreement

18  with Ergomat with regard to your product?

19      A.  I was onboard with it.

20      Q.  And what was in it for you?

21      A.  I received a royalty on every foot

22  sold.

23      Q.  How much of a royalty?

24          MR. WEBER:  Well, I'll tell you

25  what, if you plan on using this at trial as a

EXHIBIT A

Page 76

1   basis for damages, you'd better be willing to

2   say it in front of the guy you're trying to,

3   whose pocket you're trying to dig into.

4                    Now if you want me to ask him

5   to leave the room, then we'll wrestle with

6   whether or not you can present this evidence.

7                    THE WITNESS:  Yes, I want you to

8   have him leave the room.

9                    MR. WEBER:  Okay, we'll come back

10  to this.  No, stay there.

11                   MR. COHN:  If he was presenting it

12  even to you, your argument would have some

13  substance, but as it is it's not.  We always

14  deal with confidential information under a

15  protective order that then has to come out at

16  trial.

17                   MR. WEBER:  That would have to

18  come out at trial.

19                   MR. COHN:  That may be, but it

20  doesn't have to come out in front of your

21  client today, that's what the protective

22  order is for.  There's nothing in that

23  protective order that says things that can be

24  protected may not be used at trial.

25  BY MR. WEBER:

EXHIBIT A

Page 77

1       Q.  Who controlled the quality of the

2   goods or of the products sold under the

3   DuraStripe mark, was that you?

4       A.  Advanced Plastics.

5       Q.  Advanced Plastics controlled the

6   quality?

7       A.  Yes.

8       Q.  And how did you get involved with

9   Ergomat?

10      A.  Phil Nye knew of a gentleman that

11  worked at Ergomat.

12      Q.  Was that a personal relationship or a

13  business relationship?

14      A.  Business.

15      Q.  And what was the nature of the

16  business of Ergomat at this point in time?

17      A.  They sold ergo mats, mats that are

18  supposed to be ergonomic, that reduce the

19  stress of standing for long periods of time

20  on concrete.

21      Q.  Where was your first sale or to whom

22  was your first sale of the PVC material

23  product?

24      A.  Kmack Manufacturing.

25      Q.  And where are they located?

EXHIBIT A

Page 78

```
 1      A.   They're in Illinois.

 2      Q.   And did you have a contact at Kmack?

 3      A.   Yes.

 4      Q.   And what's that contact's name?

 5      A.   Evan Skytie.

 6      Q.   Can you spell that?

 7      A.   S-K-Y-T -- I'm not sure if it's I-E

 8  or something like that.

 9      Q.   And how do you know Mr. Skytie?

10      A.   He purchased the floor tape from me.

11      Q.   So your first contact with him was an

12  effort for you to sell the tape to him?

13      A.   Yes.

14      Q.   Did you just make a cold call or how

15  did you go about this?

16      A.   I did a considerable amount of cold

17  calls; I'm not a hundred percent sure how the

18  first contact came about.

19      Q.   Did you send out any mailings?

20      A.   Yes.

21      Q.   Do you have copies of those?

22      A.   Samples of what they looked like.

23      Q.   Do you have a mailing list?

24      A.   No.

25      Q.   Did you have a mailing list?
```

EXHIBIT A

Page 79

1      A.  Yes.

2      Q.  What happened to it?

3      A.  Over time, ten years old...

4      Q.  Could you -- when did these mailings

5  go out?

6      A.  Throughout the 2002 time period.

7      Q.  Did you ever do any mailings with

8  regard to your thermoplastic elastomeric

9  product?

10     A.  Yes.

11     Q.  And did you do similar mailings for

12  the polycarbonate product?

13     A.  I believe so.

14     Q.  Did you also do cold calls for all

15  those products?

16     A.  Yes.

17     Q.  Before you started on your endeavor

18  to develop this product, did you do some sort

19  of an assessment as to what competing

20  products might be available?

21     A.  I had an understanding of what was

22  out there.

23     Q.  And how did you gain that

24  understanding?

25     A.  Just by my experience working at

EXHIBIT A

1    different places that I did, as far as the

2    availability of the thinner 3-M floor tapes

3    that are out there and knowing that there did

4    not seem to be a product out there which I

5    was seeking to obtain that was very durable,

6    long lasting, easy to clean, stayed down

7    well.

8         Q.  Had you obtained samples of the

9    various products that were out there to find

10   out if they were durable, long lasting, easy

11   to clean and would stay down well?

12        A.  Not to my recollection.  I mean

13   probably I procured some of the 3M, the

14   thinner tape.

15        Q.  And did you procure them from 3M?

16        A.  Probably Granger.

17        Q.  Did you do any searching on the

18   Internet?

19        A.  Yes.

20        Q.  And what did you find on the

21   Internet?

22        A.  Basically the 3M genre of product

23   that was out there for floor tape marking,

24   which is very thin tape that does not hold up

25   all that well underneath work traffic.

EXHIBIT A

Page 81

1     Q.  Did you keep any results of your

2   searching, I mean did you print out

3   anything?

4     A.  I have the results from 3M tape from

5   the Chemsultants study that they did that

6   compared our product to a comparable thin

7   tape.

8     Q.  But when you were doing your Internet

9   searching, did you keep a list of what you

10  found and who you found?

11    A.  No.

12    Q.  Did you do any patent searches?

13    A.  Yes.

14    Q.  Okay.  Did you do those searches

15  yourself?

16    A.  No.

17    Q.  Did you have an attorney do them?

18    A.  Yes.

19    Q.  Who was the attorney?

20    A.  Hoffman, I think Hoffman, Hinks,

21  Watts.

22    Q.  Watts, Hoffmann, Fisher & Heinke?

23    A.  That's it.

24    Q.  And who with that firm?

25    A.  I don't remember.

EXHIBIT A

1       Q.  Do you have that search, did you keep

2   that search -- strike that.

3                   Did you keep the search

4   results?

5       A.  Yes.

6       Q.  And you still have those?

7       A.  Yes.

8       Q.  And that was a search for prior art,

9   right?

10      A.  Yes.

11      Q.  Did there ever come a time that you

12  believed that you should have provided that

13  to me?

14              MR. COHN:  Objection.

15              THE WITNESS:  I believe it's

16  lawyer/client privilege.

17  BY MR. WEBER:

18      Q.  You believe that's lawyer/client

19  privilege?

20      A.  Yes.

21      Q.  Even the identity of the patents is

22  attorney/client privilege?

23              MR. WEBER:  You know, I'd like to

24  see a privilege log, by the way, which I

25  don't think I've ever seen.

EXHIBIT A

Page 83

1              MR. COHN:  Neither have we, so

2    maybe we both need to do that.

3    BY MR. WEBER:

4         Q.  So you had a search done by somebody

5    at Watts, Hoffmann, Fisher & Heine, correct?

6         A.  That's correct.

7         Q.  Was it either one of the four named

8    people, I know it wasn't Watts because he's

9    gone, Fisher might have been alive then,

10   Lowell Heinke?

11        A.  I don't recall.

12        Q.  Okay.  Well, after you had the

13   search commissioned what, did you believe

14   that there was some opening in the market

15   for your product, for a product that you

16   envisioned?

17             MR. COHN:  Objection, are you

18   connecting the receptiveness of the market to

19   the search in some way?  I mean I don't

20   understand.

21   BY MR. WEBER:

22        Q.  To the prior art.  You developed an

23   understanding of the prior art before you

24   filed your patent application, correct?

25        A.  That's correct.

EXHIBIT A

1      Q.  And you actually developed an

2  understanding of the prior art before you did

3  your development effort, didn't you?

4      A.  Yes.

5      Q.  Okay.  I mean were you looking to see

6  if there was an area in the landscape of the

7  prior art that might be available for you, is

8  that what you were doing?

9           MR. COHN:  Objection.

10           THE WITNESS:  No.

11  BY MR. WEBER:

12      Q.  Okay, what were you doing, what was

13  your goal?

14      A.  To see if the product I was

15  attempting to make would be patentable.

16      Q.  So you already had pretty firmed up

17  what your product would be before you had the

18  search run?

19      A.  Yes.

20      Q.  And describe that product to me?

21      A.  A very durable, long lasting floor

22  tape that is easy to clean, that saves time

23  for the people putting it down as opposed to

24  painted floor lines or cheaper, thinner

25  tapes.

EXHIBIT A

Page 85

1      Q.  Okay.  Those are attributes of the

2  product, I'd like for you to describe the

3  physical characteristics of the product to

4  me.

5              What are the physical

6  characteristics of the product that you

7  envisioned when you had your search run?

8            MR. COHN:  Don't let him rush you,

9  just answer his question.

10            MR. WEBER:  I don't think I could

11  have asked that question any more softly or

12  slowly.

13            MR. COHN:  While he was thinking

14  about how to answer it you asked him again

15  because you were impatient.

16            MR. WEBER:  No, I asked it again

17  because, you know, he must not have

18  understood my question.

19            MR. COHN:  No, he must have been

20  trying to make sure he gave a good answer.

21            MR. WEBER:  Okay, it might be good

22  in your mind but anyhow, go ahead.

23            MR. COHN:  Good is a truthful

24  answer and that's all he does.

25            MR. WEBER:  Well, have you

EXHIBIT A

1    answered my question?  I'm fine with that

2    answer if that's the answer you want to stick

3    with.

4              MR. COHN:  What answer?

5              THE WITNESS:  What answer?

6              MR. WEBER:  The answer that he

7    just gave me.

8              THE WITNESS:  I didn't give an

9    answer.

10             MR. COHN:  No.

11             THE WITNESS:  I didn't give an

12   answer.

13             MR. COHN:  He was thinking about

14   his answer and you asked it again as though

15   you were impatient, in an effort to rush him

16   along and make him nervous.

17             MR. WEBER:  All right.

18             MR. COHN:  I don't like when you

19   do that so I commented on it.

20             MR. WEBER:  Take your time.

21             THE WITNESS:  And what's the

22   question again?

23             MR. WEBER:  I asked it twice, you

24   don't remember it?  I'll ask the reporter to

25   read it back.

EXHIBIT A

Page 87

1    (Previous testimony read back as requested.)

2              THE WITNESS:  A product that had

3    the characteristics that would give me those

4    things that I talked about, easy to clean,

5    very durable, and long lasting.

6    BY MR. WEBER:

7         Q.  And what are those physical

8    characteristics?

9         A.  They are the '480 patent.

10        Q.  So you had in mind what's disclosed

11   and claimed in the '480 patent when you asked

12   for the search to be done, is that your

13   testimony?

14        A.  No, that's incorrect.

15        Q.  Okay.

16        A.  I'm saying that through time, through

17   development of this product, I was not aware

18   of just what physical characteristics of a

19   product would get me the features of what I'm

20   trying to obtain.

21              When I applied for the patent I

22   was looking for -- not the patent, when I had

23   the patent search done, I was looking to see

24   if looking at the landscape, if you will, to

25   see if there was an opportunity to obtain a

EXHIBIT A

Page 88

1   patent.

2       Q.   The reason you didn't have a physical

3   structure in mind is because when you started

4   on this venture you weren't a person of any

5   skill in this art, is that fair to say?

6               MR. COHN:  Objection.

7               THE WITNESS:  No.

8   BY MR. WEBER:

9       Q.   Okay.  What was your skill level in

10  this art when you started on this venture?

11      A.   I had overall knowledge of the use of

12  floor paint and thinner floor tapes, so that

13  was one thing.  I saw that there was a need

14  in the marketplace for something that was

15  more durable and heavy duty.

16      Q.   Anything else?

17      A.   That should do it.

18      Q.   Why didn't you just go with PVC

19  material right out of the chute?

20      A.   Because I didn't know at that time.

21      Q.   Why didn't you just go with

22  thermoplastic elastomer right out of the

23  chute?

24      A.   Because I didn't know.

25      Q.   Because you really hadn't had any

EXHIBIT A

Page 89

1    involvement in this technology at all when

2    you embarked on this project, isn't that fair

3    to say?

4        A.   I guess it's fair to say, if you want

5    to go down the path that you're talking

6    about, saying that I didn't have a chemical

7    background or I didn't have an engineering

8    background.

9        Q.   I don't mean that in a demeaning

10   sense, and I mean that sincerely, I don't

11   have an accounting background, you can do a

12   lot of things I can't do.  I just see what

13   you did here, I take you at least for now at

14   your word on the developmental process, I was

15   just trying to understand why we went through

16   the various iterations.

17                   And I would also I guess now

18   ask, why did you sell to customers the

19   polycarbonate product that didn't work well

20   at all, why did you sell it to them?

21             MR. COHN:  Let me just object

22   because of the long preface to your question;

23   the question itself isn't objectionable.

24   BY MR. WEBER:

25       Q.   Well, you understood the question

EXHIBIT A

Page 90

1    when I actually moved to the question?

2               In fact let me just, let me do

3    it again, you've said that the polycarbonate

4    product was non-functioning, I think is how

5    you characterized it; is that correct?

6        A.  Yes.

7        Q.  Why did you sell it?

8        A.  Because I learned that over time,

9    both being tested at the place where we

10   manufactured it and selling it.

11       Q.  And the same thing for the

12   thermoplastic elastomer, you characterized

13   that as non-functioning and yet you sold it,

14   right?

15       A.  But at the time I believed it to be a

16   perfectly viable product.

17       Q.  You were obviously satisfied with it

18   when you sold it, right?

19       A.  At the time.

20       Q.  Okay.

21       A.  Until I received feedback that it

22   wasn't what I had hoped it to be.

23       Q.  Well, you wouldn't have sold any of

24   these products if you hadn't been satisfied

25   with them, correct?

EXHIBIT A

1      A.  That's correct.

2      Q.  Okay.

3      A.  That's correct.

4        (Discussion had off the record.)

5                    - - -

6           (Luncheon recess had.)

7                    - - -

8                  (Defendant's Exhibit

9                   No. 3 was marked

10                  for identification.)

11  BY MR. WEBER:

12      Q.  Do you recognize Exhibit 3?

13      A.  Yes.

14      Q.  Okay.  And what is Exhibit 3?

15      A.  It's the '480 patent.

16      Q.  And that's the patent in suit?

17      A.  That is correct.

18      Q.  Okay.  I don't want to spend a whole

19  lot of time on the patent itself but if

20  you'll turn to -- in fact you've reviewed

21  this patent, you're very familiar with it,

22  correct?

23      A.  I'm familiar with the patent, yes.

24      Q.  Okay.  If you'll go to column two, it

25  talks about, down around line 21 it says,

EXHIBIT A

1   "Advantageously, this embodiment of the

2   invention provides improved tear resistance,

3   strength and abrasion resistance by employing

4   the sum of all of the combination" --

5            MR. COHN:  Sum or all.

6   BY MR. WEBER:

7     Q.  "Sum or all of the combination of

8   polymer selected, Shore A hardness, textured

9   surface and layer thickness."  Did I read

10  that correctly?

11    A.  Yes.

12    Q.  Okay.  And what was the textured

13  surface, I haven't heard that topic so far

14  today, what's the significance of a textured

15  surface?

16    A.  That was where you could feel it,

17  feel it to the touch of the product.

18    Q.  Okay.  So if it was perceptible by

19  feel to you would be a textured surface?

20    A.  Yes.

21    Q.  Okay.  And what's the significance of

22  it, why is textured surface important, or is

23  it?

24    A.  It's on our patent.  It measured --

25  not measures but it's just an attribute of

EXHIBIT A

1   the product that you can feel, for instance

2   the bevelled edge.

3       Q.  Okay.  Well, your patent doesn't say

4   anything at all about a bevelled edge, does

5   it?

6       A.  No, it doesn't.

7       Q.  In fact, well, let me ask you this,

8   had you considered using a bevelled edge

9   before you filed this patent application?

10      A.  Yes.

11      Q.  Okay.  And what were the benefits of

12  a bevelled edge?

13      A.  That as skids are pushed over it it's

14  less likely -- it will help ride the skid

15  over it.

16      Q.  And you were aware of that before you

17  prepared this patent application or had this

18  patent application prepared, correct?

19      A.  Yes.

20      Q.  Okay.  Is there any reason why that's

21  not mentioned in your patent anywhere, the

22  fact that there's no mention of pallets and

23  forklifts or anything of that nature going

24  across the tape and damaging it?

25      A.  There's no reason to my knowledge why

EXHIBIT A

Page 94

1  it's not there.

2      Q.  When did you first add a tapered edge

3  to your product or was it in the product from

4  the beginning?

5      A.  It was in the product from the

6  beginning.

7      Q.  Then why isn't it shown in your

8  patent?

9      A.  Because we didn't include it when we

10 filed it.

11     Q.  No, I understand that, I assume the

12 Patent Office didn't make a mistake, but why

13 did you not include the tapered edge?

14     A.  I worked with my attorney at the

15 time, the product that we had tested at

16 Chemsultants had the tapered edge, I turned

17 the information over and we filed the

18 patent.

19     Q.  Well, you reviewed the patent

20 application before it was filed, didn't you?

21     A.  Yes.

22     Q.  And you approved it, right?

23     A.  Yes.

24     Q.  You signed the patent application,

25 not your attorney, correct?

EXHIBIT A

1      A.  Yes.

2      Q.  Did you ever say to your attorney why

3   isn't the tapered edge in there?

4          MR. COHN:  Objection, you know you

5   can't ask him that.

6          MR. WEBER:  No, he already told me

7   that, and his attorney is only a conduit

8   between him and the Patent Office and that's

9   something that should have been disclosed and

10  I want to know, I am entitled to know that.

11  I'm not asking for advice.

12         MR. COHN:  No, you're asking what

13  he indicated to his attorney and back and

14  forth and you're not entitled to that.

15         MR. WEBER:  Are you instructing

16  him not to answer?

17         MR. COHN:  Absolutely.

18         MR. WEBER:  Okay.

19  BY MR. WEBER:

20     Q.  Did you make any changes to the

21  patent application draft you got from your

22  attorney?

23     A.  No.

24     Q.  Did you read it?

25     A.  Yes.

EXHIBIT A

Page 96

1      Q.  Did you ask yourself, I wonder why

2   the tapered edge isn't in there?

3      A.  No.

4      Q.  Did you ask yourself, why isn't there

5   any mention of being torn by pallets or skids

6   or forklifts or things of that nature, did

7   you ask about that?

8            MR. COHN:  Ask who, the attorney?

9   BY MR. WEBER:

10      Q.  Yourself, no, yourself?

11      A.  Well, here I'm reading, "One

12   disadvantage is that the tape lacks

13   sufficient strength and hardness to prevent

14   wear and tear, cracking and breakage from

15   heavy and repeated traffic, such as from

16   forklift trucks."  I think it's in there,

17   Ray.

18      Q.  Well, is there anything in there

19   about the tapered edge in that regard?

20      A.  No.

21      Q.  What's the purpose of the tapered

22   edge?

23      A.  I just answered that before.

24      Q.  Just tell me again, I forgot, I

25   genuinely did.

EXHIBIT A

Page 97

1    A.  Let the record show that I answered

2  him before.

3    Q.  No, I want an answer now so I can

4  continue with my inquiry, tell me again.

5        MR. COHN:  Tom, usually we're we

6  accommodating up to a point, so this is the

7  second time he's asked you but go ahead.

8        THE WITNESS:  With the bevelled

9  edge, with the scraping of pallets over the

10  top of it, it's more likely they will glide

11  over the top of it rather than catch on the

12  edge.

13  BY MR. WEBER:

14    Q.  And that's not in here, right, in the

15  patent?

16    A.  No.

17    Q.  Or yes it's not in there, correct,

18  that was my fault?

19    A.  The mention of the bevelled edge is

20  not in the patent.

21    Q.  But you had told your attorney about

22  it, correct?

23        MR. COHN:  Objection.

24        MR. WEBER:  He already answered

25  that, you can keep objecting.

EXHIBIT A

1            MR. COHN:  Well, he's not going to

2     answer it again.

3            MR. WEBER:  Again, okay.

4            MR. COHN:  And I don't think he

5     did, if he did it was my mistake and that was

6     inadvertent and we're not doing it over

7     again.

8     BY MR. WEBER:

9        Q.  What else, what else is missing from

10    your patent that you believe was a part of

11    your invention when you asked your attorney

12    to prepare a patent application?

13           MR. COHN:  All right, using the

14    word else, you are accepting there was

15    something to begin with and that makes the

16    question objectionable and inappropriate.

17    BY MR. WEBER:

18       Q.  Well, what beyond the tapered edge

19    was left out of the patent application?

20           MR. COHN:  Same objection, just

21    because it's in there doesn't mean you should

22    say it's left out.

23    BY MR. WEBER:

24       Q.  Go ahead.

25       A.  I believe I filed a viable patent

EXHIBIT A

1   application based on the properties specified

2   in the '480 patent.

3       Q.  Did the -- I'm sorry, go ahead?

4       A.  No, I'm sorry.

5       Q.  Did the product that, well, that you

6   sold, you first sold with the PVC material,

7   made of the PVC material that you found to be

8   successful, did that have a tapered edge?

9       A.  Yes.

10      Q.  In the literature that you sent out

11  for your mailings -- that I'm hoping to see

12  sometime -- did that mention the bevelled

13  edge?

14      A.  No.

15      Q.  Why not?

16      A.  The literature included a sample of

17  the floor tape.

18      Q.  What did the bevelled edge say about

19  the product?

20          MR. COHN:  Objection.

21  BY MR. WEBER:

22      Q.  I'm sorry, what did the literature

23  say about the product?

24      A.  Durable floor tape.

25          MR. COHN:  Can you give me one

EXHIBIT A

1    minute?  There's no question pending.

2              MR. WEBER:  Go ahead.

3              (Discussion had off the record.)

4    BY MR. WEBER:

5        Q.  You told me that the polycarbonate

6    material was, was the material that had the

7    memory issue; is that correct?

8        A.  That's correct.

9        Q.  Okay.  And you said it was a real

10   hard, stiff material?

11       A.  That's correct.

12       Q.  What would be the Shore A hardness of

13   the polycarbonate?

14       A.  I don't know.

15       Q.  It would be above 92, wouldn't it?

16       A.  I don't know.

17       Q.  It's your testimony that you don't

18   know that polycarbonate would have a Shore A

19   hardness above 92?

20       A.  I believed it would have a Shore A

21   hardness above 92.

22       Q.  In fact you know it has a Shore A

23   hardness above 92, don't you?

24       A.  No, not explicitly.

25       Q.  You certainly wouldn't be surprised

EXHIBIT A

1   if it did though, correct?

2       A.  That's correct.

3       Q.  And when you got this polycarbonate

4   material, was that the material you cut into

5   strips?

6       A.  The first go-round, yes.

7       Q.  Okay.  Did there come a point in time

8   when you actually extruded it?

9       A.  Yes.

10      Q.  Did you extrude it with the same

11  extruder die that you ultimately extruded the

12  thermoplastic and the PVC?

13      A.  No.

14      Q.  What was the nature of the die that

15  you used with the polycarbonate?

16      A.  It was a die used for the

17  polycarbonate that was thicker.

18      Q.  Okay, how thick was it?

19      A.  Seventy to eighty-five thousandths.

20      Q.  And how thick was the die for the

21  thermoplastic elastomer?

22      A.  Seventy to eighty-five thousandths.

23      Q.  And for the PVC material?

24      A.  Sixty-five thousandths.

25      Q.  Was there a reason that you had the

EXHIBIT A

1  polycarbonate and the thermoplastic elastomer

2  thicker?

3      A.  It was the first ones that we made.

4      Q.  And that was you just sort of guessed

5  at what the thickness should be?

6      A.  We revised the thickness to lower the

7  trip hazard.

8      Q.  When did you lower that thickness?

9      A.  When we changed from thermoplastic to

10  the PVC.

11      Q.  Okay.  So if you had, if you had

12  wanted to stay with the polycarbonate, you

13  could have lowered that thickness, is that

14  fair to say?

15      A.  But we would have still run into the

16  problems we had with the product itself.

17      Q.  No, I understand that, but there was,

18  there was nothing that kept you from reducing

19  the thickness of the polycarbonate or the

20  thermoplastic elastomer, was there?

21      A.  I know of nothing that would have

22  restricted us from doing that.

23      Q.  Okay.  When you filed your patent

24  application were you aware of your duty of

25  candor before the Patent Office?

EXHIBIT A

1      A.  Yes.

2      Q.  And how did you become aware of that?

3      A.  Through consultation with my

4  attorney.

5      Q.  Look in column four of the '480

6  patent, well, the bottom of column three,

7  bridging three and four, there's that chart,

8  do you see chart?

9      A.  Uh-huh.

10     Q.  What's the, I think, what is that,

11  sigma, the standard deviation sign, what is

12  that, what is standard deviation?

13     A.  Well, any time you do anything there

14  is typically a bell curve and within a

15  certain percentage, certain things fall

16  within one, the bell curve, you typically

17  divide it in one section, two sections and

18  three sections.

19          And as you get further into

20  something that's at wide variance from what

21  you would be -- well, I don't know how to

22  explain it.

23     Q.  I'm following you, keep going.  I

24  know what it is, I want you to explain it on

25  the record.

EXHIBIT A

1     A.   It's just a measure of how consistent

2  measurements are and if there are outliers or

3  not based on the measurement that's being

4  performed.

5     Q.   And where do the numbers on this this

6  chart come from?

7     A.   These were from the Chemsultants

8  testing of the '480 patent product that we

9  submitted.

10    Q.   Did that product have a tapered edge?

11    A.   Yes.

12    Q.   Did you ever sell any of the '480

13  patent product without a tapered edge?

14    A.   No.  Well, I take that back, we had

15  it, for certain customers that would request

16  one inch wide product for whatever, we would

17  slit it and as a result of that it wouldn't

18  have a tapered edge on it.

19    Q.   It would have one tapered edge?

20    A.   It would have no tapered edge.

21    Q.   Okay.  That I assume was a very, very

22  small quantity?

23    A.   Inconsequential.

24    Q.   Did you understand your obligation to

25  disclose the best mode for carrying out your

EXHIBIT A

1    invention when you filed your patent

2    application?

3                MR. COHN:  Objection.

4                THE WITNESS:  I don't understand

5    what you mean by best mode.

6    BY MR. WEBER:

7        Q.  Okay, so that term is sort of new to

8    you?

9        A.  Yes.  And something just occurred to

10    me, best mode, if I understand it correctly,

11    is when you file a patent application, you

12    specify those, the qualities or the, the

13    claims in the product that you had the most

14    success with building that product.

15        Q.  Well, since the non-tapered edge

16    product was inconsequential, wouldn't it be

17    fair to say that you had the best success

18    with a product that had a tapered edge?

19        A.  I don't know how to answer that.

20        Q.  I bet you don't.

21                MR. COHN:  Objection, move to

22    strike.  Keep it up, we'll get out of here.

23                MR. WEBER:  Just answer, give me

24    your best answer, or if you can't answer,

25    tell me you can't.

EXHIBIT A

1          MR. COHN:  He already told you

2   that.

3          MR. WEBER:  He said he doesn't

4   know how to answer it.

5          MR. COHN:  Right, and then you

6   made your snide comment.

7          MR. WEBER:  Well, I think my

8   comment was very accurate.

9          MR. COHN:  It was snide, whatever

10  it was, it should be beneath you.

11          THE WITNESS:  The reason I say

12  that is that we never sold a non-tapered

13  product other than what we just have gone

14  over.

15  BY MR. WEBER:

16      Q.  Okay.

17      A.  So what you're asking me to do is to

18  come to a conclusion on something I've never

19  done and to say oh, yeah, I agree with you.

20      Q.  Is that your answer?

21      A.  That's my answer.

22          MR. WEBER:  Okay, good, let's take

23  a look at --

24                  (Defendant's Exhibit

25                  No. 4 was marked

EXHIBIT A

1                    for identification.)

2    BY MR. WEBER:

3        Q.  Now, do you recognize Exhibit 4?

4            MR. COHN:  And you should look at

5    all of it.

6            THE WITNESS:  Okay.

7            MR. WEBER:  I'll tell you what

8    what, I'll withdraw that question.

9    BY MR. WEBER:

10       Q.  You have before you Exhibit 4, would

11   you look at the last page and tell me if

12   that's your signature and that's the date you

13   signed this document?

14       A.  Yes.

15       Q.  Who is Scott McCollister?

16       A.  A lawyer for Fay Sharpe.

17       Q.  Was he your attorney?

18       A.  Yes, he was.

19       Q.  Who was Timothy Nauman?

20       A.  An attorney at Fay Sharpe.

21       Q.  And working on preparing this patent

22   application, who was the attorney you worked

23   with, attorney or attorneys you worked with?

24       A.  Scott McCollister.

25       Q.  Is there a reason you went to Fay

EXHIBIT A

1   Sharpe for preparing the patent application

2   when you had the search run by Watts,

3   Hoffmann, Fisher & Heinke?

4            MR. COHN:  Let me think about that

5   before I let him answer.

6            MR. WEBER:  That's one of my

7   better questions.

8            MR. COHN:  Whether it is or isn't,

9   it has nothing to do with whether I should

10  assert the privilege.

11            My problem is, Ray, I don't

12  know how he answers your question without

13  basically disclosing what one or the other

14  lawyers said to him.

15            MR. WEBER:  And I don't want you

16  to do that, I will honor that.  I disagree on

17  whether or not communications that ultimately

18  go to the Patent Office are privileged but

19  the --

20            MR. COHN:  In other words, one

21  firm, one firm tells him something and the

22  other firm tells him something?

23  BY MR. WEBER:

24    Q.  Was it a personality thing?  Well,

25  let me ask you this, did you pay Watts

EXHIBIT A

1   Hoffmann for the services they had provided

2   you?

3       A.  Absolutely.

4       Q.  Okay.  Did you know Scott McCollister

5   apart from this endeavor?

6       A.  No.

7       Q.  Okay.  How did you get Scott

8   McCollister's name?

9       A.  He was an attorney that was friends

10  with one of my wife's fellow partners at the

11  firm that she was at so we got a

12  recommendation from her partner.

13      Q.  Fair enough.  I apologize, I'm

14  jumping around a little bit here but getting

15  back to the polycarbonate material on the

16  product where you bought the polycarbonate

17  and you split it, did it have a bevelled

18  edge?

19      A.  No.

20      Q.  Okay.  Did the product that you gave

21  to Chemsultants have a textured surface?

22      A.  Yes.

23          MR. WEBER:  Let's mark this as

24  Exhibit 5.

25              (Defendant's Exhibit

EXHIBIT A

1                    No. 5 was marked

2                    for identification.)

3   BY MR. WEBER:

4       Q.  Do you recognize Exhibit 5?

5       A.  Yes.

6       Q.  And what is Exhibit 5?

7       A.  A patent application.

8       Q.  Okay.  And this is how it was

9   published, correct?  And I'll help you out

10  if you want, you'll see the title right up

11  there, it's a patent application

12  publication.

13              MR. COHN:  I just want to point

14  out that exhibit G in the court markings at

15  the top would not have been on the original

16  of this document.

17              MR. WEBER:  Fair enough, fair

18  enough, sure.

19              THE WITNESS:  Okay.

20  BY MR. WEBER:

21      Q.  So do you recognize this as the way

22  your patent application was published?

23      A.  Yes.

24      Q.  Okay.  Now, back on page two, down

25  around paragraph sixteen, you'll see how

EXHIBIT A

1    those have been marked?

2        A.  Okay.

3        Q.  It says, "Peel adhesion was tested

4    according to a modified PSTC-101D method,"

5    did I read that correctly?

6        A.  Yes.

7        Q.  Why did you use that testing method?

8            Well, in fact let me step back

9    a little bit, what is this PSTC-101D method?

10       A.  It's a method of measuring how good a

11   peel adhesion per square inch your tape has

12   to the floor or to the surface.

13       Q.  Okay.  Had you ever, well, were you

14   familiar with this test before filing your

15   patent application?

16       A.  No.

17       Q.  You'd never used it yourself, had

18   you?

19       A.  No.

20       Q.  Who told you that that's what, that

21   the PSTC-101D method was what you just

22   described to me?

23           MR. COHN:  If it was his lawyer,

24   that's a problem question.

25           MR. WEBER:  Yeah, if it was your

EXHIBIT A

1    lawyer just say it was my lawyer.

2            MR. COHN:  Well...

3            MR. WEBER:  Well, you can't do

4    that.

5            MR. COHN:  Anyone other than his

6    lawyer.

7    BY MR. WEBER:

8        Q.  Yeah, if it was anyone other than

9    your lawyer?

10       A.  If it was anyone other than my

11   lawyer, what?

12       Q.  Who, who described that test method

13   to you as you just related it to me?  And if

14   it was your lawyer, I'll allow you to say I

15   don't know.

16           MR. COHN:  Well, may I suggest...

17           MR. WEBER:  Go ahead.

18           MR. COHN:  Was there someone other

19   than your lawyer who gave you the information

20   about this patent test?

21   BY MR. WEBER:

22       Q.  Well, I'll do that, but I think that

23   suggests that it was his lawyer but anyhow,

24   go ahead?

25       A.  Okay, we submitted our potentially

EXHIBIT A

1  '480 patent to Chemsultants for a series of

2  tests at the independent lab.  Based on what

3  we were doing, they have very good

4  familiarity with floor tapes and adhesives,

5  so I relied on their expertise as far as what

6  is being measured and how.

7      Q.  Okay.  And so you more than likely

8  got that definition from them, is that fair

9  to say?

10             MR. COHN:  Objection.

11             THE WITNESS:  Yes.

12  BY MR. WEBER:

13      Q.  Okay.  When you start here at around

14  paragraph eleven back on the first page, over

15  in the lower right-hand corner, and you go on

16  down through paragraph eighteen, which is the

17  chart, is it fair to say that all of that

18  information, the technical information was

19  provided by Chemsultants?

20      A.  No.

21      Q.  Okay, what part wasn't?

22      A.  The part speaking about how the

23  polyvinyl chloride was used to form a profile

24  and what type of machine was being used and

25  at what temperatures and extrusion rate.

EXHIBIT A

1      Q.  Okay.  So that's on the manufacturing

2   of the product?

3      A.  Correct.

4      Q.  Okay.  Let's start at paragraph

5   thirteen then, that's fair enough, would

6   paragraphs thirteen through eighteen be the

7   work of Chemsultants?

8           MR. COHN:  Let me just object only

9   because that question covers so much, it's

10   difficult.

11           THE WITNESS:  Okay, you were

12   saying from?

13   BY MR. WEBER:

14      Q.  Thirteen through eighteen.

15      A.  Yes.

16      Q.  Okay.  Now, let's look at your

17   patent again, which was Exhibit 3, and you

18   characterize the invention in column two,

19   down around line 16, you say, "The polymer

20   selected must have Shore A hardness between,

21   for example, 92 and 100, preferably between

22   93 and 97," is that correct?

23      A.  That's correct.

24      Q.  Okay.  And that's how you

25   characterize your invention, it must have

EXHIBIT A

1   that Shore A hardness, correct?

2       A.  Yes.

3       Q.  And then up above that, go up to the

4   beginning of that paragraph, up around line

5   12 you say, "The layer of polymeric material,

6   one, may be a durable polymer such as

7   polyvinyl chloride, polycarbonate or a

8   terpolymer comprised of acrylonitrile,

9   butadiene and styrene or the like," did I

10  read that correctly?

11      A.  Yes.

12      Q.  Now, polycarbonate wasn't acceptable

13  I thought?

14      A.  Based on our tests, with the

15  polycarbonate we used, it was not.

16      Q.  And is terpolymer comprised of

17  acrylonitrile, butadiene and styrene, is

18  that a -- I'm trying to think how we

19  characterized those before -- a thermoplastic

20  elastomer?

21      A.  I don't know.

22      Q.  Were you hoping that when somebody

23  picked up and read your patent that they

24  might try to use something that you knew

25  wouldn't work well?

EXHIBIT A

1      A.  No.

2      Q.  Did you ever think to yourself, we

3  ought to remove polycarbonate from this

4  description of preferred embodiments and best

5  modes?

6      A.  No.

7      Q.  But of course you had sold product

8  with the polycarbonate several years before

9  you filed for this patent application, hadn't

10  you?

11      A.  That is accurate.

12      Q.  Now, if you go back to the claims

13  here -- I'm sorry, I'm back in Exhibit 5 now,

14  which is your published patent application --

15  and the claims down in paragraph 19 on page

16  two, it says what is claimed, do you see

17  that?

18      A.  Yes.

19      Q.  Claim one is, "A polymer layer having

20  a Shore A hardness of between about 92 and

21  100," did I read that correctly?

22      A.  Yes, you did.

23      Q.  That could be polycarbonate, right?

24      A.  Yes.

25      Q.  And the next one is, "A layer of

EXHIBIT A

1   adhesive attached to said polymer layer," did

2   I read that correctly?

3      A.  Yes.

4      Q.  That describes the product that you

5   sold several years prior to filing this

6   patent application, doesn't it?

7      A.  Yes.

8      Q.  Did you --

9      A.  Except it doesn't include all the

10  attributes.

11     Q.  Okay.  You reviewed that application,

12  if I remember correctly, correct?

13     A.  That's correct.

14     Q.  And you reviewed the claims because,

15  well, let me ask you this, did you understand

16  the importance of patent claims?

17     A.  Yes.

18     Q.  And you thought this document was

19  extremely important because you sent it to a

20  lot of your competitors, didn't you?

21          MR. COHN:  Which document are you

22  holding up?

23  BY MR. WEBER:

24     Q.  I'm holding up Exhibit 5, when it

25  published?

EXHIBIT A

1       A.   Yes.

2       Q.   And yet the product of claim one of

3  that patent application had been on sale well

4  more than a year prior to when you filed for

5  your patent application, right?

6       A.   All the parameters that made up the

7  '480 patent were not on sale prior to.

8       Q.   I'm only asking you about claim one.

9  In fact let me ask you about claim two, did

10  the product that you sold well more than, the

11  polycarbonate product that you had sold, did

12  it also have a substrate attached to the

13  outer most side of the second layer?

14      A.   Where are you reading that from?

15      Q.   Well, I'm reading claim two.  In

16  fact let me ask you to do this, why don't

17  you read your claims, one through ten, the

18  ones that you asked the government to grant

19  you a patent on so that you could exclude the

20  industry from, and tell me what of those

21  claims don't read on the polycarbonate

22  product that you sold?

23      A.   An adhesive tape comprising a polymer

24  layer having a Shore A hardness between about

25  92 and 100.  A layer of adhesive attached to

EXHIBIT A

1    the first polymer layer.  The adhesive tape

2    of claim one further comprising a substrate

3    attached to outer most side of the said

4    second layer, and then adhesive tape claim --

5        Q.  Well, so far do those products have

6    that?

7        A.  Yes.

8        Q.  Okay.

9        A.  An adhesive tape claim of claim one

10   wherein said polymer layer includes a

11   textured surface.

12       Q.  Did it have that?

13       A.  Yes.

14            MR. COHN:  Did what have tha, I'm

15   sorry?

16            MR. WEBER:  The polycarbonate,

17   we're talking about the polycarbonate product

18   that you sold well more than a year prior to

19   filing your patent application.

20            MR. COHN:  And I thought he was

21   reading the claims that he didn't meet?

22   Maybe I misunderstood the question?

23   BY MR. WEBER:

24       Q.  No, it meets all these claims so far,

25   doesn't it?

EXHIBIT A

1      A.  Yes.

2      Q.  The adhesive tape of claim one

3   wherein said polymer layer is comprised of

4   polyvinyl chloride.

5      Q.  It didn't have that then, did it?

6      A.  No.  The adhesive tape of claim one

7   wherein said polymer includes coloring

8   pigment.

9      Q.  Did it have a coloring pigment?

10     A.  Yes.  Adhesive tape claim of claim

11  four wherein said polyvinyl chloride

12  comprises a clear polymer.

13     Q.  So it wouldn't be that, would it,

14  because it wasn't polyvinyl chloride.  And

15  number seven?

16     A.  The adhesive tape claim of claim one

17  wherein said pressure sensitive adhesive

18  comprises a rubberized double-sided tape.

19     Q.  Did it have that?

20     A.  Yes.  The adhesive tape claim of

21  claim one wherein said first layer thickness

22  of between about .020 and .065, no.

23     Q.  So what was the thickness.

24     A.  .070 to .085.

25     Q.  Nine?

EXHIBIT A

1      A.  The adhesive tape of claim one

2  wherein said first layer has a Shore A

3  hardness of between 93 and 97.

4      Q.  It had that, right, or it might have

5  been above 97, is that fair to say?

6      A.  Might have been above 97.

7      Q.  And number ten was the adhesive, a

8  pressure sensitive adhesive?

9      A.  Yes.

10     Q.  Now, when you put together the

11  history of the development of your product,

12  was that before you went to a patent

13  attorney?

14     A.  No.

15     Q.  That was to give to your other

16  attorneys when you were ready to sue people,

17  right?

18     A.  No.

19     Q.  No?  When did you prepare that, the

20  chronology that we talked about earlier?

21     A.  Oh, when did I prepare the

22  chronology?  I thought you were talking about

23  -- I'm sorry.  The chronology was prepared

24  after we received the patent.

25     Q.  After you received the patent, okay.

EXHIBIT A

1                    (Defendant's Exhibit

2                    No. 6 was marked

3                    for identification.)

4   BY MR. WEBER:

5       Q.  Do you recognize Exhibit 6?

6       A.  Yes.

7       Q.  Okay.  Were you kept informed of the

8   prosecution of this patent application?

9       A.  Yes, I was.

10      Q.  And it spanned what, about eight

11  years or more?

12      A.  Yes.

13      Q.  And when an office action came in,

14  did you look at it?

15      A.  Yes.

16      Q.  And did you provide assistance to

17  counsel in responding?

18          MR. COHN:  Objection.

19          THE WITNESS:  I met with counsel.

20          MR. COHN:  That's as far as that

21  answer can go.

22          MR. WEBER:  No it's not, I'm not

23  asking for any information you provided

24  counsel.  Did you assist counsel in

25  responding to this office action?  It's your

EXHIBIT A

1   patent application.

2            MR. COHN:  Right, that's

3   privileged communication.

4            MR. WEBER:  All right, we'll see.

5            MR. COHN:  You can certainly

6   inquire without asking for interchanges

7   between counsel and him.

8            MR. WEBER:  Well, I think the

9   attorney here may have -- not necessarily at

10  this time talking about present counsel --

11  have problems in this case.

12           MR. COHN:  I don't agree.  You can

13  say what you like but I don't agree.

14  BY MR. WEBER:

15      Q.  Would you look back on page four of

16  this exhibit, and this exhibit is entitled

17  Amendment A and Response to Office Action,

18  and do you see claim one there, how it's been

19  amended, do you see, do you understand how

20  you amend a claim?

21      A.  Well, I see the lining out of the one

22  reference and the two reference and the first

23  reference.

24      Q.  Okay.  And then there's some

25  underlining stuff, do you see that?

EXHIBIT A

1      A.  Yes.

2      Q.  And do you understand the

3   significance of striking out and underlining?

4      A.  Yes.

5      Q.  Okay.  And what is that?

6      A.  Striking out is removing.

7      Q.  Okay.  And underlining is what,

8   adding?

9      A.  Emphasizing, adding.

10      Q.  Well, do you know that to amend a

11   claim you strike out what you want to delete

12   and you underline what you want to add?

13      A.  Yes.

14      Q.  Okay.  And you see this claim, this

15   has one, and then in parenthesis "Currently

16   amended," do you see that?

17      A.  Uh-huh.

18      Q.  Okay.  So that's saying that this

19   claim is being amended and this is how you,

20   as represent by your attorney, wanted this to

21   be amended, is that your understanding?

22      A.  That's my understanding.

23      Q.  Okay.  Now, over on -- well, okay, so

24   claim one was amended to state that the

25   adhesive tape has a polymer layer that has a

EXHIBIT A

1    thickness of between twenty thousandths and

2    sixty-five thousandths of an inch; is that

3    correct?

4         A.  That's correct.

5         Q.  And then a whole, two whole new

6    claims were added, and that's over on page

7    five.  And do you see, I want to look at

8    claim twelve, if you would, and it says, do

9    you see where it says new, in parenthesis

10   right after the twelve?

11        A.  Okay.

12        Q.  Okay.  Do you understand that to mean

13   that this claim is being presented for the

14   first time?

15                 And just to help you out, you

16   probably knew this when you were doing it but

17   to help you out, here's your patent

18   application as it was filed or as it was

19   published, and it only went up to claim, if

20   you look at Exhibit 5 --

21        A.  Ten.

22        Q.  It only went up to ten claims, see,

23   so claims eleven and twelve were added here

24   for the first time, is that fair to say?

25        A.  Yes.

EXHIBIT A

Page 126

1      Q.  And claim twelve was amended to

2  include, down in the second sub-paragraph, a

3  double-sided adhesive layer, do you see

4  that?

5      A.  Which claim?

6      Q.  Claim twelve recites a double-sided

7  adhesive layer?

8      A.  Yes.

9      Q.  By the way, on the polycarbonate

10  product that you sold, did that have carpet

11  tape on it, on the back?

12      A.  Yes.

13      Q.  Okay.  And that carpet tape had a

14  peel adhesion that was greater than two

15  pounds per inch width, didn't it?

16      A.  I don't know.

17      Q.  Have you ever tried to pull up a

18  carpet that's laid down with carpet tape?

19      A.  Yes.

20      Q.  What, what would be your

21  understanding from that effort, is it greater

22  than two pounds per inch width?

23      A.  I don't know.

24      Q.  Okay.  What is an adhesive tape?

25          MR. COHN:  Are you asking in this

EXHIBIT A

1    particular context?

2    BY MR. WEBER:

3        Q.  Yeah, the context of this patent and

4    the office action.  In fact here, I'll help

5    you out, thank you, counselor.  Turn to page

6    nine, are you at page nine?

7        A.  Uh-huh.

8        Q.  Do you see the second sentence on

9    that page, "Even if the multilayered sign

10   blank in Condon," that's referring to a prior

11   art patent, "does contain a layer of adhesive

12   that permits the multilayered sign blank to

13   be adhered to a substrate, the mere presence

14   of that adhesive does not transform the

15   multilayered sign blank into an adhesive

16   tape."  What's an adhesive tape?

17       A.  I would imagine there are many

18   definitions for what an adhesive tape is.

19       Q.  Well, what's the definition that you

20   were hoping to convey to people skilled in

21   the art when you submitted your patent

22   application?

23       A.  The '480 patent?

24       Q.  Yes.

25       A.  Yes, that's the answer.

EXHIBIT A

1      Q.   Everything that's in it, that's an

2    adhesive tape, you don't have a more general

3    definition, is that fair to say?

4      A.   I could provide you one.

5      Q.   Well, provide me with one.

6      A.   A strand of material that has sticky

7    material on it.

8      Q.   Okay, that's the sum and substance of

9    it?

10     A.   Of that definition.

11     Q.   Well, is that your definition, is

12   that a definition that when you used the term

13   or when your counsel used that term in

14   responding to the Patent Office that you

15   wanted to convey?

16     A.   Well, I guess I'm confused.  You're

17   talking about Condon here and then you're

18   talking about my counsel, with what my

19   counsel wanted to convey with this tape.

20     Q.   Did you review these responses from

21   the Patent Office actions?

22     A.   Yes.

23     Q.   Okay.  So you didn't have any trouble

24   with, I mean did you have any problems with

25   anything that was filed with the Patent

EXHIBIT A

1   Office?  Did you ever say, gee, that's not

2   right, I wouldn't have said it that way?

3             MR. COHN:  Did he ever say that to

4   who?

5             MR. WEBER:  Yourself.

6             THE WITNESS:  Of course.

7   BY MR. WEBER:

8      Q.  You did?  Did you say it about this

9   sentence I just read?

10     A.  No.

11     Q.  Okay.  Well, I mean you're just

12  saying something does not transform a

13  multilayered sign blank into an adhesive

14  tape.

15             Now is it fair to say that the

16  author of this paper, or your agent who

17  submitted this, believed that the patent

18  examiner, as a person skilled in the art,

19  would understand what an adhesive tape is,

20  and if so what is an adhesive tape?

21             MR. COHN:  Objection, this is

22  beyond factual inquiry.

23             THE WITNESS:  I relied on counsel

24  to respond to the office action as far as on

25  this and I was very satisfied with this, his

EXHIBIT A

1   responses.

2   BY MR. WEBER:

3       Q.  Okay, that's your answer to my

4   question?  I mean if it is, it is.  Is it?

5       A.  What was your question?

6       Q.  What is an adhesive tape, in the

7   context of what you were trying to relate to

8   the examiner in responding to this office

9   action?

10          MR. COHN:  Can I hear his answer

11  back please.

12   (Previous testimony read back as requested.)

13  BY MR. WEBER:

14      Q.  If you were asked about it, what did

15  you understand adhesive tape to be when you

16  read it?

17          MR. COHN:  Objection.

18  BY MR. WEBER:

19      Q.  And if it's the definition you gave

20  just awhile ago, if it is I'm fine to move

21  on, I just want to give you every opportunity

22  to perfect the record.

23          MR. COHN:  Objection, move to

24  strike, you don't have to make little

25  speeches what your question is designed to

EXHIBIT A

1    do.

2    BY MR. WEBER:

3        Q.  Go ahead.

4        A.  A tape is something that has an

5    adhesive on it that will adhere to a surface.

6        Q.  Now, if you'll turn to page ten, I

7    want you to look at the first full paragraph

8    there and go down about four lines, it starts

9    however, and it says, "However, Condon

10   discloses a polymer layer that has a

11   specified Shore D hardness or Shore C

12   hardness and does not disclose any Shore A

13   hardness values of the polymer layer," did I

14   read that correctly?

15       A.  Yes.

16       Q.  Is it, is it your understanding that

17   it's impossible to correlate Shore A to Shore

18   D to Shore C?

19       A.  It's my understanding that there are

20   some difficulties correlating between them,

21   the different scales.

22       Q.  Well, is there anything unique about

23   a Shore A hardness as compared to Shore B or

24   Shore C?

25       A.  Different methods of testing the

EXHIBIT A

1   hardness, used with different tools.

2       Q.  But assuming that you've got a piece

3   of material and you want to test its

4   hardness, you can test its hardness, its

5   Shore A hardness and get a value, a Shore B

6   hardness and get a value and a Shore C

7   hardness and get a value, and those three

8   values will correlate with each other, won't

9   they?

10              MR. COHN:  Objection.

11              THE WITNESS:  No, not that I know

12  of, there is no perfect correlation between

13  those three different scales.

14  BY MR. WEBER:

15      Q.  Okay.  Well, if I had a scale and I

16  was measuring something, let's say this

17  scale was a linear scale and I was only

18  going to measure length.  And I measure this

19  thing and the first scale was just in inches

20  and I measured it, I'd get eighteen inches

21  let's say, the thing is eighteen inches

22  long.

23              But then I go pick up something

24  that's measures only in feet and I measure

25  it and, wow, it's only one and a half feet

EXHIBIT A

1   long.  And then I get a yardstick that's only

2   measured in yards and I measure it and say

3   this is only a half yard long.

4                The length of that product

5   didn't change at all, did it?

6        A.  No, it didn't.

7        Q.  It was just the scale that I chose to

8   use; is that correct?

9        A.  That's correct.

10       Q.  So when you read this response to

11  the patent application saying, well, Condon

12  can't be a good reference because it only

13  talks about Shore D and Shore C hardness and

14  we're talking about Shore A hardness, didn't

15  you think, wow, there must be some

16  correlation between Shore A, Shore D and

17  Shore C?

18               MR. COHN:  Objection.

19               MR. WEBER:  Didn't you?

20               MR. COHN:  Objection.

21               THE WITNESS:  No.

22  BY MR. WEBER:

23       Q.  Was this the first experience you

24  ever had with testing the hardness, the

25  surface hardness of a material?

EXHIBIT A

1      A.  No.

2      Q.  Okay, when had you done that

3  previously?

4      A.  I don't remember just where it was at

5  but I know I've had different measures of

6  hardness, Shore A hardness or whatever.

7      Q.  Well, if you look at claim twelve

8  again, and it's back on page five, that's the

9  knew claim and it talks about a double-sided

10  adhesive layer and substantially continuous

11  contact with the first side of the polymer

12  layer, do you see all that?

13      A.  Where are you at?

14      Q.  I'm sorry, claim twelve, the new

15  claims, you get down there and it talk about

16  a double-sided adhesive layer, substantially

17  continuous contact with the first side of the

18  polymer layer, do you see that?

19      A.  Uh-huh.

20      Q.  Okay.  None of that was in the claims

21  as they were originally filed, was it?

22      A.  No.

23      Q.  And yet if you look at the comment

24  that you through your attorney made to the

25  Patent Office on page sixteen, it's talking

EXHIBIT A

1  about the new claims, it says, the second

2  sentence, "Applicant believes these new

3  claims will not require an additional search

4  because, even though they have been broadened

5  in certain respects, these new claims recite

6  elements largely contained in the present

7  claims covered by the Examiner's previous

8  search," do you see that?

9      A.  Yes.

10     Q.  Well, the previous search was on the

11  application as filed, you know that,

12  correct?

13     A.  Yes.

14     Q.  Okay.  And the claims as originally

15  filed didn't have any of that stuff about

16  the double-sided adhesive and the

17  substantially continuous contact in them,

18  did they?

19          MR. COHN:  Let me object to the

20  impropriety of your requiring the witness to

21  impart legal argument by his counsel.

22          MR. WEBER:  This isn't legal

23  argument, these are factual presentations

24  and, by the way, misrepresentations to the

25  Patent Office is what they are.

EXHIBIT A

1            MR. COHN:  No, they're not.

2            MR. WEBER:  Well, they are.

3            MR. COHN:  They're not.

4            MR. WEBER:  But in any event --

5            MR. COHN:  We'll see in the end

6    who's right about that, won't we?

7            MR. WEBER:  I think we will.

8            THE WITNESS:  Claim seven on the

9    original patent does indeed speak of an

10   adhesive tape, claim one, where it says

11   pressure sensitivity shall comprise of the

12   rubberized double-sided tape.

13   BY MR. WEBER:

14      Q.  It's rubberized, right, it's not as

15   broad as to say that it's just a double-sided

16   tape and it doesn't say that it's, and that

17   claim doesn't have all the other limitations

18   that are in claim twelve, does it?

19            MR. COHN:  Do you want to just

20   debate the client?

21            MR. WEBER:  Well, no, if he

22   wants --

23            MR. COHN:  That's what you're

24   doing.

25            MR. WEBER:  No, if he wants to

EXHIBIT A

1    offer that, I want to come back and ask him

2    if he can show me.

3              MR. COHN:  You're asking a

4    compound question, which is an effort to

5    enter into a debate, and it's inappropriate,

6    you should know better.

7              MR. WEBER:  Well, I've been in

8    practice for awhile so I appreciate the

9    opportunity to learn.

10             MR. COHN:  That's why you should

11   know better.

12             MR. WEBER:  I greatly appreciate

13   it.

14             MR. COHN:  There are two kinds of

15   lawyers and I'm finding out which kind you

16   are.

17             MR. WEBER:  Well, I think you guys

18   should have looked at this a little better.

19   I apologize, I'm not going to throw stones at

20   you and I'll ask you not to do it to me.

21             MR. COHN:  Well, don't force me.

22   BY MR. WEBER:

23      Q.  All right.  Well, in one of the

24   lawsuits you're involved in there's been some

25   detailed charges of fraud on the Patent

EXHIBIT A

Page 138

1    Office, haven't there been?

2              MR. COHN:  Objection, what do you

3    mean by detailed?

4              THE WITNESS:  Yeah.

5              MR. WEBER:  And what case was

6    that?

7              THE WITNESS:  Creative Safety.

8              MR. WEBER:  Let's do this one.

9                      (Defendant's Exhibit

10                     No. 7 was marked

11                     for identification.)

12   BY MR. WEBER:

13       Q.  Do you recognize Exhibit 7?

14       A.  Yes.

15       Q.  And you recognize that as another

16   response to a Patent Office action?

17       A.  Yes.

18       Q.  And do you see, now let's look at

19   claim one here where you amended your claim

20   to include "substantially uniform" in

21   describing the thickness of the polymer

22   layer, do you see that?

23       A.  Uh-huh.

24       Q.  The drawing in your patent, which I'm

25   looking at the patent itself, Exhibit 3, do

EXHIBIT A

1   you see the polymer layer there as being

2   element one?

3              And I switched, I apologize,

4   I'm sorry, it's Exhibit 3, the patent

5   itself.

6       A.  Okay.

7       Q.  If you go to the second page that has

8   the drawing, although it's on the first page,

9   too, do you see number one, which is the

10  polymer layer?

11      A.  Yes.

12      Q.  Okay.  Now, is it fair to say that

13  that polymer layer has a totally uniform

14  thickness?

15      A.  As represented.

16      Q.  Okay.  Was there anywhere in the

17  patent where it was ever represented as being

18  anything other than as shown in that drawing

19  and that is, you know, the totally uniform

20  thickness?

21      A.  I don't believe so, no.

22              MR. COHN:  Are we talking about a

23  drawing?

24              MR. WEBER:  Well, a drawing or

25  anywhere in the patent.  That's how you

EXHIBIT A

1    understood my question, right?

2              THE WITNESS:  Yes.

3              MR. WEBER:  Okay.  Why don't we

4    mark this one.

5                   (Defendant's Exhibit

6                   No. 8 was marked

7                   for identification.)

8    BY MR. WEBER:

9        Q.  Now, do you recognize Exhibit 8?

10       A.  Yes.

11       Q.  That was this Maurer patent was cited

12   against your patent application, right?

13       A.  That's correct.

14       Q.  Do you know Mr. Maurer?

15       A.  No.

16       Q.  Or either of the Messrs. Maurer, it

17   looks like there's two of them, Alex and

18   Richard, you don't know either of the

19   Maurers?

20       A.  No.

21       Q.  Okay.  And here it was talking about

22   steps that the tape forms as it's wrapped

23   around the end of a hockey stick, right?

24              MR. COHN:  Is there a specific

25   place you're referring to?

EXHIBIT A

1          MR. WEBER:  I'm referring to the

2   patent as a whole, maybe even the title,

3   Applique for a Hockey Stick.

4          MR. COHN:  You're referring to the

5   claim page on the patent?

6   BY MR. WEBER:

7      Q.  No, if you would listen to the

8   question, I'm asking isn't that what this is

9   about, this is about like the title says,

10  which the law requires that the title be

11  somewhat descriptive, it's an applique for a

12  hockey stick, and it's how the head of the

13  hockey stick can be wrapped where it makes

14  engagement with the puck, am I correct in

15  that regard, as you recall it?

16     A.  Yes.

17     Q.  Okay.  And if you look down at the

18  bottom of column twelve, line 66, the

19  Examiner was pointing to this and Maurer

20  says, "Most preferably, the first step 108

21  has a thickness of about .008 of an inch,"

22  right?

23     A.  Where are you at?

24     Q.  Okay, I'm in column twelve, and go

25  all the way down to the bottom in column

EXHIBIT A

1   twelve, around line 66 it says, "Most

2   preferably, the first step 108 has a

3   thickness of about .008 inches," correct?

4        A.   Okay.

5        Q.   And then the second step .028, third

6   step .048, do you see that?

7        A.   Yes.

8        Q.   Okay.  And to get around Maurer, the

9   claim, claim one was amended to include the

10  "substantially uniform thickness" language,

11  right, saying we don't have steps, do you

12  recall that?

13            MR. COHN:  Objection.

14            THE WITNESS:  I recall us

15  ascertaining that our product does not have

16  steps.

17  BY MR. WEBER:

18       Q.   While Maurer does, correct?

19       A.   We just read it.

20       Q.   Okay.

21       A.   Yeah.

22                      (Defendant's Exhibit

23                      No. 9 was marked

24                      for identification.)

25  BY MR. WEBER:

EXHIBIT A

Page 143

1      Q.  Do you recognize Exhibit 9?

2      A.  Yes.

3      Q.  The response here adds a couple of

4   new claims, and if you look back on page

5   three, you see claims thirteen and fourteen;

6   is that correct?

7      A.  Yes.

8      Q.  And claim fourteen talks about the

9   two pounds per inch width when peeled at a

10  ninety degree angle under a modified PSTC-101

11  method, do you see that?

12     A.  Yes.

13     Q.  Okay.  Now, we talked earlier about a

14  PSTC-101D test procedure, do you recall that

15  discussion?

16     A.  Yes.

17     Q.  And is that what's been being

18  referred to here in this claim?

19          MR. COHN:  Objection.

20  BY MR. WEBER:

21     Q.  Or is it something new, was the D

22  left off inadvertently?

23     A.  I don't know.

24     Q.  Okay.  You understand that anything

25  presented in a claim has to be supported in

EXHIBIT A

1    the patent specification or drawings, right?

2        A.  Yes.

3        Q.  Okay.  Is there anywhere in the

4    patent specification that you can recall --

5    and I'll stipulate that the document will

6    speak for itself -- but as you sit here today

7    can you recall any reference in this patent

8    specification to a PSTC-101 method as

9    compared to a 101D method?

10            MR. COHN:  You should be looking

11   at the patent if you're looking for something

12   to try to answer his question.

13            MR. WEBER:  I'm just asking if you

14   can recall, because I'll stipulate the patent

15   will speak for itself, but if you can recall

16   something then we can move it along.

17            MR. COHN:  Well, he can look at it

18   to give his answer, that's appropriate.

19            MR. WEBER:  Yeah, he can do that,

20   I'm just asking for his recollection.

21            THE WITNESS:  I'm sorry, where in

22   the patent are you talking about?

23   BY MR. WEBER:

24       Q.  Well, I saw 101D mentioned at column

25   three, down around line thirteen and

EXHIBIT A

1  fourteen, and I was wondering if there is a

2  101 mentioned anywhere in there?

3      A.  Okay.  I do have, if memory serves me

4  correct, there was some measurement done by

5  Chemsultants that they listed the wrong peel

6  adhesion method, that it was more, if I'm

7  thinking about the same thing.

8      Q.  When did you come to that

9  realization?

10     A.  After one of the filings with

11 Creative Safety and in conversations with my

12 lawyer.

13     Q.  Oh, okay, after the patent had issued

14 and after this lawsuit was filed?

15     A.  Yes.

16     Q.  Now, did you understand from this

17 office action that the Patent Office was, had

18 been challenging you as the patent applicant

19 with regard to how you could support your

20 claim for "substantially uniform polymer

21 layer," and I'm looking at the way you

22 address it at page six?

23         MR. COHN:  What office action are

24 you referring to?

25         MR. WEBER:  The office action that

EXHIBIT A

1   Exhibit 9 is responding to.

2            MR. COHN:  Do we have that so he

3   can see it?

4            MR. WEBER:  I'm asking if he

5   recalls such an office action, where the

6   Examiner challenged whether or not there was

7   any support for you claiming a "substantially

8   uniform thickness" of the polymer layer, do

9   you remember that being an issue during the

10  prosecution of the patent?

11      A.  I don't remember.

12      Q.  Okay.  If you look over at the top

13  of page seven of this response to the office

14  action, at the very top starting with the

15  first full sentence, "The substantially

16  uniform thickness of the polymer layer may

17  be defined by claim one itself, in that the

18  claim calls for, among others, a

19  'substantially uniform thickness of between

20  about .020 and .065'" of an inch, did I read

21  that correctly?

22      A.  That's correct.

23      Q.  And then you said, you through your

24  agent went on and said, "In other words,

25  this portion of the claim is self defining.

EXHIBIT A

1  Substantially uniform means between about

2  the forty-five thousandths of an inch range

3  claimed," do you see that.

4      A.  Yes.

5      Q.  So were you saying to the Patent

6  Office that any variation between twenty

7  thousandths and sixty-five thousandths of an

8  inch would still be substantially uniform?

9      A.  No.

10     Q.  Okay.  Can you explain to me what you

11  were trying to convey to the Patent Office,

12  maybe in words other than those that I just

13  read?

14     A.  That --

15          MR. COHN:  Objection, you keep

16  going from you to your attorney and back and

17  forth, you're making it very confusing for

18  the witness by doing that.

19  BY MR. WEBER:

20     Q.  Well, your attorney is only an agent

21  for you in practicing before the Patent

22  Office and in fact doesn't even have to be an

23  attorney, it can be a patent agent, do you

24  understand that?

25     A.  Yes.

EXHIBIT A

Page 148

1      Q.  Okay.  And you looked at these

2  things, these proposed responses before they

3  were filed, didn't you?

4      A.  Yes.

5      Q.  Okay.  And you approved them before

6  they were filed, didn't you?

7      A.  Yes.

8      Q.  And in fact they were filed on your

9  behalf, because you were the one that was

10  going to get the patent, right?

11      A.  Yes.

12      Q.  Okay.  So now let's talk about this

13  stuff, what is this, what am I missing here,

14  how much of a variation could you have and

15  still be substantially uniform?

16      A.  I think what you're doing is you're

17  saying that the one product has to be twenty

18  thousandths to twenty-two, where this is

19  saying that the thickness could be twenty

20  thousandths, it could be twenty-four

21  thousandths, it could be thirty-five

22  thousandths, it could be fifty-five

23  thousandths and still be covered.  And each

24  one of those products would be substantially

25  uniform in that range.

EXHIBIT A

Page 149

1      Q.  Well, how much variation could, let's

2   say that it was a twenty-four thousandths

3   inch thick layer of polymer, could it have a

4   variation of a thousandth and still be

5   substantially uniform thickness?

6                In other words, go from

7   twenty-three thousandths to twenty-five

8   thousandths and still be substantially

9   uniform?

10               MR. COHN:  Objection.

11               THE WITNESS:  That's a matter of

12  interpretation.

13  BY MR. WEBER:

14     Q.  Well, okay, but these are your claims

15  and these are your arguments to the Patent

16  Office and "substantially uniform" when you

17  were arguing with the Patent Examiner or

18  responding to the Patent Examiner, you said

19  "substantially uniform" means between about

20  the forty-five thousandths of an inch range

21  claim, and so what I take that as, I have

22  forty-five thousandths of an inch?

23               MR. COHN:  Objection, that's not

24  what he said.

25  BY MR. WEBER:

EXHIBIT A

Page 150

1      Q.  "Substantially uniform," I'm going to

2   quote it, "In other words, this portion of

3   the claim is self defining," dash,

4   "substantially uniform means between about

5   the forty-five thousandths of an inch range

6   claimed."

7                   So anything that falls within

8   the forty-five, as long as it stays within

9   that forty-five thousandths of an inch range,

10  is it substantially uniform thickness?

11     A.  My interpretation of that is that if

12  the product is twenty-two thousandths thick,

13  it's inside the patent range.  If you make

14  another product and it's thirty-five

15  thousandths thick, it's within the patent

16  range.  If we make it sixty-six thousandths

17  wide, it is outside of the patent range.

18     Q.  Okay, that's the range.  What is

19  "substantially uniform," what did you want

20  the Examiner to believe "substantially

21  uniform" meant?

22              MR. COHN:  Again, objection.

23              THE WITNESS:  That from one -- the

24  overall thickness of the tape from one edge

25  of the tape to the other, for the majority of

EXHIBIT A

1    the profile itself, is in and around the same

2    thickness.

3    BY MR. WEBER:

4        Q.  You never said that in your patent

5    application though, did you?

6             MR. COHN:  He never said anything

7    in his patent application.

8             MR. WEBER:  That's true.  Do you

9    adopt your attorney's answer?

10            MR. COHN:  The attorney said it.

11            THE WITNESS:  I didn't.

12   BY MR. WEBER:

13       Q.  Your attorney did?

14       A.  Yes.

15       Q.  Are you laying these responses to the

16   office action on your attorney and you don't

17   have any responsibility for them?

18       A.  No, not at all.

19       Q.  By the way, when did you retain Mr.

20   Harders?

21       A.  2005 sometime, July of 2005.

22       Q.  And how did that come about?  And I

23   don't want to hear any attorney/client

24   privilege stuff, but why did Mr. Harders

25   take over for Mr. Nauman and Mr. McCollister?

EXHIBIT A

1          MR. COHN:  Objection, let me think

2   about that for a minute.

3               I think that's going to be

4   difficult to answer.  I don't know what the

5   answer is so I don't know if it can be

6   answered without disclosing privilege or not.

7   Can I confer with the client and I'll give

8   you a decision on it?

9          MR. WEBER:  Sure.

10         (Discussion had off the record.)

11         MR. COHN:  You can answer.

12  BY MR. WEBER:

13     Q.  Go ahead.

14     A.  We were concerned with obtaining

15  adequate response times in working with our

16  attorney, with the Fay Sharpe attorney.

17     Q.  Okay, responsiveness of the attorney?

18     A.  Responsiveness of the attorney.

19         MR. WEBER:  Okay, fair enough.

20  Next number.

21               (Defendant's Exhibit

22                No. 10 was marked

23                for identification.)

24  BY MR. WEBER:

25     Q.  Do you recognize Exhibit 10?

EXHIBIT A

1      A.  Yes.

2      Q.  Okay.  And this is another response

3  to a Patent Office action?

4      A.  Yes, it is.

5      Q.  And here it was added to claim one --

6  I'm over on page number two -- the adhesive

7  tape comprises a peel adhesion greater than

8  two pounds per inch width, et cetera, under a

9  modified PSTC-101 method, correct?

10     A.  Correct.

11     Q.  And claim twelve, it was added that

12  the peel adhesion was measured under a test

13  method including peeling the tape at a ninety

14  degree angle after application to a stainless

15  steel panel, correct?

16     A.  Correct.  Where are you getting that

17  ninety degree angle?

18     Q.  I'm over on claim twelve, which is

19  page three, I'm sorry.

20     A.  Okay, okay.

21     Q.  See, it's the underlined portion.

22     A.  Oh, okay, okay.

23     Q.  And then you added a couple new

24  claims, claim fifteen, which is over on page

25  four, it says the test method further

EXHIBIT A

1   includes peeling the tape at a ninety degree

2   angle after application to a stainless steel

3   panel and allowing a dwell of one hour,

4   correct?

5       A.  Correct.

6       Q.  Now, the PSTC-101 method for example

7   that was added to claim one is not described,

8   at least by that name and to your

9   recollection, in the patent specification,

10  correct?

11      A.  Is that the one that was PSTC-101D?

12      Q.  Yes.

13          MR. COHN:  Are you asking him to

14  repeat his earlier testimony?

15          MR. WEBER:  I want this to be

16  cohesive here, and I'm sure that he can

17  repeat his earlier testimony without much

18  trouble at all.

19          MR. COHN:  Well, I think it should

20  be adhesive, not cohesive.

21          MR. WEBER:  Did I say cohesive?

22  All right, adhesive, the adhesive.

23          MR. COHN:  You said cohesive

24  correctly.

25          MR. WEBER:  Oh, okay, all right.

EXHIBIT A

1   It's getting late, but that was good.

2            THE WITNESS:  Okay, and what was

3   your question again, one more time?

4            MR. WEBER:  Can you read that

5   back.

6    (Previous testimony read back as requested.)

7            THE WITNESS:  In the patent

8   application it's described as PTSC-101D.

9            MR. WEBER:  Okay.  And then I'll

10  ask the reporter to mark this exhibit as

11  Exhibit 11.

12                      (Defendant's Exhibit

13                      No. 11 was marked

14                      for identification.)

15  BY MR. WEBER:

16    Q.  And do you recognize Exhibit 11?

17    A.  Yes.

18    Q.  And do you recognize this as a notice

19  of allowance of your patent application?

20    A.  Yes.

21    Q.  And back on numbered page two, which

22  is, well, let's get back, it's actually one,

23  two, three, four, the sixth page back in the

24  exhibit, where there's a heading "Reasons for

25  Allowance," do you recall receiving this in a

EXHIBIT A

1    statement for reasons for allowance from the

2    Examiner?

3        A.  Yes.

4        Q.  And have you looked at that

5    paragraph?

6        A.  Which paragraph?

7        Q.  The paragraph that's the stated

8    reasons for allowance.

9            MR. COHN:  You mean all the

10   paragraphs in that section?

11           MR. WEBER:  No, there's just one

12   paragraph that states the reasons for

13   allowance, "The closest prior art of record

14   fails to teach or suggest," do you see that?

15           THE WITNESS:  Yes.

16           MR. WEBER:  Okay.

17           MR. COHN:  I think your

18   description, I know what you're talking about

19   but I don't think you described it

20   accurately.  The whole page is headed

21   "Reasons for Allowance," not just a single

22   paragraph.

23           MR. WEBER:  Yeah, but the actual,

24   the reasons for allowance is that paragraph.

25   The next is if you've got any comments, call

EXHIBIT A

1  me.  If you have any inquiry, this is how you

2  reach me, if you try to reach me and you're

3  unsuccessful, try somebody else.

4           MR. COHN:  So you're just

5  characterizing that one paragraph as being

6  the one related to the heading?

7           MR. WEBER:  I'm telling you that

8  that's the one that states the reasons for

9  allowance.  None of the rest on that page or

10  the following page is any reason for allowing

11  the patent.

12           THE WITNESS:  Okay.

13  BY MR. WEBER:

14     Q.  Do you agree with the statements of

15  the Examiner?

16     A.  Yes.

17           MR. WEBER:  Okay.

18                (Defendant's Exhibit

19                No. 12 was marked

20                for identification.)

21  BY MR. WEBER:

22     Q.  I'll hand you what's been marked as

23  Exhibit 12 and ask if you're familiar with

24  this document?

25     A.  Yes, I am familiar with it.

EXHIBIT A

1      Q.  And do you know why this was filed?

2      A.  Procedural I would imagine, with

3  notice of allowance.

4      Q.  If you read the comments over on page

5  two, and while there's two paragraphs under

6  comments, the only one that's relevant is the

7  first one I think.

8      A.  Okay, what's your question?

9      Q.  Have you read that?

10     A.  Yes.

11     Q.  Okay.  Do you understand that to be

12  saying that the Examiner shouldn't have

13  allowed some of these claims because the

14  elements that the Examiner recited as being

15  the reason for allowance are not present in

16  some of the allowed claims?

17     A.  No, that's not my understanding of

18  it.

19     Q.  Do you read it as saying that the

20  elements that are not present in each of the

21  allowed claims that the Examiner has cited as

22  a basis for allowance are inferentially

23  included in the claims?

24          MR. COHN:  Objection.

25          THE WITNESS:  I understand it

EXHIBIT A

1  that the Examiner is saying that the claims

2  are allowed, that's my understanding of it.

3  BY MR. WEBER:

4       Q.  Okay, do you understand what you

5  through your attorney are saying, when you

6  were invited to comment upon what the

7  Examiner did and you provided this comment,

8  do you have any understanding beyond what

9  you've just stated?

10      A.  I don't know.  I have to confess I

11  thought it was just more procedural.

12            MR. WEBER:  That's fine.  All

13  right, let's take a break.

14                 - - -

15            (Short recess had.)

16                 - - -

17                 (Defendant's Exhibit

18                 No. 13 was marked

19                 for identification.)

20  BY MR. WEBER:

21      Q.  I've handed you what's been marked

22  as Exhibit 13, and I don't know that you've

23  ever seen this before, but this is PSTC-101

24  and the different test methods of that.

25                 And if you look down on the

EXHIBIT A

1  first page you'll see under scope, and you

2  go down to 1.1.4, do you see that?

3      A.  Yes.

4      Q.  And it has test method D, this is

5  under PSTC-101, it says, "Test method D

6  gives a measure of adherence of the release

7  liner to the adhesive of either single or

8  double-coat tape," did I read that

9  correctly?

10     A.  Yes.

11     Q.  Okay.  So what do you understand

12 PSTC-101D to be directed to?

13          MR. COHN:  Objection.

14          THE WITNESS:  That measures the

15 adhesion to the tape to the throw-away

16 release liner.

17 BY MR. WEBER:

18     Q.  Okay.  And then if you go back on

19 page 101-6, up at the top, thirteen, it

20 identifies the test method D and it has, it

21 identifies it as "Adhesion to liner of

22 double-coated and single-coated tapes,"

23 right?

24     A.  That's what it reads, yes.

25     Q.  Now, the reference to 101D in the

EXHIBIT A

1   patent is erroneous, isn't it?

2             MR. COHN:  Objection.

3             THE WITNESS:  Not that I know of.

4   BY MR. WEBER:

5      Q.  So you think that it was intended to

6   be, that the reference to 101D was purposeful

7   and accurate in the patent?

8             MR. COHN:  Objection.  I'm going

9   to call your attention to the part of the

10  patent that you're referring to.

11            THE WITNESS:  Okay.  And what was

12  the question, what was your question?

13            MR. WEBER:  Would you read it

14  back.

15   (Previous testimony read back as requested.)

16            THE WITNESS:  The 101D reference

17  originated from the Chemsultants report on

18  the adhesion capability of the tape

19  measurements.  I believe there was an

20  inaccuracy when they reported that, that they

21  did not mean to do the D.

22  BY MR. WEBER:

23     Q.  Okay, inaccurate, did you have the

24  problem with my saying it was erroneous?

25     A.  Yes.

EXHIBIT A

Page 162

1      Q.  And what's the difference between

2  inaccurate and erroneous?

3      A.  Because you're giving my patent a

4  connotation that it's an erroneous patent.

5      Q.  No, I was only directing it to that

6  element.  But is it fair to say that

7  somewhere along the line during the

8  prosecution of this patent that the error

9  was caught, because further reference to

10  PSTC-101 was just presented as that, without

11  the D?

12      A.  That is something that you would

13  need to consult my attorney on, in reference

14  to the inaccuracy.

15      Q.  The adherence of the release liner

16  to the adhesive was not a feature or a

17  particular concern in your patent, was it?

18      A.  No.

19                    (Defendant's Exhibit

20                    No. 14 was marked

21                    for identification.)

22  BY MR. WEBER:

23      Q.  Do you recognize Exhibit 14?

24      A.  Yes.

25      Q.  And what is Exhibit 14?

EXHIBIT A

Page 163

1      A.   The Condon patent.

2      Q.   And that's the Condon patent we

3  mentioned sometime back; is that correct?

4      A.   Yes.

5              MR. WEBER:  Okay.

6                    (Defendant's Exhibit

7                    Nos. 15 and 16 marked

8                    for identification.)

9  BY MR. WEBER:

10     Q.   Now, if you want we can either refer

11  to Exhibits 15 and 16 or we can actually go

12  to your published patent application, which

13  is Exhibit 5, and look at its claims, and

14  your patent, which is Exhibit 3, and look at

15  its claims.

16              I would represent to you that

17  I have or my secretary has accurately

18  re-typed the claims in Exhibits 15 and 16,

19  but you can do whichever makes you feel most

20  comfortable.

21              MR. COHN:  I'm more comfortable

22  with using the real thing.

23              MR. WEBER:  The real patent, all

24  right.  Well, then you can do that and the

25  witness can do whatever he feels.

EXHIBIT A

1           MR. COHN:  No, I think the witness

2    should do what his counsel is most

3    comfortable with.

4           MR. WEBER:  All right, then let's

5    look at the claims.

6           MR. COHN:  5 and 3 you say?

7    BY MR. WEBER:

8       Q.  Let's look first at Exhibit 5, which

9    was your patent application as filed, or as

10   published, which was also the claims as

11   filed.  And do you see those back on page

12   two, over on the right-hand, lower right-hand

13   corner of Exhibit 5?

14      A.  Page?

15      Q.  The page numbered two up at the top.

16      A.  Oh, okay.

17           MR. COHN:  You have Exhibit No. 3

18   out, because you're going to need it in a

19   second.

20   BY MR. WEBER:

21      Q.  Now, I walked you through, I walked

22   you through the four amendments that took

23   place in the prosecution of your patent here

24   earlier, do you recall that?

25      A.  Yes.

EXHIBIT A

1     Q.  Okay.  And is it -- and do you

2   recognize the lower right-hand corner of

3   numbered page two of your published patent

4   application, which is Exhibit 5?

5     A.  Okay.

6     Q.  Do you recognize those as being the

7   claims that published in your, when your

8   patent application was published?

9     A.  Yes.

10     Q.  Okay.  And do you recognize the

11   claims that bridge columns four and five of

12   your patent, which is Exhibit 3, as being

13   your patent claims?

14     A.  Yes.

15     Q.  Okay.  And would you agree -- well,

16   strike that.

17             Is any of the patent claims

18   substantially identical to the invention as

19   claimed in the published patent application?

20             MR. COHN:  Objection.

21             THE WITNESS:  I rely on counsel to

22   respond to patent rejections and to modify

23   the, the appeals.  And I rely on his counsel

24   and I'm happy with what he has done for me in

25   that regard.

EXHIBIT A

1    BY MR. WEBER:

2        Q.   Okay.  And do you, do you recall the

3    evolution of the application claims or the

4    publication claims of Exhibit 5 through four

5    sets of amendments to get to the patent

6    claims of Exhibit 3?

7        A.   Yes.

8        Q.   So you don't have personally an

9    appreciation of whether any of the

10   application claims is substantially identical

11   to any of the patent claims; is that

12   correct?

13       A.   That's incorrect.

14       Q.   Okay.

15       A.   What I said was I rely on counsel to

16   submit appeals to rejections on the patent

17   applications and follow the process through.

18   He consulted with me and I approved his

19   modifications.

20       Q.   All right, okay.  But my question

21   here this afternoon is, is any claim of the

22   published patent application substantially

23   identical to any of the allowed claims?

24            MR. COHN:  Do you want him to read

25   it to determine it now or do you want to know

EXHIBIT A

1    if he already knows that?

2              MR. WEBER:  Well, I want to know

3    if you already know whether or not there's

4    any claim in either the patent or the

5    published application that is substantially

6    identical to a claim in the application or

7    patent?

8              MR. COHN:  He's not asking you to

9    determine that now, he's asking whether you

10   know that.

11             MR. WEBER:  Thanks for trying to

12   help.

13             MR. COHN:  He's not asking you to

14   read it now and make that determination, he's

15   asking if in your head, if you know whether

16   any of the claims in the two documents are

17   substantially identical.  Do you know?

18             THE WITNESS:  I don't know.

19             MR. WEBER:  Okay.  See how easy

20   that was.

21             MR. COHN:  Just listen to the

22   question.

23                      (Defendant's Exhibit

24                      No. 17 was marked

25                      for identification.)

EXHIBIT A

1  BY MR. WEBER:

2      Q.  Okay.  You've seen Exhibit 17 before,

3  haven't you?

4      A.  I don't know if I've seen the exhibit

5  before; I have seen the representation of

6  what is presented here.

7      Q.  Okay.  What do you understand Exhibit

8  17 to be showing?

9      A.  I understand it to be showing Cliff's

10  representation of his floor tape with the

11  undercut.

12      Q.  Okay.  The polymer layer?

13      A.  Well, I see no reference to something

14  saying there's a polymer layer here.  But if

15  you're talking this, I read this as being the

16  floor tape.

17      Q.  Okay.  And if you read this, in fact

18  why don't you circle with this red pen what

19  you just said you understood to be the floor

20  tape.

21      A.  (Doing as requested.)

22      Q.  Okay.  And if you look at that, where

23  would the adhesive be?

24      A.  Right in the undercut to the other

25  side, where it goes into the undercut.

EXHIBIT A

1     Q.  Okay.  And on each side of the

2  undercut is there a step in the, in the

3  polymer layer?

4     A.  There is represented to be a step.

5     Q.  Okay.  And it goes from one surface,

6  it steps down and goes to another surface; is

7  that correct?

8     A.  Yes.

9     Q.  And between those two steps, do you

10  understand there to be adhesive?

11     A.  Yes.

12     Q.  And what do you understand the

13  purpose of those steps to be?

14     A.  To be a channel to where adhesive is

15  applied.

16     Q.  Okay.  Do you understand the steps to

17  serve to contain the adhesive?

18     A.  I don't know that.

19     Q.  Do you understand that to be a

20  purpose of the step?

21          MR. COHN:  Objection.  In other

22  words, is he agreeing it's a purpose or has

23  he heard someone else claim that?

24          MR. WEBER:  No, I'm asking do you

25  understand that to be a purpose?

EXHIBIT A

1            MR. COHN:  Objection, it's not

2    clear what you're asking.

3            THE WITNESS:  I heard testimony

4    yesterday with that purpose stated.

5    BY MR. WEBER:

6        Q.  Was that the first time you ever

7    heard that purpose?

8        A.  No.

9        Q.  Okay.  When had you heard that

10   purpose stated earlier?

11           MR. COHN:  Other than by counsel

12   perhaps.

13           THE WITNESS:  I saw it on the Web.

14   BY MR. WEBER:

15       Q.  You saw it on his website?

16       A.  Yes.

17       Q.  And by him, I mean Insite Solutions?

18       A.  That is accurate.

19       Q.  And do you also see a tapered edge?

20       A.  Yes.

21       Q.  And does the thickness of the polymer

22   layer change throughout the region of the

23   tapered edge?

24       A.  You're speaking here?

25       Q.  Well, there or here, where you can

EXHIBIT A

1   see it larger in the area you circled?

2       A.   In this area it changes, the

3   thickness of the profile changes.

4       Q.   Okay.  Can you mark that with the

5   letter A, what you've just drawn there?

6       A.   (Doing as requested.)

7       Q.   So the thickness changes at least in

8   the ramped area and do you also see the

9   radius, .187?

10      A.   Yes.

11      Q.   What do you understand that to be?

12      A.   An angle.

13      Q.   Or a radius?

14      A.   A radius.

15      Q.   And that's the radius of where the

16  ramp blends into the remainder of the surface

17  of the polymer layer?

18      A.   The majority of the polymer layer,

19  yes.

20      Q.   Okay.  And what do you understand the

21  purpose of the ramp to be?

22      A.   The same thing as my floor tape, the

23  bevelled edge.

24      Q.   To do what?

25      A.   Well, skids are dragged over it, to

EXHIBIT A

Page 172

1   help them slide across it rather than catch

2   on the edge.

3       Q.  Your warranty excludes that type of

4   damage, doesn't it?

5       A.  Yes.

6       Q.  And it always has, hasn't it?

7       A.  Yes.

8       Q.  And the Ergomat warranty also

9   excludes it, doesn't it?

10      A.  I don't know.

11      Q.  You don't know whether Ergomat's

12  warranty excludes it?

13      A.  I don't know.

14      Q.  And you circled the front page of

15  Exhibit 17, the region.  Do you recognize the

16  other two pages as showing the same tape or

17  polymer layer but for different widths of

18  tape?

19      A.  Across the different pages you're

20  talking about?

21      Q.  Yes.

22      A.  Yes.

23              MR. WEBER:  Okay.

24                  (Defendant's Exhibit

25                  No. 18 was marked

EXHIBIT A

1                    for identification.)

2    BY MR. WEBER:

3        Q.  Do you recognize Exhibit 18?

4        A.  Yes.

5        Q.  And what is Exhibit 18?

6        A.  It's the Patent Office review of the

7    '480 patent and opening it back up again.

8        Q.  Well, they opened it back up again

9    and they've rejected all of the claims of

10   patent, haven't they?

11       A.  Yes.

12       Q.  Did you ask the Patent Office to

13   re-open or to re-examine this patent or did

14   someone else ask that they re-examine it?

15       A.  I did not ask.

16       Q.  Do you know who did?

17       A.  Yes.

18       Q.  Who?

19       A.  Creative Safety.

20       Q.  And Creative Safety is a company

21   where?

22       A.  Out on the West Coast.

23       Q.  Oregon?

24       A.  Either Oregon or Washington.

25       Q.  Okay.

EXHIBIT A

1      A.  I think it's Oregon.

2      Q.  Had you brought a lawsuit against

3   them on your '480 patent?

4      A.  Yes.

5      Q.  Were you surprised by this office

6   action that rejects all of the claims?

7      A.  No.

8      Q.  Did you expect it?

9      A.  No.

10     Q.  So you were neither surprised nor did

11  you expect it, what -- have you reviewed the

12  office action?

13     A.  Yes.

14     Q.  Do you think the Examiner is

15  correct?

16          MR. COHN:  Objection.

17          MR. WEBER:  Well, it's your

18  patent.

19          MR. COHN:  But he's not a patent

20  lawyer.

21          MR. WEBER:  He doesn't have to be

22  a patent lawyer.

23          THE WITNESS:  No.

24  BY MR. WEBER:

25     Q.  You don't think the Examiner is

EXHIBIT A

1   correct?

2       A.  No.

3       Q.  Where did the Examiner go wrong?

4           MR. COHN:  Objection.

5           THE WITNESS:  In consultations

6   with my attorneys, we've discussed that, it's

7   a privileged matter.

8   BY MR. WEBER:

9       Q.  Well, it's a privileged matter that's

10  going to be put into a response to the Patent

11  Office, isn't it?

12      A.  That might be.

13          MR. COHN:  It's from his lawyer.

14  BY MR. WEBER:

15      Q.  Well, do you have an opinion -- I

16  don't want to hear what your attorney told

17  you nor what you told your attorney -- do

18  you have an opinion as to why the Examiner

19  is wrong in this rejection?

20          MR. COHN:  Objection.  If your

21  opinion is what your lawyer told you, I

22  instruct you not to divulge it.  If you have

23  some opinion that you've reached

24  independently of anything your lawyer said

25  and you wish to express it, you may do so.

EXHIBIT A

Page 176

1              THE WITNESS:  My opinion is that

2    once I came out with a floor tape, I had

3    three other companies that distributed the

4    product and after they decided that they

5    could make more money, decided to knock it

6    off and copy it.  It has enjoyed pretty

7    fabulous success since its start.

8    BY MR. WEBER:

9       Q.  Well, why, to what do you attribute

10   this success, were these people good at

11   selling?

12      A.  It wasn't only the people that

13   knocked it off, it was, I attribute the

14   success, the market reception to a good, a

15   very good product that fills a need.

16      Q.  Well, what, besides being a good

17   product, to what do you attribute the success

18   of the product?

19              MR. COHN:  Objection.

20              THE WITNESS:  The market

21   acceptance of the product.

22   BY MR. WEBER:

23      Q.  Well, did you or any of your

24   distributors, did they advertise and promote

25   this product?

EXHIBIT A

1      A.  The product is advertised and

2   promoted via many distributors.

3      Q.  Well, is that what developed the

4   market for it, the advertising and

5   promotion?

6      A.  Certainly it helped.

7      Q.  Who are the, who besides Ergomat was

8   selling this product for you?

9      A.  Insite Solutions, Creative Safety.

10     Q.  And who else, anybody, I mean Insite

11  Solutions, Creative Safety and Ergomat, was

12  anybody else selling it for you?

13     A.  Many distributors were selling it for

14  me.

15     Q.  Okay.  Were they distributors of

16  yours or were the distributors of Ergomat,

17  Creative Safety and Insite?

18     A.  Distributors of mine.

19     Q.  Okay.  Are the distributors of yours

20  still distributing?

21     A.  Yes.

22     Q.  Now, do you provide them with

23  advertising and promotional material?

24     A.  Yes.

25     Q.  Okay.  Do any of them generate their

EXHIBIT A

1    own advertising and promotional material?

2        A.  Occasionally.  Oftentimes we're

3    relied on to provide it.

4        Q.  How did you receive Exhibit 18?

5        A.  I'm not clear as to what you mean how

6    did I receive it?

7        Q.  Did your attorney send you a copy?

8        A.  I received a copy in e-mail, yes.

9        Q.  An e-mailed copy, okay.  And when you

10   received that e-mailed copy did you sit down

11   and study the office action?

12       A.  I have studied it.

13       Q.  Okay.  Did you study it before

14   meeting with your attorney?

15       A.  No.

16       Q.  You didn't.  I mean this came as

17   somewhat of a bombshell to you, didn't it?

18            MR. COHN:  Objection.

19            THE WITNESS:  I see no, I really

20   don't see the relevance of whether it's a

21   bombshell to me or not or what it means to

22   this whole proceeding.

23   BY MR. WEBER:

24       Q.  Well, okay, and I don't want to fence

25   with you in that regard but did you, you're

EXHIBIT A

1    saying that you didn't look at this or study

2    this?

3         A.  I have looked at it.

4         Q.  Prior to meeting with your attorneys?

5         A.  After I looked at it I have met with

6    my attorneys.

7         Q.  Okay.  Well, when you looked at it

8    before meeting with your attorneys did you --

9    what conclusions if any did you draw as to

10   the efficacy of the Examiner's position?

11             MR. COHN:  Objection.

12             MR. WEBER:  Or the merits of the

13   Examiner's position?

14             THE WITNESS:  As of this point I

15   have drawn no conclusions.

16   BY MR. WEBER:

17        Q.  Okay.  Even as you sit here today?

18        A.  Even as I sit here today.

19        Q.  Now, there's a response due in about

20   a little over a week, right, to this office

21   action?

22        A.  That's correct.

23        Q.  Now, will you see a copy of the

24   response before it goes in?

25        A.  Absolutely.

EXHIBIT A

1      Q.  And you'll review it?

2      A.  Absolutely.

3      Q.  And it won't go in unless you approve

4  it?

5      A.  That's correct.

6                      (Defendant's Exhibit

7                      Nos. 19 and 20 marked

8                      for identification.)

9  BY MR. WEBER:

10     Q.  Okay, do you recognize Exhibits 19

11  and 20?

12     A.  Yes.

13     Q.  And you've studied those?

14     A.  I've perused them.

15     Q.  Okay, you've just perused them, and

16  you're going to rely on your attorneys to

17  study them and prepare arguments in response

18  to the office action, right?

19     A.  Yes.

20     Q.  All right.  Prior to meeting with

21  your attorneys, had you formed any opinions

22  as to the relevance of Murata or Kjellqvist,

23  these two patents?

24     A.  No.

25     Q.  Were you made aware of these patents

EXHIBIT A

1    by the attorneys for Creative Safety prior to

2    the re-exam proceedings?

3        A.   No.

4        Q.   So you only became aware of these

5    through the re-examination proceedings; is

6    that correct?

7        A.   That's correct.

8                        (Defendant's Exhibit

9                        No. 21 was marked

10                       for identification.)

11   BY MR. WEBER:

12       Q.   Do you recognize Exhibit 21?

13       A.   Yes.

14       Q.   And do you recognize that as a chart

15   that correlates Shore A and Shore D hardness?

16       A.   Yes.

17       Q.   Could you on what you've got there go

18   up and draw a horizontal line across to

19   intersect the graph at the Shore A hardness

20   of 92, and if you want a straight edge I can

21   give it to you?

22       A.   Somewhere around there I guess.

23       Q.   Okay, let me see what you marked.

24       A.   (Doing as requested.)

25       Q.   Okay.  Now, the Shore A hardness

EXHIBIT A

1   loses much of its resolution up in that area,

2   doesn't it, the Shore A hardness?

3           MR. COHN:  Objection.

4   BY MR. WEBER:

5       Q.  Well, it flattens out, doesn't it?

6       A.  Yes.

7       Q.  And so a Shore A hardness, even on

8   where you marked Shore A 92, from 92 to 100,

9   which is only a spread of eight on the Shore

10  A graph, correlates to what on the Shore D

11  scale?

12      A.  From 92 to --

13      Q.  Do you want to use a straight edge to

14  find where it goes?

15      A.  What were you measuring from?

16      Q.  92.

17      A.  To?

18      Q.  On the Shore A.

19      A.  Okay, but you were going Shore A 92

20  to what Shore A or just 92?

21      Q.  Well, 92 to 100 on Shore, I mean

22  that's where they all peak out, right, a

23  hundred?

24      A.  Yes.

25      Q.  Okay.

EXHIBIT A

1    A.  Yes.  Looks like that correlates to a

2  Shore 50 to Shore 95.

3    Q.  Okay.

4    A.  On Shore D hardness.

5    Q.  So on Shore D you get a spread of 45

6  measurement points, where you're only

7  measuring eight measurement points on Shore

8  A, right?

9    A.  For this Apilon TPU material.

10    Q.  What is Apilon TPU materials?

11    A.  I don't know.

12    Q.  I'm trying to read where you were

13  reading?

14        MR. COHN:  The bottom line.

15  BY MR. WEBER:

16    Q.  Okay.  Shore hardness A and D scales

17  for Apilon 52 TPU materials, do you know what

18  TPU stands for?

19    A.  No.

20    Q.  Do you agree that Shore hardness

21  reduces as temperature rises?

22    A.  Generally.

23    Q.  When you presented the Shore A

24  hardness ranges in your patent, at what

25  temperature were those specified?

EXHIBIT A

 1      A.  They weren't.

 2                    (Defendant's Exhibit

 3                    No. 22 was marked

 4                    for identification.)

 5   BY MR. WEBER:

 6      Q.  I've handed you what's been marked

 7   as Exhibit 22, do you recognize that

 8   document?  These are the initial disclosures

 9   that ShieldMark presented in this case.

10      A.  Yes.

11      Q.  Okay.  And number one is individuals

12   likely to have discoverable information, do

13   you see that?

14      A.  Yes.

15      Q.  And the two people listed are you and

16   Mr. Lowe from Insite, correct?

17      A.  Yes.

18      Q.  As I sit here today it sounds like

19   there are other people that would have had

20   discoverable information, like Phil Nye, he

21   certainly would have information regarding

22   the development of your patented concept and

23   product, wouldn't he?

24                    MR. COHN:  Is there no end to your

25   picking on Mr. Goecke for what his lawyers

EXHIBIT A

1    have done?

2              MR. WEBER:  I'm not picking on

3    him, I'm asking if Mr. Nye, I'm not laying

4    any blame or whatever.

5              MR. COHN:  Well, you phrased that

6    very argumentatively.

7              MR. WEBER:  Would Mr. Nye have had

8    discoverable information regarding your

9    lawsuit?

10             MR. COHN:  Objection.

11             THE WITNESS:  Yes.

12   BY MR. WEBER:

13      Q.  Would the people to whom you sold

14   your polycarbonate product or your

15   thermoplastic elastomer product and your

16   first PVC material products have had

17   discoverable information that would be

18   relevant to your lawsuit?

19             MR. COHN:  Objection.  Do you

20   really think he's learned in what is

21   discoverable under the Federal Rules of Civil

22   Procedure?

23             MR. WEBER:  I think he does.

24   Well, he's filed three lawsuits, four now

25   that I'm aware of.  But would those have been

EXHIBIT A

1   people that would have information, let's say

2   regarding the development, reduction to

3   practice and initial sales of products during

4   your development period?

5           MR. COHN:  Objection.

6           THE WITNESS:  Would what people?

7   BY MR. WEBER:

8       Q.  The people to whom you sold the

9   polycarbonate thermoplastic elastomer?

10      A.  No.

11      Q.  Well, they would know that they had

12  purchased this product, wouldn't they?

13      A.  Yes.

14      Q.  And they would know the dates on

15  which they purchased the product, wouldn't

16  they?

17      A.  Yes.

18      Q.  And they would know how you offered

19  these products for sale to them, wouldn't

20  they?

21      A.  Yes.

22      Q.  Does Mr. Nye, did Mr. Nye have any

23  associates working with him at Advanced

24  Plastics at the time you were developing this

25  product?

EXHIBIT A

Page 187

1      A.  He has a workforce that works for

2  him.

3      Q.  Are there any members of the

4  workforce that you worked with in this

5  undertaking of developing the '480 patent?

6      A.  No.

7      Q.  There were none, you only worked with

8  Mr. Nye?

9      A.  That is correct.

10     Q.  Have you destroyed or erased or

11  gotten rid of any documents or data relevant

12  to the conception or reduction to practice,

13  development, testing, offering for sale and

14  initial marketing efforts of the various

15  products that led to the '480 patent?

16     A.  No.

17     Q.  Okay.  Ever, is that correct?

18     A.  Correct.

19     Q.  Okay.  So you still have those

20  available, is that fair to say?

21     A.  I have what is still around, that

22  didn't get thrown out in the normal course

23  of business.  I can't say that I have a

24  hundred percent of everything that I sold; I

25  have a good majority of it.

EXHIBIT A

1      Q.  Well, what gets thrown out in the

2   normal course of business?

3      A.  Just information that if it found its

4   way into a file that got pitched.  I'm just

5   saying that I have the majority of the

6   information from inception of this product as

7   far as what, what we sold.

8                      (Defendant's Exhibit

9                      No. 23 was marked

10                     for identification.)

11  BY MR. WEBER:

12     Q.  Do you recognize Exhibit 23?

13     A.  Yes.

14     Q.  What is it?

15     A.  What's that?

16     Q.  What is it?

17     A.  It's a chart on peel adhesion.

18     Q.  And where did this come from?  I mean

19  it was provided to us from by your counsel.

20     A.  I don't know.

21     Q.  What use if any did you ever make of

22  it?

23     A.  I haven't made any use of it.

24     Q.  Do you know if Mr. Nye ever made any

25  use of it?

EXHIBIT A

```
 1      A.  No.

 2      Q.  You don't know?

 3      A.  No, I know Mr. Nye never made use of

 4  it.

 5            MR. WEBER:  Okay.

 6                  (Defendant's Exhibit

 7                  No. 24 was marked

 8                  for identification.)

 9  BY MR. WEBER:

10      Q.  Do you recognize Exhibit 24?

11      A.  Yes.

12      Q.  And it's a compilation of documents

13  that are called assignments so what, can you

14  just explain to me what this compilation is

15  or what it relates to, or do we have to look

16  at each one individually?

17      A.  It's assignment of the patents from

18  my name to my company's name.

19      Q.  So these are patents or patent

20  applications, it looks like they might be

21  both.

22            MR. COHN:  Objection.  Is that a

23  question?

24  BY MR. WEBER:

25      Q.  I was wondering if you were done
```

EXHIBIT A

1  commenting, I was waiting for you to finish.

2  But if you're done, this first one is called

3  assignment, it makes reference to the '480

4  patent, right?

5      A.  Uh-huh.

6      Q.  And you've signed it as on behalf of

7  both parties to the assignment, correct?

8      A.  That's correct.

9      Q.  Okay.  And what was the purpose of

10  this instrument?

11      A.  To assign the patent to ShieldMark.

12      Q.  The '480 patent?

13      A.  Yes.

14      Q.  No, I don't think that's the case.

15          MR. COHN:  No, it's not.

16  BY MR. WEBER:

17      Q.  I guess these documents will speak

18  for themselves, let me just ask you to look

19  at the signature pages of them, okay?

20      A.  Okay.

21      Q.  On page three that bears control

22  number 2227, is that your signature

23  personally and on behalf of your company?

24      A.  Yes.

25      Q.  And on 2229, is that your signature?

EXHIBIT A

1      A.  What is the 2229 and 2227 that you're

2   referring to?

3      Q.  They're the numbers in the lower

4   right-hand corner, I'm dropping the zeros, so

5   do you see on the third page of this whole

6   stack.

7      A.  Okay.

8      Q.  There's a 2227?

9      A.  Okay.

10      Q.  Now those are your signatures, right?

11      A.  Yes, they are.

12      Q.  And you signed them about January 3rd

13   of this year, right?

14      A.  That's correct.

15      Q.  And then on 2229, is that your

16   signature?

17      A.  Yes, it is.

18      Q.  And you signed that on June 16th of

19   '05, is that fair to say?

20      A.  Yes.

21      Q.  And then on 2232, is that your

22   signature both personally and on behalf of

23   ShieldMark?

24      A.  Yes.

25      Q.  And that was signed November 28th,

EXHIBIT A

Page 192

1    2012?

2        A.  Yes.

3        Q.  And 2235, you signed that again on

4    behalf of yourself and corporately?

5        A.  Yes.

6        Q.  And these assignments are for

7    continuation applications off of the '480

8    patent?

9              Well, they are what they state

10   they are, but is it your understanding that

11   the purpose of this was to assign

12   continuation applications to your company?

13   A.  Yes.

14       Q.  And those are continuations off of

15   the '480 patent, right?

16   A.  Correct.

17           MR. WEBER:  Okay.

18                    (Defendant's Exhibit

19                    No. 25 was marked

20                    for identification.)

21   BY MR. WEBER:

22       Q.  Let's move on to Exhibit 25, do you

23   recognize that?  These are documents you

24   provided us, what are these?

25       A.  Just web pages off Insite Solutions.

EXHIBIT A

1     Q.  Okay.  These came from your files?

2     A.  Yes.

3     Q.  And you kept these in your business

4  records?

5     A.  Yes.

6     Q.  Why?

7     A.  I'm trying to recall.  Was this not

8  a response to your request for documents?

9     Q.  Yeah, that's the reason I have it,

10  my question was, what was the reason you

11  have it?

12     A.  Because we had them in our files and

13  you requested them.

14     Q.  Well, no, I understand that, but why

15  were they in your files?

16     A.  I don't know.

17     Q.  It fair to say those documents all

18  deal with Insite or Mr. Lowe?

19     A.  Yes, and DuraStripe tape.

20                  (Defendant's Exhibit

21                  No. 26 was marked

22                  for identification.)

23  BY MR. WEBER:

24     Q.  Do you recognize Exhibit 26?

25     A.  Yes.

EXHIBIT A

1      Q.  And who is Anie Simard, was I close

2   on that?

3      A.  She's an employee at Ergomat.

4      Q.  And this is a letter she wrote to Mr.

5   Lowe or an e-mail she sent to Mr. Lowe?

6      A.  That's correct.

7      Q.  And who is Claus Lendal?

8      A.  He is the manager of Ergomat USA.

9      Q.  Who is John Girard?

10      A.  He is an employee at Ergomat.

11      Q.  Karen Taylor?

12      A.  She is an accountant at Ergomat.

13      Q.  You are the T. Goecke and who is Amy

14   at stop-painting.com?

15      A.  I believe that's an employee of

16   Cliff's.

17      Q.  And Terry McHale?

18      A.  An employee at Ergomat.

19      Q.  Why were you copied on this, if you

20   know?

21          MR. COHN:  Objection.

22          THE WITNESS:  I don't know.

23   BY MR. WEBER:

24      Q.  This was July 24th of 2012, had Mr.

25   Lowe or Insite Solutions been telling the

EXHIBIT A

Page 195

1    trade that Ergomat could not sell

2    DuraStripe?

3         A.   I don't know.

4         Q.   And you see in bold there that Ms.

5    Simard has said, "Ergomat is entitled to sell

6    DuraStripe and will continue to do so for

7    years to come," did I read that correctly?

8         A.   Yes.

9         Q.   Do you know what threats Mr. Lowe or

10   Insite had been making to the dealers of

11   Ergomat?

12        A.   No.

13        Q.   Do you know what threats, lies,

14   anything of that nature?

15        A.   I don't know.

16        Q.   And then this is captioned as "the

17   one and only friendly reminder."  Does that

18   look like a friendly reminder to you?

19              I mean did you take this as a

20   friendly reminder when you saw it, did you

21   say, yeah, I'm sure Mr. Lowe will accept this

22   as a friendly reminder?

23        A.   I don't think it makes a whole lot of

24   difference what I think about this.

25        Q.   Well, it does to me and it does to

EXHIBIT A

1  the record so I'd like an answer.

2          MR. COHN:  Well, objection, but

3  you can answer.

4          MR. WEBER:  Eighty percent of your

5  deposition yesterday had nothing to do with

6  the lawsuit either but I tolerated it.

7          MR. COHN:  And I said he can

8  answer.

9          MR. WEBER:  And I appreciate it.

10          THE WITNESS:  Could she have put

11  it in a more cordial fashion, yes.

12  BY MR. WEBER:

13      Q.  Do you know Anie?

14      A.  Yes.

15      Q.  Personally?  Do you know her

16  socially?

17      A.  No.

18      Q.  Is she related to any of the

19  principals of Ergomat?

20      A.  Yes.

21      Q.  Who?

22      A.  Claus.

23      Q.  And how is she related to Claus?

24      A.  She's his wife.

25      Q.  Is Ergomat owned by Claus Lendal?

EXHIBIT A

```
 1        A.  I don't know.

 2             MR. WEBER:  Okay.

 3                  (Defendant's Exhibit

 4                  No. 27 was marked

 5                  for identification.)

 6   BY MR. WEBER:

 7        Q.  Do you recognize Exhibit 27?

 8        A.  Yes.

 9        Q.  And did you review this letter before

10   it was sent?

11        A.  Yes.

12        Q.  And you authorized it being sent; is

13   that correct?

14        A.  Yes.

15        Q.  And this was sent to Mr. Lowe,

16   telling him that your patent application had

17   published, correct?

18        A.  That's correct.

19        Q.  And you were warning him of all the

20   things that could happen if he persisted in

21   his present actions, right?

22             MR. COHN:  When you say you, you

23   mean through his counsel?

24   BY MR. WEBER:

25        Q.  Yeah, well, was -- let me ask you
```

EXHIBIT A

1  this, was Mr. Harders writing this on his own

2  or on behalf of his firm?

3      A.  He wrote that on behalf of

4  ShieldMark.

5      Q.  Okay.  And you approved it before it

6  went out, right?

7      A.  That's correct.

8      Q.  So it was basically you saying this,

9  or at least Mr. Harders saying it on your

10  behalf, correct?

11      A.  That's correct.

12      Q.  Okay.  And when you read this and you

13  saw that for there to be liability for a

14  reasonable royalty based on knowledge of the

15  published patent application that the

16  infringed claim had to be, quote,

17  substantially identical to a claim in the

18  patent issued from the publication, end

19  quote, do you know what that meant?

20      A.  I'm not a patent lawyer.

21      Q.  Well, I know you're not a patent

22  lawyer but did you know what that meant?

23      A.  Yes.

24      Q.  Okay.  And you actively participated

25  in a prosecution of a patent that went

EXHIBIT A

Page 199

1    through at least four amendments, correct?

2        A.  That's correct.

3        Q.  And then you authorized the filing of

4    a lawsuit that sought recovery of pre-issue

5    damages, didn't you?

6        A.  That's correct.

7        Q.  And yet when I asked you if you could

8    tell me if there was a substantial similarity

9    between the issued patent claims and the

10   published claims, you declined to do so,

11   didn't you?

12       A.  You were asking me to become a patent

13   lawyer; I am not a patent lawyer.

14       Q.  And you declined to do so, didn't

15   you?

16       A.  I did.

17       Q.  Well, did you rely on advice of

18   counsel for mailing this letter?

19       A.  Yes, I did.

20                      (Defendant's Exhibit

21                      No. 28 was marked

22                      for identification.)

23   BY MR. WEBER:

24       Q.  Do you recognize Exhibit 28?

25       A.  Yes.

EXHIBIT A

1      Q.  And what is it?

2      A.  It's a letter to Terry McHale at

3  Ergomat.

4      Q.  And also to Phil, right, Phil Nye?

5      A.  Yes.

6      Q.  And you tell them to see the

7  attached file, and what does the attached

8  file say?  You address it specifically to

9  Terry McHale, right?

10     A.  Yes.

11     Q.  And down a little bit you say, "At

12 this point I have a published patent

13 application.  Below is some information on

14 just what this means."  Where did you get

15 that information from?

16     A.  I believe I got it from the uspto

17 website.

18     Q.  And then the last paragraph of your

19 writing it says, "I will be getting in touch

20 with my lawyer to find out what sort of

21 letter and action we should now be taking

22 against the stop-painting.com folks," right?

23     A.  That's correct.

24     Q.  So you were ready to spring into

25 action, right, with your patent publication?

EXHIBIT A

1      A.  Yes.

2      Q.  Okay.  Did you get in touch with your

3   lawyer?

4      A.  Yes.

5      Q.  Which lawyer?

6      A.  Scott Harders.

7          MR. WEBER:  Okay.

8              (Defendant's Exhibit

9              No. 29 was marked

10              for identification.)

11   BY MR. WEBER:

12      Q.  Do you recognize Exhibit 29?

13      A.  Yes.

14      Q.  And what is it?

15      A.  It was a Chemsultants report on

16   different testing of competitors' products.

17      Q.  Do you see over on the second page,

18   under peel adhesion --

19          MR. COHN:  If you notice this

20   Exhibit 29 is marked subject to protective

21   order.

22          MR. WEBER:  Yeah.

23          MR. COHN:  If you're going to

24   examine him on it, you're disclosing the

25   contents to Mr. Lowe.

EXHIBIT A

1           MR. WEBER:  No, we have a two tier

2    protective order.  This doesn't say

3    attorney's eyes only, it's confidential

4    subject to protective order.  There's two

5    tiers.  I mean I don't think I'm going to

6    make it that difficult so I think we can

7    probably --

8           MR. COHN:  Well, with regard to

9    the deposition questions, I'll assert the

10   order.

11          MR. WEBER:  Okay.

12   BY MR. WEBER:

13     Q.  All right.  Over on the second page,

14   and this can hardly be attorney/client

15   privilege or attorney's eyes only, do you see

16   peel adhesion?

17     A.  Yes.

18     Q.  Okay.  And what test method was used

19   by Chemsultants to test peel adhesion?

20     A.  PSTC-101 method F.

21     Q.  Not method D, right?

22     A.  That's correct.

23          MR. WEBER:  Okay.  I want to ask

24   you to look at these three and tell me if you

25   are serious, that you're going to say that's

EXHIBIT A

1    attorney's eyes only, when those are the

2    basis of other lawsuits and we know about the

3    existence of those otherwise, that's the

4    exact same as another exhibit we've seen.

5    I'm just trying to expedite this.

6                MR. HARDERS:  I think this is

7    level one.

8                MR. WEBER:  So we'll mark these.

9                     (Defendant's Exhibit

10                     Nos. 30 through 32 marked

11                     for identification.)

12   BY MR. WEBER:

13      Q.  Do you recognize Exhibits 30, 31 and

14   32?

15      A.  Yes.

16      Q.  And what are they?

17      A.  Notification to Creative Safety,

18   Ergomat and Insite that we obtained the

19   patent, ShieldMark obtained the patent.  And

20   inviting them -- hold on.

21      Q.  Well, you invited a business

22   resolution, right?

23      A.  Yes, that's correct.

24      Q.  You say ShieldMark's patented

25   technology provides -- by the way, all three

EXHIBIT A

1   of these letters are identical, right, except

2   for the addressee?

3       A.  Yes.

4       Q.  Okay.  Down in the second paragraph

5   on the first page, "ShieldMark's patented

6   technology provides numerous benefits,

7   including superior ductility, strength and

8   tear and abrasion resistance, and I assume

9   InSite would like to be able to offer this

10  superior product to its customers."

11          MR. COHN:  Objection, because of

12  Rule 408 these are all inappropriate

13  discovery so I object.

14          MR. WEBER:  This is inappropriate

15  discovery about a letter that he sent to Mr.

16  Lowe?

17          MR. COHN:  A Rule 408, yes.

18          MR. WEBER:  Where do I see a Rule

19  408?

20          MR. COHN:  I don't have to recite

21  Rule 408 to be Rule 408.

22          MR. WEBER:  Oh, this was a

23  gracious offer of settlement, okay, all

24  right.  But let me -- when you sent these

25  letters, had you already filed your

EXHIBIT A

Page 205

1    lawsuits?

2              MR. COHN:  You mean when his

3    lawyer sent them?

4              MR. WEBER:  Yeah, when your lawyer

5    sent the letters, had you already filed the

6    lawsuits.

7              THE WITNESS:  Yes.

8    BY MR. WEBER:

9         Q.  Why had you done that?

10        A.  To convey the importance of it.

11        Q.  Okay.  Did anyone take you up on your

12   offer?

13             MR. COHN:  Same objection, Rule

14   408.

15             THE WITNESS:  We came to an

16   agreement with Ergomat.

17             MR. WEBER:  Okay, let's look at

18   Exhibit 33 and this is attorney's eyes only

19   so I don't want you to -- we'll get it marked

20   and then we'll go from there.

21                   (Defendant's Exhibit

22                   No. 33 was marked

23                   for identification.)

24   BY MR. WEBER:

25        Q.  Do you have Exhibit 33?

EXHIBIT A

1      A.  Yes.

2      Q.  And you recognize it?

3          MR. COHN:  That's a yes or no.

4          THE WITNESS:  Yes.

5  BY MR. WEBER:

6      Q.  And back on page nine -- and you

7  don't need to identify anybody or anything,

8  although I see your signature and I see

9  somebody who is probably related to you,

10  their signature, but I don't see a signature

11  by the other party.  Was this actually signed

12  by the other party?

13      A.  Yes, it was.

14      Q.  You have a signed copy of it?

15      A.  Yes, I do.

16      Q.  And so this was an agreement that

17  took place then and was effective on the date

18  written up in the first paragraph of the

19  agreement; is that correct?

20      A.  That's correct.

21          MR. WEBER:  All right.

22              (Defendant's Exhibit

23              No. 34 was marked

24              for identification.)

25  BY MR. WEBER:

EXHIBIT A

1      Q.  Do you recognize Exhibit 34?

2      A.  Yes.

3      Q.  And what is it?

4      A.  It's a trademark.

5      Q.  It's evidence of a trademark

6   registration, is that what you --

7      A.  Correct.

8      Q.  And that's for the trademark

9   DuraStripe?

10      A.  That's also correct.

11      Q.  And this registration is owned by

12   Tinby LLC; is that correct?

13      A.  That's correct.

14      Q.  Who is Tinby LLC?  Or I'm sorry, it's

15   Tiny LLC corporation?

16      A.  A parent company of Ergomat or

17   however they're related.

18      Q.  So the registrant, the actual owner

19   of the mark is not Ergomat, is that your

20   understanding?

21          MR. COHN:  Objection.

22          THE WITNESS:  That would be my

23   understanding.

24   BY MR. WEBER:

25      Q.  Okay.  And is this the registration

EXHIBIT A

1    for the mark under which Ergomat sells your

2    product?

3        A.  When they did sell my product at one

4    time.

5        Q.  Are they no longer selling your

6    product under this mark?

7        A.  That's correct.

8        Q.  But they are selling a product under

9    the mark?

10       A.  That's correct.

11       Q.  Is the product of the same nature and

12   quality as when you were providing it?

13       A.  I don't know that.

14       Q.  You haven't gotten any samples of

15   their product to test?

16       A.  We tested samples at Chemsultants.

17       Q.  Well, the reason I ask is you had

18   testified earlier that obviously when they

19   were buying from you, it was you who was

20   controlling the nature and quality of the

21   goods?

22           MR. COHN:  That's not what he

23   said.

24   BY MR. WEBER:

25       Q.  Oh, he didn't?

**EXHIBIT A**

1      A.  No, I said Advanced was.

2      Q.  Oh, Advanced was, okay, I apologize.

3  But Advanced is not doing that now, correct?

4      A.  That's correct.

5           MR. WEBER:  Okay.

6                    (Defendant's Exhibit

7                    No. 35 was marked

8                    for identification.)

9  BY MR. WEBER:

10     Q.  Do you recognize Exhibit 35?  And I

11  apologize, the underlining that's on there

12  was not in the original.

13     A.  Yes, I recognize it.

14     Q.  Okay.  Is that Mr. Nye in the

15  pictures there?

16     A.  Yes.

17     Q.  In both pictures?  The one is sort of

18  hard to see.

19     A.  Yes.

20     Q.  So Mr. Nye, up on the top of page two

21  in the partial paragraph, about the second

22  line, "Advanced Plastics was founded on

23  September 15, 1999, when Phil and his partner

24  became the owners of the business formerly

25  known as Almetco," do you see that?

EXHIBIT A

1       A.   Uh-huh.

2       Q.   Do you know who his partner was?

3       A.   Who Phil's partner is.

4       Q.   Okay.

5       A.   Yes.

6       Q.   And who is it?

7       A.   John Davis.

8       Q.   John Davis?

9       A.   Yes.

10      Q.   Did you have any dealings with Mr.

11   Davis in your development or manufacturing

12   efforts of your '480 product?

13      A.   No.

14      Q.   What is Mr. Davis' background, do you

15   know?

16      A.   He's a CPA.

17      Q.   What's his first name?

18      A.   John.

19      Q.   John.  And you see in the indented

20   section here that's written in italics, down

21   in the next to last paragraph in italics,

22   the last sentence of that paragraph says --

23   well, that whole paragraph deals with Ergomat

24   and DuraStripe.

25                   And the last sentence says,

EXHIBIT A

1  "In addition to manufacturing the product,

2  we also provided the inventor of DuraStripe

3  with design support and the recommendation

4  for the material that gives DuraStripe its

5  unique qualities," did I read that

6  correctly?

7      A.  Yes.

8      Q.  Is that an accurate statement?

9      A.  No.

10      Q.  That's not accurate?

11      A.  No.

12      Q.  What's inaccurate about it?

13      A.  The recommendation for material.

14  It's accurate as far as design support for

15  making the molds and marking the material for

16  DuraStripe with the DuraStripe stamp that

17  went on every roll.

18      Q.  But did anybody make recommendations

19  for the material to you?

20      A.  Yes.

21      Q.  Who?

22      A.  Phil Nye.  But the '480 patent was

23  not a recommendation from Phil Nye for the

24  material.

25      Q.  Okay, what was it that Phil Nye

EXHIBIT A

1    recommended?  And I apologize, I'm missing

2    this.

3         A.  Thermoplastic elastomer.

4         Q.  He didn't recommend the

5    polycarbonate?

6         A.  No.

7         Q.  And he didn't recommend the PVC?

8         A.  That's correct.

9              MR. WEBER:  Okay.

10                   (Defendant's Exhibit

11                   No. 36 was marked

12                   for identification.)

13   BY MR. WEBER:

14        Q.  Do you recognize Exhibit 36?

15        A.  This is the first time I've seen it

16   but I recognize Advanced Plastics.

17        Q.  Do you recognize the product that's

18   in the block on the second page, in the

19   vertical block?

20        A.  Yes.

21        Q.  And what is that?

22        A.  That is the four inch tape.

23        Q.  The Ergomat tape or the DuraStripe

24   tape?

25        A.  I can't tell by the picture.

EXHIBIT A

1     Q.  Well, okay, when you said the tape,

2  what tape did you mean, or just generically?

3     A.  Since Phil Nye only makes tape, floor

4  tape products on my behalf, and doesn't make

5  them for anybody else, I would have to assume

6  that that is floor tape from us.

7     Q.  Okay.

8     A.  When the picture was taken, I don't

9  know.

10    Q.  All right.

11    A.  I can't tell by the picture what.

12    Q.  That's fair enough, okay.

13         MR. WEBER:  Let's look at 37.

14              (Defendant's Exhibit

15              No. 37 was marked

16              for identification.)

17  BY MR. WEBER:

18    Q.  Do you recognize Exhibit 37?

19    A.  Yes, I do.

20    Q.  And this is -- well, what is it?

21    A.  Ergomat brochure advertising the

22  DuraStripe product.

23    Q.  Was this a DuraStripe product made

24  according to the '480 patent?

25    A.  Yes.

EXHIBIT A

Page 214

1      Q.   And you see the two year warranty

2   down at the bottom on the left?

3      A.   Yes.

4      Q.   Okay.   It says, "DuraStripe is

5   conditionally warranted against failure for

6   two years from the date of purchase.

7   Warranty does not cover damage caused by

8   items pushed or dragged across the product,

9   such as skids or pallets.   Warranty claims

10  are limited to replacement of DuraStripe for

11  damaged sections at no charge."   Did I read

12  that correctly?

13     A.   Yes.

14     Q.   Aren't these floor marking tapes

15  often used in areas where they're subject to

16  items that are pushed or dragged across them,

17  such as skids or pallets?

18     A.   Oftentimes, yes.

19     Q.   But the warranty didn't cover that,

20  correct?

21     A.   That is correct.   If a skid weighs

22  five thousand pounds or if it's got nails

23  sticking out of it, chances are you're going

24  to tear it up as it's dragged across it.

25     Q.   Well, that isn't what the warranty

EXHIBIT A

1  says, that isn't the exclusion of the

2  warranty though, is it?

3      A.  That would be my understanding of

4  it.

5      Q.  Well, no, it doesn't say anything

6  about nails sticking out of anything or any

7  weight, it talks about uncovered damage

8  caused by items pushed or dragged across the

9  product, such as skids or pallets, doesn't

10  it?

11      A.  My answer is a business reply to that

12  question.

13      Q.  And you have the same exclusion for

14  yours, right?

15      A.  I have an exclusion that is similar.

16      Q.  I think you have a three year

17  warranty, don't you?

18      A.  I do.

19      Q.  I mean if you do that type of an

20  exclusion, you could warrant it almost

21  forever, couldn't you?

22      A.  Forever is a long time.

23      Q.  No, but you could extend that

24  warranty out five years or more with no

25  concerns, couldn't you?

EXHIBIT A

Page 216

1            MR. COHN:  Do you want to debate

2    him on the warranty, is that where we're

3    going now?

4            MR. WEBER:  Could you?

5            MR. COHN:  Objection.

6            THE WITNESS:  The decision to

7    establish a warranty and put it in place is

8    my decision based on sound business

9    practice.

10           MR. WEBER:  And what was the, what

11    were the sound business practices?

12           MR. COHN:  He's already answered

13    that.

14           MR. WEBER:  I'm just too slow I

15    guess, it's too late.

16           MR. COHN:  You just want to go

17    over things.

18           MR. WEBER:  Go ahead.

19           THE WITNESS:  We provide a very

20    decent warranty for our product.  You can

21    drive over it with tow motors, clean it with

22    industrial brush scrubbers.  We do not

23    warranty it for the dragging and pulling of

24    skids.

25    BY MR. WEBER:

EXHIBIT A

1      Q.  Your product doesn't have the

2   undercut recess for the adhesive, does it?

3      A.  No, it does not.

4                    (Defendant's Exhibit

5                    No. 38 was marked

6                    for identification.)

7   BY MR. WEBER:

8      Q.  Do you recognize Exhibit 38?

9      A.  Yes.

10      Q.  And is this again for a product

11   that's made according to the '480 patent?

12      A.  Yes.

13      Q.  I see here that this is sold in

14   hundred foot rolls, is that your typical size

15   of selling this product?

16      A.  That's not a typical size, it is

17   something that we implemented and several of

18   our competitors that copied our product also

19   made it in the same size rolls as we did.

20      Q.  Okay.  What size rolls does it come

21   in?

22      A.  A hundred feet.

23      Q.  Okay.  Well, does it come in any

24   other lengths?

25      A.  No.

EXHIBIT A

1     Q.  Okay.  And the extrusion process of

2  manufacturing is what enables you to put them

3  in those hundred foot rolls, isn't it?

4     A.  Yes.

5     Q.  In fact if you didn't extrude it,

6  you'd really have a difficult time rolling

7  up a hundred foot of an elongated material,

8  wouldn't you?

9     A.  I would imagine there might be other

10  methods to doing it.

11     Q.  But the simplest method is the

12  extrusion in a take-up roll, isn't it?

13     A.  I don't know if it's the simplest

14  method or not.

15     Q.  Well, do you know of a simpler

16  method?

17     A.  I would imagine there's a whole realm

18  of possibilities of different ways to skin

19  the cat, so for me to tell you what the most

20  effective, cheapest, quickest way, and to

21  stand here and tell you that would be

22  inaccurate.

23     Q.  I thought that was part of what you

24  studied in school, wasn't it, process

25  engineering?

EXHIBIT A

Page 219

```
 1      A.  I did.

 2      Q.  Okay.  But you can't --

 3              MR. COHN:  Now it's a little late

 4  in the day for you to try to debate him on

 5  something.

 6              MR. WEBER:  I'm not wanting to

 7  debate.

 8              MR. COHN:  He answered your

 9  question.  You said Goecke, you can't answer

10  me?  He answered it.

11              MR. WEBER:  No, I didn't.  Well,

12  thank you, do you want to form some more

13  questions for me?

14              MR. COHN:  No, you're doing bad

15  enough on your own.

16              MR. WEBER:  Okay, good, good.  I

17  think we've done quite well today, as a

18  matter of fact I think we've done extremely

19  well.

20              MR. COHN:  Wait until you read the

21  transcript.

22              MR. WEBER:  Okay.  I don't think

23  I'm even going to need a transcript after

24  today.

25  BY MR. WEBER:
```

EXHIBIT A

1     Q.  Do you know how many generations of

2  the DuraStripe product there have been?

3     A.  No.

4     Q.  Have you ever heard of the Supreme

5  five or the Supreme V generation?

6     A.  Yes.

7     Q.  And what is that?

8     A.  A different version of the Ergomat

9  product.

10     Q.  What does it have that's different

11  from the other generations?

12     A.  I don't know.

13                    (Defendant's Exhibit

14                    No. 39 was marked

15                    for identification.)

16  BY MR. WEBER:

17     Q.  Do you recognize Exhibit 39?

18     A.  Yes.

19     Q.  What is it, apart from some of the

20  notes that are written on it or underlining

21  that's not in the original?

22     A.  I'm sorry, what's the question

23  again?

24     Q.  What is this document, apart from the

25  markings and the handwriting?

EXHIBIT A

1     A.  It's just a brochure for Ergomat's

2   tape products.

3     Q.  Okay.  Do you know what DuraStripe

4   Lean is?

5     A.  Yes.

6     Q.  And what is that?

7     A.  It's a product that they sell in two

8   hundred foot rolls.

9     Q.  If you look back on the third page

10  of this document there's a, from the way-back

11  machine, the Internet archives, it shows May

12  3rd of '09, new DuraStripe Supreme V, I think

13  that's five, Roman numeral five; is that

14  correct?

15    A.  Yes.

16    Q.  And it talks about a fifth generation

17  of the original DuraStripe.  And down at the

18  last sentence of the second and last main

19  paragraph on that page it says, "It also has

20  the added benefit of having tapered edges to

21  eliminate potential tripping and impact

22  hazards," am I correct in that regard?

23    A.  That's what it reads.

24    Q.  Now, was the DuraStripe Supreme V

25  when the tapered edges were introduced to

EXHIBIT A

1   DuraStripe?

2       A.  No.

3       Q.  Do you have any drawings of the

4   tooling that you've used for making

5   originally the DuraStripe stripe product and

6   today the product that you make?

7       A.  No.

8       Q.  You don't have any drawings of the

9   tooling?

10      A.  I don't, no.

11      Q.  Who does?

12      A.  Phil Nye.

13      Q.  Has he always had the drawings of the

14  tooling?

15      A.  Yes.

16              MR. WEBER:  Okay.

17                  (Defendant's Exhibit

18                  No. 40 was marked

19                  for identification.)

20  BY MR. WEBER:

21      Q.  Do you recognize Exhibit 40?

22      A.  I recognize the first page.  The

23  other pages, the first time I've seen it.

24      Q.  Okay.  What do you recognize the

25  first page to be?

EXHIBIT A

Page 223

1       A.  A brochure on the DuraStripe

2   product.

3              MR. WEBER:  41.

4                     (Defendant's Exhibit

5                      No. 41 was marked

6                      for identification.)

7   BY MR. WEBER:

8       Q.  Do you recognize Exhibit 41?

9       A.  Yes.

10      Q.  And what is 41?

11      A.  Installation tips for when you

12  install MightLine tape, when two lines

13  intersect at corners, the best way to miter

14  the corners, make it look better rather than

15  having one just go to the end of the other

16  one and butt up against it.

17      Q.  So you do a mitered joint instead of

18  a butt joint?

19      A.  Yes.

20      Q.  You said MightyLine, this says

21  DuraStripe?

22      A.  DuraStripe, I'm sorry, my error.

23      Q.  Who came up with these installation

24  tips, was that you or Ergomat or?

25      A.  Ergomat would have come up with this

EXHIBIT A

Page 224

1   one.

2       Q.   I mean did you ever provide

3   installation instructions to Ergomat?

4       A.   No.

5             MR. WEBER:  Okay.

6                   (Defendant's Exhibit

7                   No. 42 was marked

8                   for identification.)

9   BY MR. WEBER:

10      Q.   Do you recognize Exhibit 42?

11      A.   Yes.

12      Q.   What is that?

13      A.   A brochure for our MightLine tape

14  products.

15      Q.   Does this show all of your floor tape

16  products?

17      A.   No.

18      Q.   It talks here about, on the second

19  page under the easy installation, just peel

20  and stick, and it talks about a double-coated

21  tape, is that the double-backed adhesive

22  we've been talking about?

23      A.   Yes.

24      Q.   And I do apologize, I know you've

25  said this before but what is the thickness

EXHIBIT A

1    of the double-backed tape on your product?

2        A.  The tape itself?

3        Q.  Right -- or no, I'm sorry, but yeah,

4    that's a good point, the double-backed

5    adhesive, the adhesive you use, is it a

6    double-backed tape?

7        A.  Yes.

8        Q.  Okay.  And that's applied to your

9    polymer layer?

10       A.  Correct.

11       Q.  And the thickness of the

12   double-backed tape that is applied to the

13   polymer layer is what?

14       A.  Ten to eleven mil.

15            MR. WEBER:  Okay.

16                 (Defendant's Exhibit

17                  No. 43 was marked

18                  for identification.)

19   BY MR. WEBER:

20       Q.  Do you recognize Exhibit 43?

21       A.  Yes.

22       Q.  And what is that?

23       A.  A brochure for out MightyLine

24   products.

25       Q.  Now, down on the front lower

EXHIBIT A

1   left-hand corner you have a three year

2   limited warranty, right?

3       A.  Yes.

4       Q.  Now, when, when does the customer get

5   to see the warranty?

6       A.  Oftentimes it's dealers will ask us

7   for it on behalf of a customer.

8       Q.  So you actually have a written

9   warranty?

10      A.  Yes, we do.

11      Q.  You have down in the lower right-hand

12  corner "MightLine patent pending," is that,

13  was that referring to the '480 patent or the

14  application for the '480 patent or do you

15  know?

16      A.  Yes.

17      Q.  Yes you know or yes it is the '480?

18      A.  Yes, it is.

19      Q.  Okay, that was my fault.

20          MR. WEBER:  Why don't we take

21  about a five minute break, I think I'm done

22  but I may have a couple more questions and

23  we'll be done with it.

24                  - - -

25              (Short recess had.)

EXHIBIT A

```
 1                    - - -

 2   BY MR. WEBER:

 3       Q.  Okay.  The advertising that your

 4   company does of its product, do you keep a

 5   portfolio or file of that advertising?  You

 6   know, when you've developed an ad, do you

 7   keep a copy of that ad?

 8       A.  Is there a specific ad?

 9       Q.  No, no, I'm just wanting to know the

10   chronology of ads for example that you've

11   run on the MightyLine product or the

12   DuraStripe when you were, you know, if you

13   did advertisements for the DuraStripe, things

14   of that nature.

15               Because the ads that I see that

16   I've been able to get aren't dated, do you

17   keep a listing of when an advertisement was

18   developed and when it was run?

19       A.  No.

20       Q.  Do you at least keep samples of your

21   advertising?

22       A.  Yes.

23       Q.  Okay.  And do you have that in a

24   physical file or an electronic file?

25       A.  Electronic.
```

EXHIBIT A

1      Q.  And how long does that go back?

2      A.  I believe 2008.

3      Q.  Now, at a point in time Advanced

4  Plastics was making product for Ergomat and

5  Ergomat was selling it, correct?

6      A.  That's correct.

7      Q.  And there came a point in time when

8  that stopped, is that fair to say?

9      A.  Yes.

10     Q.  What brought that stoppage about?

11     A.  A falling-out.

12     Q.  What do you mean by a falling-out?

13     A.  There was a breach of an agreement

14  between Advanced and Ergomat.

15     Q.  And did Ergomat quit buying from

16  Advanced or did Advanced cut Ergomat off?

17     A.  Advanced cut Ergomat off.

18     Q.  And when was that?

19     A.  Early 2006.

20     Q.  Okay.  And did the two ever hook back

21  up?

22     A.  No.

23     Q.  Advanced has not made product for

24  Ergomat since then?

25     A.  That's correct.

EXHIBIT A

1      Q.  And you're familiar with the Jayco

2    product that we've advanced in this case, are

3    you not?

4      A.  Yes.

5      Q.  Have you researched that Jayco

6    product any since it was brought to your

7    attention in this case?

8            MR. COHN:  Objection, don't answer

9    that, if he's done that it's clearly been for

10   Rule 26 purposes.

11   BY MR. WEBER:

12     Q.  It's clearly been done for Rule 26

13   purposes?  What purposes did you do it for,

14   don't tell me what you did, just tell me the

15   purpose?

16     A.  We used the material that you

17   provided us.

18     Q.  To run tests?

19     A.  To ascertain, yes.

20     Q.  Okay.  Did you provide that material

21   to an expert witness?

22     A.  Yes.

23     Q.  And who was that?

24     A.  (Unintelligible)

25            MR. COHN:  Objection.  Did you

EXHIBIT A

1    already answer?

2              MR. WEBER:  Tim Sara did you say?

3              MR. COHN:  Objection, don't

4    answer.

5              THE WITNESS:  No.

6    BY MR. WEBER:

7        Q.  Okay.  Who is Anthony Goecke?

8        A.  That's my brother.

9        Q.  And what is Pristine Products?

10       A.  A distributor.

11       Q.  Of what?

12       A.  MightyLine tape.

13       Q.  And how long has he been a

14   distributor of MightyLine tape?

15       A.  I have to think about that.  I would

16   put it around 2011, 2010 or 2011.

17       Q.  Do you know what type of business

18   Pristine Products was in in 2005?

19       A.  It's possible it goes back that far,

20   being a distributor of our products in 2005.

21       Q.  That's six years different from

22   2011.

23       A.  At one point in time he made

24   mouldings, wood mouldings for houses.

25       Q.  Where does your brother live?

EXHIBIT A

1      A.  Liberty, Indiana.

2      Q.  Do you converse regularly?

3      A.  Yes.

4      Q.  Older brother or younger brother?

5      A.  Younger.

6      Q.  Did you know that your brother

7   attended the Jayco booth at a trade show on

8   January 10th through the 13th of 2005?

9      A.  No.

10     Q.  He never shared that with you?

11     A.  No.

12     Q.  Does that surprise you, if that in

13  fact is the case, would that surprise you?

14            MR. COHN:  Objection.

15            THE WITNESS:  No.

16  BY MR. WEBER:

17     Q.  Does your brother go to trade shows?

18     A.  Yes.

19     Q.  Trade shows of the type that would

20  handle floor marking tape?

21     A.  Yes.

22     Q.  What is that, what is the nature of a

23  trade show that would feature or include

24  floor marking tape?

25     A.  Material handling shows, safety

EXHIBIT A

1    shows.

2        Q.   Okay.  Now, when your brother would

3    go to these types of shows, did he pay his

4    own way or did you help fund it?  And by you

5    I mean your company or you personally.

6        A.   He would pay his own way.

7        Q.   Who are Alec and Michael Goecke?

8        A.   Alec is my son, Michael is another

9    brother of mine.

10       Q.   Are they both involved in the

11   business?

12       A.   Alec works for ShieldMark, Mike has

13   his own company.

14       Q.   Does he sell ShieldMark product?

15       A.   Yes.

16       Q.   Did the two of them visit the Jayco

17   booth at a show in Atlanta in 2012?

18       A.   I believe they did.

19       Q.   And they reported that back to you?

20       A.   No.

21       Q.   How do you come to the belief that

22   they did?

23       A.   After, it was brought up in the

24   conference with you and your party, they

25   mentioned that they had stopped by the

EXHIBIT A

1   booth.

2              MR. WEBER:  Okay.  Why don't you

3   mark this as the next exhibit.

4                        (Defendant's Exhibit

5                        No. 44 was marked

6                        for identification.)

7   BY MR. WEBER:

8       Q.  Do you recognize Exhibit 44?

9       A.  Yes.

10      Q.  And what is Exhibit 44?

11      A.  It's our response to your

12   interrogatories.

13      Q.  Now, when was the first time you

14   heard of Jayco?

15      A.  At your conference in May of 2012.

16      Q.  Did you review Exhibit 44 before it

17   was sent to us?

18      A.  Yes.

19      Q.  Did you ever sign the back sheet of

20   this document?

21      A.  Yes.

22      Q.  You did.

23              MR. WEBER:  Did you provide us

24   with a signed one, I don't have a signed

25   sheet, do you know if it ever was?

EXHIBIT A

1            MR. HARDERS:  I'm pretty sure that

2    we do have a copy of that and I think we

3    didn't get yours either.

4            MR. WEBER:  No, and that's the

5    reason he asked him and he just said yeah,

6    those are my answers.

7            MR. COHN:  And you should if you

8    don't already have a signed one.

9    BY MR. WEBER:

10      Q.  Okay.  You have signed this, or do

11   you remember?

12      A.  I don't remember.

13           MR. WEBER:  Okay.  And you're

14   going to look then, right, Scott?

15           MR. HARDERS:  Yes.

16   BY MR. WEBER:

17      Q.  Okay.  One of the, well, let me just

18   ask you, one of topics you were to be

19   prepared to testify on was damages.  How,

20   what is the nature and extent of the damages

21   that ShieldMark has suffered because of the

22   alleged wrongdoing of InSite?

23      A.  I would have to know the sales that

24   we lost in our product as a result of the

25   competing infringing product taking its

EXHIBIT A

1   place to give you an accurate assessment on

2   that.

3        Q.  All right.  Well, I think you do have

4   that, at least your --

5        A.  I don't have that.

6             MR. COHN:  We have it for

7   counsel's eyes only.

8             MR. WEBER:  Okay, you've got it,

9   but how would --

10            MR. COHN:  He doesn't have it.

11  BY MR. WEBER:

12       Q.  Are you saying -- well, strike that.

13            Who are your competitors in

14  this industry?

15       A.  The competitors include Brady,

16  Creative, InSite, 3M, 3 Com or In Com, and

17  anybody who paints their floors with paint,

18  amongst I'm sure others, Windmill Tapes.

19       Q.  I didn't get the second one you said,

20  Brady something, then 3M, In Com, people who

21  paint floors, Windmill Tapes?

22            MR. COHN:  You skipped InSite and

23  Creative.

24            MR. WEBER:  Okay.

25            MR. COHN:  I think we can have it

EXHIBIT A

1    read back.

2              MR. WEBER:  No, no, that's fine.

3    BY MR. WEBER:

4         Q.  Does Brady infringe your patent?

5         A.  No.

6         Q.  Does 3M?

7         A.  No.

8         Q.  Does N Com?  I said N Com but I --

9    how do you spell it?

10        A.  I don't know.

11        Q.  Does it sound like I-N-C-O-M-E or

12   I-N-C-O-M?

13        A.  It sounds like I-N-C-O-M.

14        Q.  Okay.  Painting floors certainly

15   doesn't infringe your patent, does it?

16        A.  No.

17        Q.  Does Windmill Tapes, do they infringe

18   your patent?

19        A.  No.

20        Q.  Any other competitors you can think

21   of?

22        A.  Not at the moment.

23        Q.  So are you saying that every sale

24   that InSite made was a sale that you lost, is

25   that your assessment?

EXHIBIT A

1      A.   A possible sale that we lost.

2      Q.   Have you made an assessment or tried

3  to evaluate what a reasonable royalty would

4  be on your patent?

5      A.   Yes.

6      Q.   And what's the figure you've come up

7  with on that?

8      A.   Well, I think we're into the

9  confidential nature of this.

10     Q.   How would you determine what a

11  reasonable royalty would be on your product?

12     A.   I would take the sales of what they

13  should be and then take my gross margin.

14     Q.   And then what?

15     A.   Multiply times the gross margin.

16     Q.   Well, that would be your actual

17  damages, wouldn't it?

18     A.   And what were you asking for then?

19     Q.   I was asking a reasonable royalty

20  rate, how would you determine a reasonable

21  royalty rate for your product if you were

22  trying to assess damages?

23          MR. COHN:  He obviously didn't

24  understand the difference when you asked the

25  question.

EXHIBIT A

1   BY MR. WEBER:

2       Q.   Okay.  In the first instance you're

3   saying a sale that InSite made is possibly a

4   sale you lost, right?

5       A.   That's correct.

6       Q.   And therefore you should get your

7   gross margin on those sales, correct?

8       A.   Correct.

9       Q.   All right.  Now, if the law were to

10  say you're not entitled to these actual

11  damages but you're entitled to a reasonable

12  royalty, what would a reasonable royalty be

13  for this product?

14              What would a royalty rate be

15  for this product and how, how have you come

16  to determine that to be a reasonable

17  royalty?

18      A.   Royalty rates vary anywhere in the

19  range from five to twenty percent.

20      Q.   Okay.  What product, are you familiar

21  with any licenses for twenty percent?

22      A.   No.

23      Q.   Okay.  But anyhow, for your product

24  -- this isn't a cure for cancer, right, I

25  mean we'll agree to that, this is a tape, so

EXHIBIT A

1  what would be a reasonable royalty rate for

2  this adhesive tape?

3          MR. COHN:  It's an important

4  enough product for your client.

5          MR. WEBER:  I wouldn't use terms

6  like that if I were you.

7          MR. COHN:  Are you going to sue

8  me?

9          MR. WEBER:  No, I'm not going to

10  sue you, but we're sure going to look for

11  getting our attorney fees in this case.

12          MR. COHN:  That was such a

13  terrible thing, that I made a joke.

14          MR. WEBER:  If this goes much

15  further.

16  BY MR. WEBER:

17      Q.  But I'd like to know what would be a

18  reasonable royalty?

19      A.  Well, I think you were privy to the

20  document for the other agreement we had, were

21  you not?

22      Q.  Well, I'm privy to that.

23      A.  It would be that plus two.

24      Q.  And why?

25      A.  I've gone through considerable

EXHIBIT A

1   expense going through this process and

2   enforcing the rights of my patent.

3       Q.  Uh-huh.  Well, okay, that would be a

4   recovery of attorney fees, you know, if you

5   were, you know, or a trebling of damages if

6   you thought there was willful infringement

7   and could prove it.

8           MR. COHN:  Are you giving a

9   lecture or are you trying to ask questions?

10          MR. WEBER:  No, I'm trying to get

11  him back on track here, what reasonable

12  royalty would be.

13          MR. COHN:  He's answered your

14  question.  Maybe it's not an answer that you

15  think is correct but he's given it.

16          MR. WEBER:  Well, no, I'm not

17  judging whether it's correct or not, I am

18  trying to --

19          MR. COHN:  Well, you're arguing

20  with him about it.

21          MR. WEBER:  I'm not arguing, I'm

22  trying to -- I'll just ask one time very

23  succinctly and then I'll leave your answer

24  for the record and we'll be done with it.

25  BY MR. WEBER:

EXHIBIT A

1      Q.   What would a reasonable royalty rate

2  on your product be or product made under your

3  patent would be and what is the basis for

4  your determination of that rate?

5      A.   The determination of the rate would

6  be based on fact that, well, the reasonable

7  rate I just gave you.

8      Q.   X plus two?

9      A.   That's right.

10      Q.   And now the reasoning behind this or

11  the justification or method for determining

12  it?

13      A.   Because of the inordinate amount of

14  time and expense I've had to incur to reach

15  the point in time to sustain an agreement.

16      Q.   To reach an agreement with somebody

17  who thinks your patent is invalid and not

18  infringed; is that correct?

19      A.   That's the other side of the

20  opinion.

21      Q.   Well, no, that's, that is what goes

22  into it.

23      A.   I'm not going to tell you that's

24  correct.

25      Q.   And I don't expect you to but that's

**EXHIBIT A**

1   what goes into an arm's length negotiation

2   and that's what you're looking for in a

3   reasonable royalty, you have someone that

4   says I don't think your patent is valid and I

5   don't think it's infringed and you're

6   saying...

7               You know, I think you need to

8   look at that part of the equation just as we

9   need to look at our part of the equation.

10  And I don't mean to be lecturing, I do

11  apologize because I did say I would ask for

12  your answer and let it go, but are you done

13  with your answer?

14      A.  Yes.

15      Q.  And do you reaffirm, to the extent

16  you affirmed it before, the answers and

17  responses in Exhibit 44?

18      A.  Yes.

19      Q.  When you were selling product during

20  your developmental period while you were

21  still working at Akro-Mils, what was the

22  name of the product, what was the trademark

23  or product name that you gave these

24  products?

25               MR. COHN:  Objection.

EXHIBIT A

1            THE WITNESS:  Floor tape.

2    BY MR. WEBER:

3        Q.  Floor tape?

4        A.  Uh-huh.

5        Q.  You never registered that, did you?

6        A.  No.

7        Q.  Did you use your company name in

8    association with it, did you use --

9        A.  Yes.

10        Q.  Okay.  Let me ask you this, is John

11    Davis, he's a CPA?

12        A.  Yes.

13        Q.  Do you know where he worked before he

14    worked with Advanced Plastics?

15        A.  No.  He's a part-owner of Advanced

16    Plastics, he doesn't work there.

17        Q.  Oh, he's just -- I apologize, I don't

18    mean just, he's an owner but he doesn't work

19    there?

20        A.  Correct.

21            MR. WEBER:  Okay.  Well, I have no

22    further questions of you at this time and I

23    appreciate your patience.

24            THE WITNESS:  Thank you.

25            MR. COHN:  No questions.  We'll

EXHIBIT A

Page 244

1    read it.

2                    - - -

3    (Deposition concluded at 6:00 o'clock p.m.)

4                    - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT A

I, THOMAS R. GOECKE, do verify
that I have read this transcript consisting
of two hundred and forty-six (246) pages and
that the questions and answers herein are
true and correct with corrections as noted on
the errata sheet.


-------------------------------------------
  THOMAS R. GOECKE




    Sworn to before me_____,
a Notary Public in and for the State of
_____, this _____ day of _____, 2013.



    _____
    Notary Public in and for the
    State of _____




    My commission expires -----------------------

EXHIBIT A

Page 246

THOMAS R. GOECKE

Page/Line              Correction

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

_____/_____  _____

EXHIBIT A

C E R T I F I C A T E

STATE OF OHIO, )
            ) SS:
SUMMIT COUNTY. )

        I, Michael G. Cotterman, a Notary
Public within and for the State of Ohio, duly
commissioned and qualified, do hereby certify
that the within named witness, THOMAS R.
GOECKE, was by me first duly sworn to testify
the truth, the whole truth and nothing but
the truth in the cause aforesaid; that the
testimony then given by the witness was by me
reduced to Stenotypy in the presence of said
witness, afterwards transcribed upon a
computer; and that the foregoing is a true
and correct transcription of the testimony so
given by the witness as aforesaid.

        I do further certify that this
deposition was taken at the time and place in
the foregoing caption specified, and was
completed without adjournment.

        I do further certify that I am not
a relative, employee of or attorney for any
of the parties in the above-captioned action;
I am not a relative or employee of an
attorney of any of the parties in the
above-captioned action; I am not financially
interested in the action; and I am not, nor
is the court reporting firm with which I am
affiliated, under a contract as defined in
Civil Rule 28(D).

        IN WITNESS HEREOF, I have hereunto
set my hand and affixed my seal of office at
Akron, Ohio on this 2nd day of May, 2013.


      -------------------------------------------------------
      Michael G. Cotterman, a Notary
      Public in and for the State of Ohio.


  My Commission expires October 25, 2017.

EXHIBIT A