

July 10, 2013

Ray L. Weber, Esq.
Renner, Kenner, Greive, Bobak, Taylor & Weber Co., LPA
Fourth Floor, First National Tower
Akron, Ohio 44308-1456

**Subject:** *ShieldMark, Inc. v. Insite Solutions, LLC*
**United States District Court for the Northern District of Ohio, Eastern Division**
**Case No. 1:12-CV-00223-DCN**

Dear Mr. Weber:

I have been retained to provide expert analysis, opinion and testimony on behalf of Insite Solutions, LLC ("Insite Solutions") relating to commercial damages that may have been sustained by ShieldMark, Inc. ("ShieldMark") if Insite is found liable for any of the claims made in the Complaint filed January 30, 2012. This report is offered in rebuttal to damage calculations ShieldMark has advanced by their expert, Jeffrey Firestone, CPA, CPE. The accused products are "Superior Mark Tape" and "Last Mark Aisle Marking Tape" adhesive tapes sold by Insite Solutions.

You have supplied me with copies of a variety of information to review and utilize including:

- The Complaint and attachments filed January 30, 2012;
- U.S. Patent 8,088,480, "Adhesive Tape" dated January 3, 2012; also referred to as the "'480 patent;"
- The plaintiff's expert report of Jeffrey D. Firestone, CPA, dated June 20, 2013;
- Insite Solutions sales cited above (ISS 0261 through ISS 0412);
- Insite Solutions *Form 1065 U.S. Return of Partnership Income* for the years 2009 through 2011; and
- The Confidential Settlement and Patent License Agreement between ShieldMark, LLC and Ergomat, LLC dated July 24, 2012.

Ray L. Weber, Esq.
July 10, 2013
Page 2

You have also provided me with information that will be presented in the case for the purpose of my obtaining a better understanding of relevant issues. Among this information that will serve as assumptions on my part are that:

- The '480 patent is currently under re-examination at the Patent Office; and
- The primary value of the Insite Solutions' products at issue are enhancements provided by Insite Solutions and not addressed by the patent (e.g. beveled edges, recessed adhesive area, and easy-to-remove liner as well as cost and pricing advantages).

As stated above, this report and these calculations are offered in rebuttal to damage calculations ShieldMark has advanced by their expert, Jeffrey Firestone. Please note that Insite Solutions disputes the damage allegations and these discussions and/or calculations assume a finding against Insite Solutions, LLC.

## SHIELDMARK- LOST PROFITS AND REASONABLE ROYALTY DETERMINATION

ShieldMark has retained Jeffrey D. Firestone, CPA, CFE. Mr. Firestone enumerates his findings and opinion in his report dated June 13, 2013.

## LOST PROFITS- SHIELDMARK

According to the report of Mr. Firestone, Insite Solutions has generated sales of approximately $1,325,000 of the accused products in 2012. ShieldMark's gross profit on sales of its adhesive tapes are approximately 35%. Had ShieldMark enjoyed all of the Insite Solution sales at the ShieldMark average gross profit margin of 35%, ShieldMark would have had an additional profit of $460,000.

Ray L. Weber, Esq.
July 10, 2013
Page 3

Even assuming a finding of fact for ShieldMark on the '480 patent, there is absolutely no basis in fact or theory to merely assume that 100% of the Insite Solution sales would have gone directly to ShieldMark as additional lost sales, and therefore lost profits.

While this is an exceedingly simple calculation to make and explain, it falls short at many levels. The analysis fails to examine market share data for the relevant market for adhesive floor tape while ignoring any price differences and elasticity of demand issues in a "but-for-market" that may have changed the quantity demanded of <u>all</u> sales of ShieldMark, not just those at issue.  To believe this determination and conclusion, one must assume that there are no commercially viable, non-infringing alternatives.  This is simply not the case.  In fact the '480 patent at issue discusses commercially available, non-infringing alternatives.[1]  Additionally, while Mr. Firestone understands ShieldMark had the capacity to take on these sales, no evidential analysis was offered for this understanding.

Mr. Firestone further states that this $460,000 calculation "does not include certain considerations that _would likely have a significant effect_ (emphasis added) on the amount of damages suffered in this matter."  These include:

- Ongoing Insite Solutions sales after 2012;
- Potential lost profits related to the exclusive licensing of the manufacturing of ShieldMark's product to Advance Plastics; and
- Likely price erosion of ShieldMark products from the "but-for" world without competition.

Mr. Firestone then indicates, "If these considerations were taken into account, the amount of damage incurred by ShieldMark _would likely increase_ (emphasis added)."

---

[1] See the '480 patent's Background discussion of available existing types of polymeric pressure sensitive adhesive tape and painting.

Ray L. Weber, Esq.
July 10, 2013
Page 4

It is difficult to address these additional bullet items in the vacuum of no underlying analysis in Mr. Firestone's report. However, because I see no analysis or documentation supporting an initial assertion of actual damages of any lost ShieldMark product sales and ShieldMark profits, I disagree with this conclusion.


## *SHIELDMARK- REASONABLE ROYALTY*

According to the report of Mr. Firestone, ShieldMark has one existing patent agreement on the '480 patent at 7.5% of gross sales in the United States and 5% for sales overseas.[2] This patent agreement was from a patent-in-suit.

Additionally there was research on royalty rates within SIC 5099 and other similar related codes which corresponds to the NAICS code utilized by Insite on its tax returns (NAICS #423990 Other Miscellaneous Durable Goods Merchant Wholesalers). The report indicates a review of the ktMINE database and "noted royalty rates based on sales ranging from 5 percent to more than 20 percent."

Concluding the review of the above, the report states, "As a result, it appears that a reasonable range of royalty rates in this matter would be 10 to 15 percent."

There are many misgivings about this "reasonable range" assessment and resulting conclusion in Mr. Firestone's report.

The royalty rate conclusion at "10 - 15 percent" yields a "reasonable range of royalty rate" that is 1/3 to 2x higher than the only other royalty rate agreement on the '480 patent that would apply at these sales levels. An agreement which was the result of a patent-in-suit.

---

[2] These respective rates drop to 5.0% and 2.5% for respective sales over $5,000,000 (within USA) and $3,000,000 (outside the USA).

Ray L. Weber, Esq.
July 10, 2013
Page 5

A patent-in-suit royalty rate agreement brings many other values to the licensee than the use of the patent (e.g. ending the ongoing, expensive, time consuming litigation costs[3]). In fact, this particular license agreement is for the '480 patent and an additional patent application.

Additionally, a patent-in-suit rate is not an arms-length transaction suggesting an indicator of the fair market value for a Reasonable Royalty. The term "fair market value" is commonly defined in IRS Revenue Ruling 59-60 as the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy nor sell and both having a reasonable knowledge of relevant facts.

Not mentioned in Mr. Firestone's review is that this particular agreement-in-suit has a "Most Favored Nation clause"[4] for the licensee. This clause would accord the licensee the best royalty rate that ShieldMark would give anyone and yet the licensee would not bear any of the costs or risk of ongoing litigation. It gets the best royalty rate if the patent is ultimately held valid and it bears none of the ongoing litigation costs or risks in proving the patent is invalid or unenforceable.

Finally, one would certainly also expect to see an analysis of the Georgia-Pacific factors in support of this conclusion as set forth in *Georgia-Pacific Corp. v. United States Plywood Corp.* There is none.

What appears to hold the bulk of the weight of Mr. Firestone's conclusion is the reported review of NAICS 423990 and SIC 5099 in the ktMINE database.[5] The reliance on this review, even though this NAICS code is found on the Insite tax records, may not yield reliable observations.

---

[3] As noted in the Recitals, "WHEREAS, the parties hereto wish to settle their disputes in order to avoid further expenditures of legal costs and time."
[4] Kolovrat v. Oregon, 366 U.S. 187 (U.S. 1961), the court held that the term "most favored nation" clause in a treaty means that each signatory grants to the other the broadest rights and privileges which it accords to any other nation in other treaties it has made or will make.
[5] No detail of this review was attached to Mr. Firestone's report including actual license agreements supporting the conclusion.

Ray L. Weber, Esq.
July 10, 2013
Page 6

The North American Industry Classification System (NAICS) is the standard used by Federal statistical agencies in classifying business establishments for the purpose of collecting, analyzing, and publishing statistical data related to the U.S. business economy.   The US Census Bureau offers the following on NAICS 423990, *Other Miscellaneous Durable Goods Merchant Wholesalers:*[4]

> *This industry comprises establishments primarily engaged in the merchant wholesale distribution of durable goods (except motor vehicle and motor vehicle parts and supplies; furniture and home furnishings; lumber and other construction materials; professional and commercial equipment and supplies; metals and minerals (except petroleum); electrical goods; hardware, and plumbing and heating equipment and supplies; machinery, equipment and supplies; sporting and recreational goods and supplies; toy and hobby goods and supplies; recyclable materials; and jewelry, watches, precious stones and precious metals).*

> *Illustrative Examples:*

> *Musical instruments merchant wholesalers*
> *Prerecorded audio and video tapes and discs merchant wholesalers*
> *Phonograph records merchant wholesalers*
> *Prerecorded compact discs (CDs) and digital video discs (DVDs) merchant wholesalers*
> *Prerecorded audio and video cassettes merchant wholesalers*
> *Timber and timber products (except lumber) merchant wholesalers*

---

[4] http://www.census.gov/eos/www/naics/.

Ray L. Weber, Esq.
July 10, 2013
Page 7

The US Census Bureau offers the following on SIC 5099, *Durable Goods Not Elsewhere Classified*:[5]

> *Establishments primarily engaged in the wholesale distribution of durable goods, not elsewhere classified, such as musical instruments and forest products, except lumber.*
>
> *SIC 5099 is subdivided in some tables into -*
>
> *1. Musical instruments and supplies.*
>
> *2. Forest products, except lumber.*
>
> *3. General merchandise - durable.*
>
> *4. Compact disks, prerecorded audio tapes, and phonograph records.*
>
> *5. Fire extinguishers and fire safety equipment.*
>
> *6. Other durable goods.*

*Durable Goods* are typically defined as a goods not destroyed by use[6] that have an average useful life of at least 3 years.[7]

Regardless of what is indicated on the Insite tax returns or whether or not the '480 patented product is a *Durable Good*, the '480 patented product at issue is Adhesive Tape.[8]   An NAICS (2012) keyword search on Adhesive Tape[9] directs the user to:

> <u>322220</u>  Adhesive tape (except medical) made from purchased materials
>
> <u>339113</u>  Tapes, medical adhesive, manufacturing
>
> <u>339113</u>  Adhesive tape, medical, manufacturing

---

[5] http://www.census.gov/epcd/www/wc92sics.html.
[6] http://wordnetweb.princeton.edu/perl/webwn?s=durable%20goods
[7] http://www.bea.gov/national/pdf/NIPAhandbookch5.pdf
[8] U.S. Patent 8,088,480, "Adhesive Tape" dated January 3, 2012.
[9] http://www.census.gov/eos/www/naics/.

Ray L. Weber, Esq.
July 10, 2013
Page 8

The US Census Bureau offers the following on NAICS 322220, *Paper Bag and Coated and Treated Paper Manufacturing*:[10]

> *This industry comprises establishments primarily engaged in one or more of the following: (1) cutting and coating paper and paperboard; (2) cutting and laminating paper, paperboard, and other flexible materials (except plastics film to plastics film); (3) manufacturing bags, multiwall bags, sacks of paper, metal foil, coated paper, laminates, or coated combinations of paper and foil with plastics film; (4) manufacturing laminated aluminum and other converted metal foils from purchased foils; and (5) surface coating paper or paperboard.*

Adhesive Tape was formerly classified in 2007 with a corresponding index entry under NAICS 322222, *Coated and Laminated Paper Manufacturing*.[11]

> *This U.S. industry comprises establishments primarily engaged in performing one or more of the following activities associated with making products designed for purposes other than packaging: (1) cutting and coating paper; (2) cutting and laminating paper and other flexible materials (except plastics film to plastics film); and (3) laminating aluminum and other metal foils for nonpackaging uses from purchased foils. The products made in this industry are made from purchased sheet materials and may be printed in the same establishment.*

The Standard Industrial Classification (SIC) was replaced by the North American Industry Classification System (NAICS) starting in 1997, but several data sets are still available with SIC-based data. Both SIC and NAICS classify establishments by their primary type of activity. The Census keyword lookup system link[12] directs the user to the United States Department of Labor

---

[10] http://www.census.gov/eos/www/naics/.
[11] http://www.census.gov/cgi-bin/sssd/naics/naicsrch?code=322222&search=2007%20NAICS%20Search.
[12] http://www.census.gov/epcd/www/sic.html

Ray L. Weber, Esq.
July 10, 2013
Page 9

for a keyword search in the former SIC system.[15]  An SIC code keyword search on "Adhesive Tape" directs the user to:

> <u>2672</u> Coated and Laminated Paper, Not Elsewhere Classified
>
> <u>3579</u> Office Machines, Not Elsewhere Classified
>
> <u>3842</u> Orthopedic, Prosthetic, and Surgical Appliances and Supplies

SIC 2672, *Coated and Laminated Paper, Not Elsewhere Classified* has the following definition:[16]

> *Establishments primarily engaged in manufacturing coated, laminated, or processed paper and film from purchased paper, except for packaging. Also included are establishments primarily manufacturing gummed paper products* <u>***and pressure sensitive tape with backing of any material other than rubber, for any application***</u>*.* (emphasis added)

You have also asked that I opine as to a reasonable royalty on the '480 patent at issue.

## MARKET APPROACH- INDUSTRY LICENSES FROM ktMINE DATABASE

Accepting for the moment that SIC 5099, as relied on by Mr. Firestone, is the appropriate metric for comparison, one must examine the actual license agreements within this selection for their appropriateness as guideline transactions.  Much caution should be observed as cited royalty percentages within and between industry groups can vary dramatically.  The further one steps away from the direct product considered, the more problematic these issues may become.

I have undertaken a search of the ktMINE database[17] for information resulting from the search of SIC 5099.  The relevant survey results are outlined below.

---

[15] http://www.osha.gov/pls/imis/sicsearch.html
[16] http://www.osha.gov/pls/imis/sic_manual.display?id=577&tab=description

Ray L. Weber, Esq.
July 10, 2013
Page 10

Attached in Appendix A are the summary results printout of the seven agreements from SIC 5099,[18] the SIC code apparently utilized by Mr. Firestone for his "reasonable royalty" conclusion.[19]  The ktMINE Synopsis from the seven[20] license agreements products are:

1.  *Marketing Agreement- Grant the right to manufacture, duplicate, produce, advertise, promote, sell, rent, sub-license, exhibit and distribute the twenty-five L&M Health and Medical Programs, in all languages, in unlimited quantities, in all channels of distribution, and in all media.  Rate 15% to 25% Gross Sales*

2.  *Distribution Agreement- Grant the right to manufacture, duplicate, promote, sell, exhibit and distribute The Video Tech How-To Library and Video Computer Training Series programs in the videocassette format. Rate 10% Gross Sales*

3.  *Distribution Agreement- Grant the right to manufacturer, duplicate, produce, advertise, promote, sell, rent, sub-license, exhibit and distribute the Personal & Sales Development Multimedia Success Programs in all languages, in unlimited quantities, in all channels of distribution, and in all media.  Rate 20% Gross Sales of the Program over $750,000*

4.  *Marketing Agreement- Grant the right to amend THE LICENSE AGREEMENT EFFECTIVE JANUARY 01, 1993 BETWEEN DAIMLERCHRYSLER COPRORATION AND DYNAMIC INTERNATIONAL, INC., D/B/A DYNAMIC CLASSICS COVERING "JEEP" AND CHRYSLER'  Rate 6% Gross Sales of Mark identified Chrysler PT Cruiser Licensed Articles and 1% of of Mark identified Chrysler PT Cruiser Licensed Articles to be used for the Licensing Institutional Advertising Campaign*

5.  *Marketing Agreement- Grant the right to manufacture, duplicate, produce, advertise, promote, sell, rent, sub-license, exhibit and distribute the Personal & Sales Development Multimedia Success Programs (including existing printed text and electronic video, CD and Internet versions to be created) in floppy disk, digital video, CD-ROM, video cassette, video disk, film or any other present or future format now in*

---

[17] As of July 3, 2013, the ktMINE Royalty Rate Database detailed 14,158 license agreements.  All searches and corresponding results were taken on July 3, 2013.

[18] These represent 100% of findings of "SIC 5099" in the ktMINE database.

[19] As noted earlier, there are no attached actual license agreements to the report supporting a conclusion.

[20] The ktMINE database lookup resulted in an erroneous duplicate reporting of agreement 7 as an additional  8th license.

Ray L. Weber, Esq.
July 10, 2013
Page 11

existence or later developed which can be used to record the HRS media, in all languages, in unlimited quantities, in all channels of distribution, and in all media and delivery of content of media presently known and/or in use or to be devised and used in the future, including interactive television, satellite and Internet, notwithstanding the nature of format used, form of delivery system or contrivance utilized, venue utilizing such programming or method of payment. _Rate 20% Gross Sales over $750,000_

6. Service Agreement- Grant the right to enter into a Service Level Agreement for U.S. Filter Wastewater Group at Thomasville, Georgia providing for U.S. FILTER DISTRIBUTION GROUP, INC. to house and provide certain support services for the Wastewater Group AS/400 server and to cover the Wastewater Group AS/400 under U.S. FILTER DISTRIBUTION GROUP, INC.'s disaster recovery contract with SunGard Recovery Services. _Rate $2,500 per unit_

7. Distribution and Service Agreement- Grant the right to engage Current Media Group LLC. as the Contractor to purchase the Products with the FoodSoFresh name from HUMITECH INTERNATIONAL GROUP, INC. for resale, leasing, marketing or other distributions. _Rate $12 to $18 per unit_

It is my opinion that these agreements are not appropriate or useful as guideline transactions.

A similar search of the ktMINE database for SIC 2672 revealed _no_ license agreements whatsoever.

One may also search the database for "keywords." The ktMINE database revealed no license agreements for "Aisle" and "Tape" _or_ "Marking" and "Tape."

A ktMINE search for "Adhesive" AND "Tape" revealed one result, attached as Appendix B, which also included use of a Mark.

1. Manufacturing/ Process/ Marketing and Service Agreement- Grant the right to utilize the Tessera Patents and Technical Information relating to semiconductor integrated

Ray L. Weber, Esq.
July 10, 2013
Page 12

> circuit ("IC") packaging technology it calls TCC technology along with related IC tape
> design and mounting technology it calls TCMT technology, where said technologies
> include manufacturing processes, package device designs and specifications,
> including design rules and certain other proprietary information and technology
> required to manufacture TCC (Tessera Compliant Chip) packages to make or have
> made Tape (any flexible film circuit starting material that may be made under certain
> of the Tessera Patents, including but not limited to TAB tape, flex-circuit film, and
> substantial equivalents commonly available in the industry) and Convert or have
> Converted such Tape into TCMT (Converted Tape capable of being incorporated into
> the manufacture of a TCC package) for Licensee to package and/or assemble ICs
> into TCC packages and use or sell such TCC packages.  Grant the right to use the
> Marks (the following trademarks: TESSERA BLOCK LOGO, TCC, COMPLIANT
> CHIP, (micro)BGA, Micro BGA and F-(micro)BGA) to identify and distinguish
> Licensee's royalty bearing TCC packages that are sold by Licensee.  <u>Rate $1,200
> per unit</u>

It is my opinion that this agreement is not appropriate or useful as a guideline transaction.

A similar ktMINE search for "Floor" AND "Tape" revealed two results, attached as Appendix C.

1. *Asset Purchase Agreement- Grant the right to acquire all of Seller's rights, title and interest in and to all of the assets and properties of Seller of every kind and description wherever located at the closing date.  <u>Rate 6% Net Sales</u>*
2. *Marketing Agreement- Grant the right to promote, advertise, merchandise, offer for sale, sell, and distribute all MacGregor-branded Products.  <u>Rate 2% Gross Sales that exceed $17 million and 1% Gross Sales that exceed $22 million with a minimum annual royalty of $100,000.</u>*

As indicated above, the first resulting observation is an asset purchase agreement which includes properties of the Seller.   The "tape" mentioned in the full agreement[19] refers to "Scotch Tape" on the asset listing and "floor" refers to things like "floor lamp" and "first floor."

---

[19] The full license agreement was not attached to this report due to its length.

Ray L. Weber, Esq.
July 10, 2013
Page 13

The second resulting observation is a worldwide, multi-exclusivity marketing Trademark Licensing Agreement to promote, advertise, merchandise, offer for sale, sell, and distribute all MacGregor-branded Products.  Of note, amongst the long list of products covered in the full license agreement[22] with the MacGregor name are "floor tape applicator," "marking tapes" and "boundary tapes."

While the Asset Purchase and Trademark agreements do contain keywords that match search criteria, it is my opinion that these agreements are not appropriate or useful as guideline transactions.

## INDUSTRY LICENSES SUMMARY

Based on a review of the above, there were no comparable guideline transactions for the seven agreements within SIC 5099 (*Durable Goods Not Elsewhere Classified*), no agreements whatsoever within SIC 2072 (*Coated and Laminated Paper, Not Elsewhere Classified*[23]), no agreements found for search terms "Aisle" and "Tape," "Marking" and "Tape," "Adhesive" and "Tape," or "Floor" and "Tape."

## INDUSTRY LICENSE CONCLUSION

Under a market approach based on a search of over 14,000 license agreements utilizing these industries and transactions as search criteria, I find no indication that this type of patent is directed to a technology which is licensed in or out.

---

[22] The full license agreement was not attached to this report due to its length.

[23] Establishments primarily engaged in manufacturing coated, laminated, or processed paper and film from purchased paper, except for packaging. Also included are establishments primarily manufacturing gummed paper products **and pressure sensitive tape with backing of any material other than rubber, for any application**. (emphasis added)

Ray L. Weber, Esq.
July 10, 2013
Page 14

## COST APPROACH- INSITE SOLUTIONS

You have informed me that had Insite Solutions felt the '480 patent at issue and subsequent claims made by ShieldMark were valid, they would have been able to introduce an alternative product ("design around") with minimal cost and within a short period of time.   This suggests little value in licensing a patent for this technology.

## INCOME APPROACH

An Income Approach methodology may rely on some sort of analytical or theoretical forecasted profit split amongst the parties.  However with the recent advent of *Uniloc v. Microsoft* and the abolishment of the use of the 25% Rule of Thumb, empirical studies of profit splits and suggested royalty rates will not be used in this analysis.

That notwithstanding, the Market Approach and Cost Approach resulting valuation indicators rely on objective data that is readily available in contrast to the significant use of assumptions and subjectivity inherent in the Income Approach.

## SURVEY DATA STUDY

### *Degnan and Horton Survey[22]*

Stephen A. Degnan and Corwin Horton published a survey of royalty rates sub-setting described bands of rates in an innovativeness scale by "Revolutionary," "Major Improvement," and "Minor Improvement."   Revolutionary is defined as satisfying a long felt need or creating a whole new industry, Major Improvement signifies enhancing quality or product superiority in an existing product, process or service and finally, Minor Improvement creates an incremental

---

[22]   *"A Survey of Licensed Royalties,"* les Nouvelles, June 1997, pages 91 through 96 (data from Table 16).

Ray L. Weber, Esq.
July 10, 2013
Page 15

improvement in an existing product or service.   For the Non-Pharmaceutical Industry, the respective median royalty rates are 5-10%, 3-7% and 1-3%.

Per counsel, it is my understanding that this technology will be at the very highest, classified at the lowest end of a "Minor Improvement" which would result in a suggested royalty of 1% according to the range outline in the study.


## <u>*QUANTITATIVE METHOD CONCLUSION*</u>

The guideline transactions from ktMINE yield no indication that this type of patent deals with a technology which is licensed in or out.

In addition, it is my understanding that the design around costs would be nominal and hold no influence with a potential licensee to take on a license for this technology.

The Degnan Horton survey suggests the lowest bound of "minor" improvement resulting in a royalty rate of 1.0%.

The above data indicate that a range for this technology between 0.0% and 1.0% of net sales with a mid-point of that range of 0.5%.

Ray L. Weber, Esq.
July 10, 2013
Page 16

## QUALITATIVE ANALYSIS

**Georgia-Pacific Factors**

In *Georgia-Pacific Corp. v. United States Plywood Corp.*, the court used fifteen factors, paraphrased here, to determine the type of monetary payments that would compensate for a patent infringement. We discuss these individual factors below and their relative impact on a suggested royalty rate assuming the patent is valid.

1.  **The royalties received by the patentee for the licensing of the patent in suit, providing or tending to prove an established royalty.**

    There are no arms-length, fair market transaction existing for this patent. This factor could have a negative <u>or</u> positive impact on the hypothetical royalty. However, there is one existing license from a patent-in-suit which not only includes the '480 patent, but also a pending application for another patent AND contains a Most Favored Nation clause. I assume this to have a neutral impact as no previous arms-length value for this technology has been established.

2.  **The rates paid by the licensee for the use of other patents comparable to the patent in suit.**

    There are none. This factor would have a downward impact on the hypothetical royalty as this is a product that is not commonly licensed.

Ray L. Weber, Esq.
July 10, 2013
Page 17

3.   **The nature and scope of the license, as exclusive or nonexclusive; or as restricted or nonrestricted in terms of territory or with respect to whom the manufactured product may be sold.**

> A non-exclusive license is less valuable than an exclusive license.  In this case, it is my understanding the hypothetical negotiation between these two companies would have been for a non-exclusive license as there are other licensed users of this technology.   This factor tends to have a downward impact on the hypothetical royalty.

4.   **The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.**

> ShieldMark has licensed the '480 patent at issue as a patent-in-suit with a non-exclusive agreement.   This non-exclusivity suggests a policy of license availability to others.  In addition, ShieldMark has other similar suits based on this patent.  This factor tends to have a downward impact on the hypothetical royalty.

5.   **The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.**

> ShieldMark and Insite Solutions are competitors.  As such, there is both strategic and economic value in withholding a license.   This factor tends to have an upward impact on the hypothetical royalty.

Ray L. Weber, Esq.
July 10, 2013
Page 18

6.  **The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.**

It is my understanding that the sale of this product does not generate appreciable sales of other products.  As such, this factor would tend to have a neutral impact on the hypothetical royalty.

7.  **The duration of the patent and the term of the license.**

This patent expires on or about July 8, 2026.  The remaining life expectancy of the patent from the hypothetical negotiation was long and would have suggested an upward impact on the hypothetical royalty rate from that time.

8.  **The established profitability of the product made under the patent; its commercial success; and its current popularity.**

While the accused products do sell in a highly competitive market with alternatives available, there is no indication that the sales of the accused products are due to the patented features at issue.   This factor tends to have a neutral impact on the hypothetical royalty rate at this time.

9.  **The utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results.**

As there is no indication that the sales of the accused products are due to the patented features at issue, this factor would suggest a neutral impact on the hypothetical royalty rate at that time.

Ray L. Weber, Esq.
July 10, 2013
Page 19

10.  **The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.**

It is my understanding that the patented invention differs little, if at all, from prior adhesive floor tapes used for the same purpose.   Looking at this factor would suggest a downward impact on the hypothetical royalty rate.

11.  **The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.**

While Insite Solutions disagrees with the infringement claims made by ShieldMark, assuming the patent is valid and covers sales made by Insite, this factor would suggest an upward impact on the hypothetical royalty rate.

12.  **The portion of the profit or selling price that may be customary in the particular business or in a comparable business to allow for the use of the invention or analogous inventions.**

This factor was dealt with earlier in the report with the conclusion resulting in a range of the royalty at 0.0% to 1.0% on sales, centered on 0.5%.

Ray L. Weber, Esq.
July 10, 2013
Page 20

13.  **The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.**

It is my understanding that the primary value of Insite Solutions' products are enhancements provided by Insite Solutions and not addressed by the patent (e.g. beveled edges, recessed adhesive area, and easy-to-remove liner) .  Even assuming a valid patent, this factor would tend to result in a negative impact on the hypothetical royalty rate.

14.  **The opinion testimony of qualified experts.**

See conclusion outlined below.

15.  **The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.**

See conclusion outlined below.

Ray L. Weber, Esq.
July 10, 2013
Page 21

## OVERALL RESULTS OF THE QUALITATIVE FACTORS

The conclusion of these factors would be a *downward impact* (five downward impacts, four neutral impacts and three upward impacts) thus supporting a royalty rate below the middle of the range under consideration at the time of the hypothetical negotiation.

## *SUMMARY: REASONABLE ROYALTY*

### Resulting Reasonable Royalty Rate

The quantitative valuation methods suggest the reasonable rate range is between 0.0% and 1.0% of sales, centered at 0.5%. The qualitative factors support a rate below the middle of the range under consideration; say 0.25% of sales. This rate reflects a synthesis of analyses and is in line with a narrow band of consensus-results offering a dependable convergence of indicators.

It is my understanding Insite Solutions does not agree that it has violated the '480 ShieldMark patent. As stated earlier, these conclusions *assume* a finding against Insite Solutions.

These opinions are based upon data and information available as of this time. Receipt of additional data or information may require an update to this report. Finally, if called to testify at trial, I may employ demonstrative exhibits and materials consistent with the foregoing.

Ray L. Weber, Esq.
July 10, 2013
Page 22

**Qualifications**

Attached to this letter report as Appendix D is a summary outlining my qualifications and testimony experience.  I have a Bachelors Degree in Economics (B.A.) and a Masters Degree in Business Administration  (M.B.A.) with dual concentrations in Finance and Business Statistics.  I am also an Accredited Senior Appraiser in Business Valuation from the American Society of Appraisers.  For the last twenty-plus years, my career and work-effort has involved a variety of damage assessment and valuation issues on matters that have included this type of analysis.  I have no publications.

My time is billed at the following rates: $275 per hour for work and analysis performed in or around the office and $300 per hour for deposition and/or courtroom testimony.  As is my standard, the fees and billing are not dependent on the outcome of this matter.

Respectfully submitted,

Constable Consulting, LLC

_____          _____
Alex L. Constable                                        7-10-2013
                                                                   Date